THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINDA VALENTIN,<br>JOEL VALENTIN, and<br>GRACE GABLE MANOIRS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>TOWN OF NATICK, PLANNING BOARD OF THE<br>TOWN OF NATICK, THERESA EVANS in her individual<br>capacity and in her official capacity as planning board<br>member for the Town of Natick, ANDREW MEYER<br>in his individual capacity and in his official capacity as<br>planning board member for the Town of Natick,<br>JULIAN MUNNICH in his individual capacity and in his<br>official capacity as planning board member for the Town<br>of Natick, GLEN GLATER in his individual capacity and<br>in his official capacity as planning board member for<br>the Town of Natick, PETER NOTTONSON in his<br>individual capacity and in his official capacity as planning<br>board member for the Town of Natick, NATICK<br>HISTORICAL COMMISSION, and STEPHEN EVERS,<br>In his individual capacity and in his official capacity as<br>Chair of the Natick Historical Commission,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT AND JURY DEMAND**

## I.    <u>INTRODUCTION</u>

1. Plaintiffs Joel and Linda Valentin (the "Valentins") bring this action against the Town of Natick, the Planning Board of the Town of Natick (the "Board") and five members of the Board, the Natick Historical Commission (the "Commission") and its chair Stephen Evers ("Mr. Evers") (collectively, "Defendants") alleging that—in denying the Valentins' application to develop a condominium project containing affordable housing units—Defendants discriminated against them on the basis of race, color and national origin, in violation of the Fair Housing Act and violated their rights to due process and equal protection under the laws.

2. The Valentins are dark-skinned Haitian immigrants who have called Natick home for more than 30 years. In early 2019, they worked closely with the Board to develop Natick's Historic Preservation Bylaw (the "New Bylaw"), which sought to preserve certain historic properties labeled "smaller estates," by permitting redevelopment in the form of condominium or other multifamily units.

3. The Board sponsored the New Bylaw at the April 2019 Town Meeting, where it was passed almost unanimously. Thereafter, once the Valentins proposed to develop eleven condominium units under the New Bylaw at 50 Pleasant Street in South Natick (two of which would be required to be "deed restricted affordable units" under Natick's mandatory inclusionary zoning ordinance), certain South Natick neighbors began to pressure Defendants—because of the Valentins' race, color and national origin and because of the perceived race, color and national origin of the prospective residents of the Valentins' development—to oppose and ultimately deny the approvals necessary for the Valentins to proceed.

4. Defendants acquiesced in the discriminatory views and motivations of the South Natick neighbors, who alleged the Valentins' development amounted to an "attack on the

suburbs" in the predominantly white South Natick neighborhood (which is encompassed entirely within Census Tract 3823, Natick's richest, whitest Census Tract with the fewest number of multifamily or affordable units).

5. From shortly after August 2019 (when the Valentins first sought a "special permit" under the New Bylaw to develop the condominium units) through the late Fall of 2020 (when Town Meeting repealed the New Bylaw and the Board denied the Valentins' permit), the Board and the other Defendants worked in concert with residents of South Natick to thwart the Valentins' development, because of their race, color and national origin (and those of the prospective residents of the condominium units).

6. Defendants were well aware, throughout this time period, that the Valentins' development fully comported with the requirements of the New Bylaw, and that the only means by which the neighbors could defeat the project was for the Board to delay its approvals long enough to give opponents time to seek a Town Meeting repeal of the New Bylaw, which was effectuated through an unfair process on November 10, 2020.

7. The Board, which had ultimate control over whether the Valentins' project could proceed, consistently acquiesced to the neighbors' discriminatory opposition. As the factual allegations herein demonstrate, the Board was both influenced by, and supportive of, the neighbors' efforts to stop the Valentins' project. Indeed, the Board constructed every conceivable hurdle to the Valentins' project. It scheduled an interminable string of public hearings—29 in all from the Valentins' original application in August 2019 to the Board's final denial in December 2020—which is without precedent in the history of similar developments in Natick. Individual Board members invented ambiguities in the New Bylaw that the Board itself sponsored just a few months earlier at the April 2019 Natick Town Meeting. The Board sought the opinion of

Town Counsel as to those purported ambiguities, only to reject that opinion when it did not serve the Board's purposes in halting the Valentins' development. The Board undertook all of these efforts in order to support the opposition of the South Natick neighbors.

8. At least one member of the Board, Associate Member Susan Kang, recognized the racism that drove the opposition to the Valentins' project, and that fueled the repeal of the New Bylaw. Notably, White individuals in Natick, as well, recognized the racial animus that fueled the opposition to the Valentins' project and made their concerns known to Defendants.

9. Most indicative of its unlawful motivation, the Board facilitated the efforts of the neighbors to repeal the New Bylaw, which the Board had sponsored just months earlier. Members of the Board repeatedly and categorically stated that any repeal would have no impact at all upon the Valentins' application. The Board explained, including in public meetings, that the Valentins' project, as a pending application, would be "grandfathered" in regardless of any repeal.

10. Following the repeal of the New Bylaw on November 10, 2020, the Board then revealed its true colors. Contrary to its repeated representations, including in public meetings, that the repeal would have no impact on the Valentins' project, on December 2, 2020, the Board formally rejected the Valentins' project on the exclusive basis of the New Bylaw's repeal.

II.   **JURISDICTION AND VENUE**

11. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331. 1343, and 2201; and 42 U.S.C. § 3613. The claims alleged here arise under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a

common nucleus of related facts. The Plaintiffs' state law claims form part of the same case or controversy under Article III of the United States Constitution.

12. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because the facts giving rise to the claims occurred within this district. Additionally, the Defendants reside within the District of Massachusetts.

### III.   PARTIES

13. Plaintiff Linda Valentin is of Haitian descent, is dark-skinned, often wears a head covering, and speaks with a thick Haitian or Creole accent. She lives at 8 Nancy Road in, Natick, Massachusetts, and has been a resident of Natick since 1995.

14. Plaintiff Joel Valentin is also of Haitian descent and also has dark skin. He is employed by the Town of Natick as a Network Administrator. He lives at 8 Nancy Road in Natick, Massachusetts, and has been a resident of Natick since 1995.

15. Plaintiff Grace Gable Manoirs, LLC ("Grace Gable") is a Massachusetts Limited Liability Company of which the Valentins are the Managers. At all times, the intention of the Valentins was to transfer to Grace Gable all rights in the Property once they had obtained approval to develop the Property into condominiums. Grace Gable was then to hold and eventually sell the condominiums to be located at the Property.

16. Defendant, Town of Natick ("Natick"), is a body politic that can sue and be sued.

17. Defendant Planning Board (the "Board") is an elected town-wide board. Among other things, it oversees and makes determinations with regard to the approval or denial of special permits consistent with the Natick Zoning Bylaws.

18. Defendant Theresa Evans ("Evans"), is an individual who resides at a domicile unknown to Plaintiff, but known to be within the Town of Natick, Massachusetts. Ms. Evans was chair of the Natick Planning Board at all pertinent times.

19. Defendant Andrew Meyer ("Meyer") is an individual who resides at 31 Prescott Avenue, Town of Natick, Massachusetts. Mr. Meyer is a current member of the Natick Planning Board and was such a clerk member at all pertinent times.

20. Defendant Julian Munnich ("Munnich") is an individual who resides at 310 North Main Street Town of Natick, Massachusetts. Mr. Munnich is a current vice-chair member of the Natick Planning Board and was such a vice-chair member at all pertinent times.

21. Defendant Glen Glater ("Glater"), is an individual who resides at 28 Reynolds Avenue, Town of Natick, Massachusetts. Mr. Glater is a member of the Natick Planning Board and was a member at all pertinent times.

22. Defendant Peter Nottonson ("Nottonson"), is an individual who resides at 11 Parker Court Town of Natick, Massachusetts. Mr. Nottonson is a current member of the Natick Planning Board and was such a member at all pertinent times.

23. Defendant Natick Historical Commission (the "Commission") is a town-wide body of appointed officials by the Select Board of Natick with limited jurisdiction related to the preservation, protection, and development of the places historical and archaeological value in Natick.

24. Defendant Stephen Evers ("Evers"), is an individual who resides at 1 Frost Street, Town of Natick, Massachusetts. Mr. Evers is the Chair of the Commission and was the Chair of the Commission at all pertinent times.

25. Each Defendant who acted or failed to act, as alleged herein, was the actual or apparent agent, employee, manager, or representative of the other Defendants and, in doing the acts or omitting to act as alleged in this Complaint, was acting in the course and scope of his, her, or its actual or apparent authority pursuant to such agencies, or the alleged acts or omissions were subsequently ratified and adopted by the Town or Board as principal.

IV.   **FACTS COMMON TO ALL COUNTS**

26. Natick is a town of approximately 36,050 people located in the western suburbs of the City of Boston, Massachusetts. According to the 2010 Census, the percentage of the population that is White is 85.4%. The percentage of the population that is Black is less than 2.0%.

The Subject Parcel

27. In or about November 2005, the Valentins purchased the real estate located at 50 Pleasant Street, Natick, Massachusetts (the "Property"). At one point, they intended to occupy it as their residence, but subsequently sought to develop the Property for others.

28. The Property is situated in the Residential Single District B (RSB) zoning district and contains 63,256 square feet of land and 549.7 feet of frontage along Pleasant Street.

29. It is located in a neighborhood commonly called South Natick, and is encompassed entirely within Census Tract 3823, which is the Whitest and wealthiest in Natick, and where the Black population constitutes an even smaller share than in Natick as a whole. The median sales price of a home in the district is $821,328, and it has Natick's smallest share of multifamily housing and smallest share of deed-restricted affordable units.

30. The Property is improved with an existing, single-family residential dwelling with a gross floor area of approximately 6,386 square feet according to assessors' records.

31. The Property and surrounding land covering over thirty-four acres was formerly known as White Gables Park. Constructed in or about 1917, the existing residence once sat on 3.4 acres and comprised the main house, a large Victorian barn, a chicken coop, a large stable, carriage house, and garages. Over time, the land comprising White Gables Park was subdivided, and the barn and other structures accessory to the existing residence were lost or demolished. The main house had been one of the oldest buildings in the Town of Natick. It qualified as an "Historic Structure." A true and correct copy of photographs of the Property are attached as **Exhibit <u>A</u>**.

32. In 2007, the Valentins sought a variance to erect an eight (8) foot fence surrounding their property. Neighbors opposed the variance, suggesting that the Valentins could not be from Natick, and had come from outside to "change our neighborhood." Because of this opposition—which was rooted in the perception that they were outsiders because of their skin color and accents and did not belong in South Natick—the Valentins withdrew their request for a variance.

<u>Municipal Boards Involved in The Special Permitting Process</u>

33. Pursuant to Massachusetts General Laws, Natick has the limited power to create zones by usage. M.G.L. c. 40A. Massachusetts law requires that the City adopt a comprehensive plan for the development of large areas and to follow that plan in making zoning decisions regarding particular parcels of land.

34. The Planning Board of Natick (the "Board") is an elected body, the jurisdiction of which includes:

a.  developing plans for future provisions of municipal services and for the development of the entire Town;

b.  approving, modifying, or rejecting proposed subdivision applications;

c.   approving, modifying, or refuting proposed special permit applications for commercial development in the Regional Corridor (RC) and Highway Corridor (HC) Overlay Districts in the environs of Route 9;

d.   endorsing or rejecting applications for "Approval Not Required" plans;

e.   initiating Zoning Bylaw recommendations for Town Meeting action; and

f.   advising Town Meeting on all Zoning Bylaw changes proposed by other entities or persons.

35. The Planning Board has six (6) members, each of whom serves a term of 60 months. This complaint alleges claims against five individual members of the Board.

36. Pursuant to its zoning laws, Natick has designated the Planning Board as the Special Permit Granting Authority with respect to applications for historic preservation special permits.

<u>2014 Historic Preservation Bylaw</u>

37. Section III-J (subsections 1-9) of the Natick Zoning Bylaw, adopted at Fall Town Meeting in October 2014, allows for the enlargement and adaptive reuse of structures by special permit to encourage the preservation and continued use of buildings of historic or architectural significance. Section III-J.1.1 (the "2014 Bylaw").

38. The 2014 Bylaw provides, in relevant part, that the Board as Special Permit Granting Authority "may grant a special permit for re-use, construction, and occupancy of buildings, and structures relating to qualifying buildings…[upon] [u]nanimous vote of the Natick Historical Commission, subsequent to a public hearing, that the building or structure is of historic, architectural or cultural significance." <u>Id.</u> at Section III.J.2.2.

39. The 2014 Bylaw also provides that the Planning Board may grant a special permit to allow for the use of a structure deemed historically significant by the Natick Historical

Commission for multi-family town houses or apartments, including in the RSB single-family residential district.

40. Section III-J.6.4 provides that the Board shall provide copies of any application for historic preservation special permit under Section III-J to the "Advisory Bodies for their recommendation," defined under Section III-J.6.3 to include the Board of Health, the Historical Commission and the Design Review Board ("DRB").

<u>The Natick Planning Board and Natick Town Meeting<br>Enthusiastically Endorse the Historic Preservation Bylaw</u>

41. To expand the opportunity to preserve historic properties beyond what was permitted under the 2014 Bylaw, and promote redevelopment that would simultaneously diversify the types of housing units available in Natick, in early 2019, the Natick Planning Board, via a Town Meeting Warrant Article proposed the New Bylaw, providing for the historic preservation of certain properties which were not within the scope of existing historic preservation zoning provisions.

42. As proposed to Town Meeting, the New Bylaw provided:

Historic Preservation: Smaller Estates.

The [Board] may, at its sole discretion, consider an alternative preservation option for certain parcels that exceed the minimum lot size of the underlying zone by at least 20% but not more than 100%, and have a documented history of single ownership comprising houses, outbuildings, and supporting land or woods. For such projects the following criteria shall apply.

- Number of Dwelling Units. The maximum number of dwelling units allowed shall equal the net useable land area of the parcel divided by 6,000 square feet, rounded to the nearest whole number.
- New construction shall be of design and materials contemporaneous with the structure being preserved, or replicate documented previous structures that had existed on the site.
- New construction shall not exceed the greater of:
  - i. For design and materials contemporaneous with the structure being preserved; 100 percent of the interior habitable floor area or above

10

grade gross volume of the historic building. This shall exclude aspects of construction that pertain to components required for code compliance, of the existing historic building, for access and egress, such as stairs and elevators, or

    ii. For replication of documented previous structures, 200 percent of the interior habitable floor area or above grade gross volume of the historic building.

- The [Floor Area Ratio] of the interior habitable floor area shall not exceed 0.50.
- All parking, areas of active use, play areas, communal gathering areas, and storage; whether in buildings, accessory structures, or outdoor; shall be subject to the district's setbacks as shown in Table IV – B.
- The [Board] shall seek input and review of the proposal from the Natick Historical Commission.
- Unless specifically modified in this subsection 10, all the preceding criteria and standards of Section III-J shall apply.
- Notwithstanding the foregoing and in order to encourage the preservation of structures on larger historic estates, in the event a project consists of more land than 100% of the minimum lot size of the underlying zoning and the remaining land would otherwise qualify for a cluster project or conventional subdivision elsewhere under the Bylaw, the total of the land owned (including the parcel created to qualify under this Section 10) shall be counted and included in the calculation of the amount of land needed to qualify under the cluster or subdivision regulations of the Bylaw.

(Art. 24, Spring A.T.M 4/9/19).

43. The proposal was then sent for debate to the annual Town Meeting in the normal and customary course of business.

44. At Town Meeting, on April 25, 2019 then-Board Chair Theresa Evans spoke on behalf of the proposed New Bylaw. She explained on the floor of the Town Meeting that the proposed amendment as drafted provided the Board with needed "clarity" and "direction" to enable the Board "to fairly and equitably apply the bylaw to projects around the town." Transcript of April 25, 2019 Town Meeting, at 2–3.[1] Ms. Evans further explained that the proposed New Bylaw included safeguards ensuring that any proposed project would complement

---

[1] An addendum of the relevant excerpts of the transcripts of Town Meeting and Board meetings referred to herein are collected in chronological order at **Exhibit B**.

and protect the surrounding neighborhood, including through limitation of floor area ratio ("FAR"). Ms. Evans further stated that the Board discussed the New Bylaw "a great deal at Planning Board meetings." Id.

45. The New Bylaw expressly provided for the redevelopment of "Smaller Estates" in every neighborhood in Natick, into multifamily housing, such as the condominium development the Valentins later proposed.

46. Particularly relevant here, Ms. Evans stated as an example that the Valentins sought to restore a previously existing historic barn believed to have been lost in a fire that could not have been accomplished under the 2014 Bylaw without the proposed amendment. Id. at 5.

47. Town Meeting overwhelmingly passed the New Bylaw as proposed by the Planning Board on April 25, 2019 by a vote of 96 in favor, 4 against, and 3 abstentions. The New Bylaw was memorialized as Section III-J.10.

48. The New Bylaw permits two categories of new construction: i) new construction of design and materials contemporaneous with the existing structure being preserved; and ii) new construction which replicates a documented previous structure.

<u>The Valentins Apply for Permits</u>

49. On August 28, 2019, with the assistance of attorney George Richards, the Valentins submitted an application for a special permit and site plan approval under the New Bylaw (the "First Application").

50. The Valentins proposed to renovate the existing house at the Property with additions, and construct a new reproduction barn and carriage house, with all parking underground. Consistent with the New Bylaw's development guidelines, the Valentins originally proposed to

develop eleven residential condominium units: five in the restored existing house, five in the reproduction barn, and one in the carriage house, as well as other site improvements.

51. As originally proposed, the Valentins' project fully complied with all dimensional requirements, including as to setbacks, height, building coverage, parking spaces, and especially as to the number of units and FAR as allowed under the New Bylaw.

<u>The Board, Natick Historical Commission and Design Review Board</u>
<u>Receive the Application Favorably</u>

52. In the summer of 2019, the Valentins' architects embarked on creating plans and scheduled their first hearing with the planning board in August of 2019.

53. Consistent with Ms. Evans's reference to the Valentins' intention to develop the Property during the April 25, 2019 Town Meeting, Defendants initially received the project favorably. For example, at the August 7, 2019 hearing of the Planning Board, Ted Fields, Senior Planner of the Community & Economic Development stated that "the design review board and most of the historic commission had a preliminary review of the proposal on July 18th… both boards were encouraged by the plan as presented because the main house will be preserved and restored its original details…and the barn will be recreated." Transcript of Aug. 7, 2019 Board Meeting, at 6.

54. On July 16, 2018, the Natick Historical Commission ("NHC") determined by unanimous vote that the Property is of "architectural significance" under the New Bylaw. Indeed, by letter dated September 9, 2019 the NHC and Design Review Board ("DRB") wrote to the Board that, following a detailed review, the "NHC believes the proposed project will have great benefit to our local historic character and architecture by the preservation of the house and development of the reproduced buildings on the site." A true and correct copy of that letter is attached here as **<u>Exhibit C</u>**. Beyond fulfilling the preservation objective, the Valentins' proposed

13

condominium development also addressed the fact—recognized in its Comprehensive Master Plan, *Natick 2030*—that "a diverse housing stock is still needed to support both existing and future residents." Natick 2030+ Master Plan, Chapter 2, Goals and Recommendations, R.2.2., at p. 2.30, available at https://www.natickma.gov/DocumentCenter/View/7884/Chapter2-Goals-and-Recommendations (last visited May 17, 2021).

55. Under the New Bylaw, the NHC's and DRB's respective roles relate solely to reviewing the architectural design of the proposed project, not to assessing any of the sizing or massing considerations that are exclusively within the Board's jurisdiction. Indeed, by letter dated November 14, 2019 to the Board after the NHC and DRB jointly met to review revised site plans, Chair of the NHC Steve Evers ("Mr. Evers") explained that "Both NHC and DRB made it clear to several neighbors in attendance that the size, density of units, parking requirements, vehicle access, etc. are under the jurisdiction of the Planning Board…our role is to recommend the appropriateness of the architectural character of the existing house and any new construction that is permitted." A true and correct copy of that letter is attached here as **Exhibit D**.

56. The proposed project was objectively tasteful and unobtrusive and, in its presentation, complied with all of relevant municipal procedures.

<u>South Natick Neighbors Campaign Against the Valentins' Project</u>

57. Upon learning about the First Application, several South Natick neighbors began a concerted effort to turn the Board and other Town entities against the Valentins' condominium development. Some of the neighbors launched an opposition website, at www.stop50pleasant.org, which is still active. Notably, however, the comments section of the website, which had included a number of racist comments directed at the Valentins and their proposed, has been deleted.

58. The neighbors—assuming that because the Valentins are people of color and intended to develop condominium units under the New Bylaw, approval of the development would lead to an influx of people of color into the neighborhood—subjected the Valentins and their land development team to a unique and unprecedented level of hostility.

59. One neighbor wrote a letter questioning the Valentins' ability to finance the development. Another insinuated that the Valentins were not taxpayers. A third questioned whether the Valentins were intelligent enough to carry out the development, asserting that they had to be coached by others. A fourth went so far as to question whether the Valentins were "monkeying around" or manipulating the Bylaw. A fifth described the Valentins' efforts to develop the Property as an "attack on South Natick."

 In Response to Pressure from Neighbors, the Board Undermines the Valentins' Proposed Project

60. Throughout its consideration of the Valentins' development proposal, the Board knew and recognized that the First Application complied with all requirements of the Bylaw.

61. However, once it realized the vehemence of the neighbors' opposition, the Board abandoned its support for the New Bylaw and the Valentins' development proposal. Thereafter, it coordinated with the neighbors to stymie the Valentins' efforts at every turn, thus adopting or acquiescing to the neighbors' discriminatory views. In service of the neighbors' effort to prevent the Valentins' development, the Board molded the review of the Valentins' application under the New Bylaw to delay, obfuscate, and frustrate the Valentins' efforts until the neighbors could succeed in repealing the New Bylaw.

62. Defendant members of the Board, including the Chair, adopted or acquiesced in these discriminatory views that the Valentins' development presented a threat to the character or integrity of the neighborhood.

15

63. The Board initially responded to the virulent opposition of the South Natick neighbors by informing the Valentins that it would not approve the proposed project without a substantial revision of the plans. To satisfy the Board's request, and despite complying with the requirements of the New Bylaw, in the Fall of 2019 the Valentins eliminated the carriage house from the project design and reduced the proposal to contain just ten condominium units in two buildings. They hoped that their prompt compliance with the Board's suggestion would ensure the approval of their application.

<u>The Planning Board Disingenuously Claims Not to Understand Its Bylaw</u>

64. When the Valentins returned to present their revised plans at the November 20, 2019 public hearing of the Board, however, the South Natick opposition, motivated by racial animus, returned in force as well, and spoke out vocally against the Valentins' project.

65. During the November 20, 2019 public hearing of the Board, the Valentins' architect presented the revised project of ten condominium units, six units in the main house and four units in the barn. The carriage house was removed from the proposal.

66. In response to continuing opposition from the South Natick neighbors attending the November 20 hearing, the Board again changed course. This time, in response to the opposition, the Board claimed—less than seven months since Ms. Evans described the New Bylaw *which the Board wrote and sponsored at Town Meeting* as a model of "clarity"—that the New Bylaw was unclear in several respects. Transcript of Nov. 20, 2019 Board meeting, at 12–14, 23–25, 32–35. The Board then sought a legal opinion from Town Counsel about how to interpret the New Bylaw. There is just one inference to be drawn from the Board member's claim that the New Bylaw was unclear: they hoped to find an ostensible basis for denying the Valentins' application.

<u>Town Counsel Issues An Opinion;</u>
<u>Natick Instantly Rejects It</u>

67. By letter of December 19, 2019, Town Counsel Karis North provided a well-reasoned

legal opinion reaffirming the clarity of the New Bylaw and explaining that the Valentins'

condominium proposal comported with the New Bylaw. A true and correct copy of Town

Counsel's December 19, 2019 letter is attached here as **Exhibit E**. Town Counsel opined that:

- Section III-J.10 authorized replication of the entire barn even though a portion of
  the barn may have occupied land subsequently conveyed to a different owner
  only after the barn had been destroyed.

- Section III-J.10 authorized both forms of the new construction as part of the
  same project: i) new construction of design and materials contemporaneous with
  the structure being preserved; and ii) new construction to replicate a documented
  previously existing structure. Relatedly, Town Counsel opined that different size
  limits applied to the different categories of new construction: i) up to 100 percent
  for design and materials contemporaneous with the existing structure being
  preserved; and ii) up to 200 percent for replication of a documented previously
  existing structure, as clearly defined in Section III-J.10.3.

- The term "habitable" applied only to the calculation of interior floor area, and
  not the calculation of above-grade gross volume.

<u>Id.</u>

68. Notwithstanding the sound reasoning of Town Counsel's opinion, the Board

disregarded that opinion and continued to interpret the New Bylaw contrary to its plain text and

meaning, and in a manner to severely and unlawfully stymie the Valentins' development.

69. Indeed, following a lengthy discussion of the provisions on which Town Counsel had

opined, at the January 15, 2020 public hearing, the Board Chair strongly suggested the Valentins

withdraw their application without prejudice. Transcript of Jan. 15, 2020 Board meeting, at 27.

The Valentins reasonably understood that suggestion to mean that the Board would deny the

First Application if the Valentins did not comply. Reasonably believing they had no other option

by which to obtain Board approval, the Valentins agreed to do so.

<u>Plaintiffs Decide to Proceed with Condominiums in the Face of Continued Delay</u>

70. On or about February 24, 2020, the Valentins renewed their application for Historic Preservation Special Permit and Site Plan Approval under the New Bylaw (the "Second Application"). The Second Application called for six units in the restored existing house, and four units in the reproduction barn, with underground parking and other site improvements.

71. By that time, the South Natick neighbors had embarked upon a campaign to repeal the New Bylaw entirely, seeking to ensure that the Valentins would never be able to develop the Property.

72. In an effort to delay a decision on the Second Application until the repeal could be decided at Town Meeting, the Board scheduled a remarkable *17* public hearings on the Valentins' new application, stretching from April 1, 2020 until December 16, 2020, to permit the South Natick neighbors to voice their racially motivated opposition to the Valentins' proposed project while time marched on towards the Fall 2020 Town Meeting and the ultimate repeal effort.

73. At all times during these eight months, the Board knew that the Valentins' Second Application complied with the New Bylaw. Notably, during the entirety of the time that the Valentins sought to develop the Property, the Board held 29 hearing and 14 working group meetings.

74. Throughout these public hearings, and other work sessions, Board members named as Defendants were influenced by the racially-tinged opposition of the South Natick neighbors and used their official positions to frustrate the Valentins' development of the Property. The Board consistently invited and allowed every neighbor to speak, and often repeated and adopted the

neighbors' complaints and criticism. Worse yet, individual Board members continued to insist that they did not know how to interpret or apply the New Bylaw, and departed from historic practice by refusing to give Valentins constructive guidance or direction with respect to what proposal would fit within the parameters of the New Bylaw, even though the project as proposed fully conformed with all dimensional requirements.

<u>The Board Interprets the Bylaw Contrary to its Plain Meaning<br>and the Interpretation of Town Counsel</u>

75. Near the outset of the Board's 17 public hearings regarding the Second Application, on April 22, 2020, the Board for the first time—about eight months after the Valentins' First Application—declared two new interpretations of the New Bylaw that radically reduced the allowable new construction by the Valentins.

76. First, the Board claimed that the phrase "historic building" in the New Bylaw referred solely to an *existing* historic structure to be preserved despite the fact that the New Bylaw at Section III-J.10.3.b provides "[f]or replication of documented previous structures" like the barn on the Property.

77. Second, and contrary to Town Counsel's December 19, 2019 opinion set out above, the Board found that the New Bylaw applied a single size limitation for all new construction, rather than separate limits on each of two types of new construction— i) new construction of design and materials contemporaneous with the structure being preserved; and ii) new construction to replicate a documented previously existing structure—set out in the New Bylaw.

78. These interpretive rulings—made for the first time more than eight months after the Valentins filed the First Application, and in response to the opposition of South Natick neighbors—reduced the allowable new construction by one-third and forced the Valentins to

substantially revise their plans in a manner plainly inconsistent with the language and purpose of the New Bylaw.

79. Contrary to the plain language of the New Bylaw and the legal opinion of Town Counsel, on May 6, 2020, the Board further limited the scope of the Valentins' development by reducing the gross volume of the proposed barn replication to the portion that is situated on the land currently owned by the Valentins. Town Counsel had previously determined that the New Bylaw authorized the Valentins to replicate the entire barn structure on the present-day site.

80. In the summer of 2020, at least one member of the Board, Mr. Meyer, recognized that contrary to the Board's ultimate actions described above everyone on the Board knew how to interpret the New Bylaw, and specifically that the Board knew the New Bylaw allowed the developer to add 100% to the structure that needs to be preserve and 200% to a replication. Mr. Meyer noted in particular that, where Chair Evans had previously claimed that the replication in the Valentins project included a cupola, that anyone who said the replication referred to a cupola is lying.

81. During the June 3, 2020 public hearing, the Board noted that the Building Commissioner had certified the architects' volumetric calculations and methodology. Nonetheless, the Board continued to question the calculations and required that certain elements included within the calculation be omitted, further restricting the Valentins' development opportunity contrary to the plain language of Section III-J.10 of the New Bylaw. The public record reflects that the Board did not impose such restrictions on, or challenge the calculations made by, the only other developer to apply for and obtain a special permit under Section III-J to preserve and redevelop the historic Sacred Heart Church located at 26/28 Eliot Street, a single

family residential district, into multiple dwelling units described in greater detail in ¶¶ 115-119, below (the "Church Project").

82. On or about August 12, 2020 the Planning Board voted to deny the Second Application without prejudice.

<u>Recognition of the Racial Animus Infecting the Board's Decisions</u>

83. One of the members of the Board, Associate Board Member Susan Kang, did recognize the discriminatory process that was unfolding throughout the Board's evaluation of the Valentins' project.

84. By way of limited example only, in the July 22, 2020 Planning Board meeting, Ms. Kang said she was "concerned about what the neighbors have said." July 22, 2020 Transcript of Planning Board, at 10–11. She said she "would ask people to reflect very carefully before they use comments like, detrimental to the character of the neighborhood. Um, if, if they examine any conscience and have any doubt as to the actual source of the meaning of those words, I would ask people to think very carefully." <u>Id.</u>

85. Multiple other white individuals in Natick also recognized the racism undergirding the South Natick neighbors' opposition to the Valentins' proposed project. True and correct copies of correspondence expressing the concerns of such individuals are attached here as **Exhibit F**.

<u>In Response to the Board's Pressure,
the Valentins Cut Down their Plans Again</u>

86. In October 2020, the Valentins again submitted revised plans, consistent with their willingness to cooperate with the suggestions and the demands of the Board, even in the face of a radically unfair process.

87. The Valentins reduced the total number of units to seven by reducing the number of units in the existing house from eight to five. The Valentins also eliminated the proposed underground parking, which the Board and abutters disfavored, and instead proposed individual garages for each unit. Based on the revised plans, the Valentins had reduced the overall massing and scale of the Project by approximately one-third, from 11 units to seven units, from three buildings to two buildings, and from an allowed 31,628 square feet to approximately 21,751 square feet, resulting in an FAR of 0.34, well below the FAR of 0.5 specifically provided in the New Bylaw.

88. Throughout its consideration of the Valentins' development plans, the Board knew and recognized that those plans complied with the requirements of the New Bylaw. Indeed, having eliminated the proposed underground parking, and having reduced the number of units and massing of the buildings yet again far below what was authorized for the lot under Section III-J.10, the Second Application was well within the bounds of the New Bylaw.

89. On many occasions throughout this process, Linda Valentin implored the Board for guidance as to how the Project could move forward under the New Bylaw. Departing from its historic practice of providing such guidance on request to applicants, the Board gave no direction or guidance to the Valentins and continued the matter yet again.

### The Chair of the Natick Historic Commissioner
### Actively Coordinates with South Natick Opponents

90. While the Board's acquiescence in the discriminatory opposition of the South Natick neighbors became clear through the many actions of the Board described above, other arms of the Natick town government went so far as to explicitly coordinate with and support the South Natick neighbors in writing.

91. For example, the Chair of the Natick Historic Commission, Mr. Evers, repeatedly corresponded with the neighbors who opposed the Valentins' project on many occasions. He expressed agreement with their views, and even actively repeated their positions to the Planning Board members. True and correct copies of Mr. Evers's emails with the South Natick neighbors discussing their joint opposition to the Valentins' project is are attached here as **Exhibit G**.

92. Mr. Evers went so far as to lobby the Planning Board on behalf of the neighbors, arguing that the project was still "too big." A true and correct copy of the December 1, 2019 letter forwarding this argument is attached here as **Exhibit H**. Incredibly, he did this despite the fact that the New Bylaw designates the Planning Board, and not the Natick Historic Commission, as having the exclusive responsibility for determining the appropriateness of the massing and scaling of the project. Through Mr. Evers, the Commission went so far as to write a letter to Town Meeting endorsing the repeal of the New Bylaw. A true and correct copy of that letter is attached here as **Exhibit I**.

During the Pendency of the Second Application, Defendants Consistently Represented That Any Repeal Would Have No Impact on the Valentins' Development

93. As part of its cooperation with the racially motivated opposition to the Valentins' development of the Property, Defendants repeatedly misrepresented to the Valentins that any repeal of the New Bylaw would have no impact upon the Second Application.

94. Indeed, though the Board would ultimately, on December 2, 2020, deny the Valentins' application on the basis of the repeal of the New Bylaw, it represented at least twice during previous public hearings that any repeal would not impact the Valentins' project whatsoever.

95. During the September 9, 2020 public hearing, Chair Evans stated: "I think it's important to note both for Articles 13 [proposing a repeal of the New Bylaw] and 14, is that any

change to this bylaw . . . does not adversely affect any active application that is before this Board.. .it would affect any application that is proposed after the advertising of the public hearing for these Articles." Transcript of Sept. 9, 2020 Board Hearing, at 4–5. The Valentins' new application was submitted on February 24, 2020, long before any such advertising for the November 10, 2020 Town Meeting.

96. During the October 21, 2020 public hearing, Board Chair Evans again confirmed that any change or repeal of the New Bylaw at Town Meeting would have no effect on the Board's review and approval of the Valentins' Application. Transcript of October 21, 2020 Planning Board Meeting, at 38. Ms. Evans was categorical; in response to Linda Valentin's question of whether a repeal would impact the proposed project Ms. Evans stated that the repeal "would have . . . It would not adversely affect this project." Id.

97. Ms. Evans's representations on this point echo previous representations by Town officials.  Notably, on February 25, 2020, the day after submitting the new application, Linda Valentin asked James Freas, Director, Community & Economic Development, to seek an opinion from Town Counsel whether the application under the New Bylaw would be "grandfathered" in the event of any repeal of the New Bylaw, such that the Board could still approve it under New Bylaw. On February 26, 2020, Mr. Freas confirmed—based on advice he obtained from Town Counsel—that the Valentins' Application "received before the date of first notice of the pending zoning change is considered under the existing zoning." A true and correct copy of that email chain is attached here as **Exhibit J**.

<u>Town Meeting Votes to Repeal the New Bylaw After Board Withholds Vote on Approval of the
Second Application</u>

98. On November 4, 2020, just six days before the Town Meeting vote on repeal of the
New Bylaw, the Board voted to approve the massing, scale and layout of the Valentins' project.
In so doing, the Board necessarily concluded that the Valentins' development was "not
substantially more detrimental to abutting properties and neighborhood," an essential criterion
under the New Bylaw.

99. Nevertheless, rather than moving to a discussion and vote of whether to grant the
special permit—or a special permit conditioned upon subsequent approvals, as had been the case
for a number of other developments that had come before it, including the Church Project—the
Board elected to continue the matter for yet another hearing, scheduled for ***just after*** the Town
Meeting vote on whether to repeal the Bylaw.

100. The Valentins agreed to the continuance because the Town officials had assured
them that any repeal of the New Bylaw would not affect their application.

101. Prior to the November 10, 2020, Town Meeting, the Town Moderator cautioned the
Valentins to focus their comments at the hearing strictly on the scope of the at-issue Articles. A
true and correct copy of the email chain between the Valentins and the Town Moderator
preceding Town Meeting is attached here as **<u>Exhibit K</u>**.

102. The Town Moderator nevertheless allowed the proponents of the repeal to describe
and criticize the Valentins' project at length, and did not interrupt or direct them to focus solely
on the language of the New Bylaw and the warrant article seeking its repeal. Indeed, while the
repeal proponents did not refer to the Valentins by name (or their development by address or
location), they displayed what purported to be plans and diagrams for Property throughout their

presentation, and made it clear that they sought repeal because the Valentins had sought to develop a condominium project with some affordable units pursuant to the New Bylaw.

103. By prohibiting the Valentins from advocating on behalf of their project but permitting the proponents of the repeal of the New Bylaw to frame their position on repeal almost exclusively in the context of the Valentins' discrete development at 50 Pleasant Street, the Town Moderator unfairly biased the deliberation process against the Valentins, as they were prohibited from rebutting the arguments of the proponents of repealing the New Bylaw.

104. Town Meeting voted to repeal the New Bylaw on November 10, 2020.

<u>The Board Denies the Valentins' Second Application</u>
<u>Solely on the Basis of the Repeal</u>

105. On December 2, 2020 the Board denied the Valentins' Second Application exclusively on the basis that Town Meeting had repealed the New Bylaw.

106. The Board did not purport to exercise any discretion it may have had in denying the Valentins' Second Application.

107. In denying the Second Application on the basis of the New Bylaw's repeal, the Board entirely reversed course from its previous statements that any repeal of the New Bylaw would have no impact upon its consideration of the Valentins' project.

108. During the December 2, 2020 public hearing, Board Chair Evans read into the record, verbatim, certain excerpts of a legal opinion from Town Counsel, and claimed that opinion prohibited the Board from considering the Valentins' Second Application on account of the New Bylaw.  To date, Defendants have refused to produce a full copy of that legal opinion to the Valentins.

109. By publicly revealing the substance of Town Counsel's opinion, Defendants have waived any claim of privilege. By withholding a copy of the opinion on which they justified

denial of the Second Application, Defendants have further deprived the Valentins of due process of law.

<u>Defendants Subjected the Valentins to Disparate and Discriminatory Treatment</u>

110. The process to which the Board and Town Meeting subjected the Valentins was unlike any other to which a special permit applicant has ever been subjected in Natick.

111. On information and belief, over the past decade, Natick has not denied a permit for any condominium project, large or small. Each of those projects has been sponsored by white applicants.

112. In the face of the first such application by persons of color, neighbors motivated by racial animus strongly opposed the project and the Board acquiesced to that unlawful motivation, erected serial barriers to the Valentins' development, and "ran out the clock" in service of the neighbors' discriminatory objectives.

113. The Board has never before engaged in the above-described process—including delaying the decision on pending applications, seeking and then rejecting the opinion of Town Counsel as to the interpretation of the Bylaw, and misrepresenting that any repeal would have no impact upon a pending application—to facilitate the denial of a project. Indeed, on information and belief, the Board has approved every condominium project applied for in Natick in the past ten years with the exception of the Valentins' proposed project.

114. The only reasonable inference to be drawn from the above-described events is that the Board at all relevant times supported the efforts of the South Natick neighbors to repeal the Bylaw and undertook all of the above-described actions in service of seeking to have the Bylaw repealed in order to reject the Valentins' Second Application.

115. The clearest comparator to the Valentins' proposed project, in both the First and Second Applications, is the Church Project, an historic preservation proposal to convert a former Catholic church at 19 and 26/28 Eliot Street in Natick into a mixed-use project including seven condominium units which would not have included any deed-restricted units on-site.

116. That application was submitted under the 2014 Bylaw, its development team was composed of White individuals, and the Board granted its approval in less than six months. That matter also involved an application for a special permit and was located within a similar zoning district (RSA) to the Valentins' Property.

117. The sponsor of the Church Project was Randy Johnson, who is the chairman of the Affordable Housing Trust Fund board and an architect in Natick.

118. In contrast to the Valentins' development proposal, the Board (including at least four members who also deliberated over the Valentins' application) held only 10 public hearings (some of which were necessary because the proposal was amended to double the size of the development after the initial application was filed), as compared with 29 for the Valentins' project over a period of 16 months.

119. In contrast to the Valentins' proposal—where the Board repeatedly demanded multiple plan submissions, including multiple three-dimensional drawings—the Board approved the Church Project based on Mr. Johnson's hand-drawn plans. Finally, the Board expedited its approval of the Church Project, and permitted it to submit detailed drawings and to secure ancillary approvals thereafter. In the case of the Valentins, the Board pointedly limited its November 4, 2020, approvals to massing and scaling, but did not grant them a special permit and delayed doing so until after Town Meeting repealed the New Bylaw. The independent factors

distinguishing the two projects are the race of the developers, the inclusion of deed-restricted affordable units and the existence of racially motivated neighborhood opposition.

## INJURY TO PLAINTIFFS

120. As a direct and proximate result of Defendants' discriminatory acts described above, Plaintiffs have suffered, and continue to suffer, irreparable loss and injury, including, but not limited to, economic losses, injury to reputation, humiliation, emotional distress, loss of housing opportunities, and the deprivation of their housing and civil rights.

121. Through the actions described above, Defendants have engaged and continue to engage in discrimination on the basis of race, color and national origin, in violation of the Fair Housing Act and the equal protection and due process rights of the Valentins.

122. Defendants have acted or failed to act with deliberate indifference. They have known that their acts and omissions create a substantial likelihood of harm to Plaintiffs' federally protected rights, and they failed to prevent that likelihood.

123. There now exists an actual controversy between the parties regarding Defendants' duties under federal civil rights laws. Accordingly, Plaintiffs are entitled to declaratory relief.

124. Unless enjoined, Defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination and unlawful conduct described above.

125. Through their actions described above, Defendants have acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing and non-discrimination laws.

126. Plaintiffs have no adequate remedy at law. They are now suffering and will continue to suffer irreparable injury from Defendants' acts and unlawful conduct unless relief is provided by this Court. Plaintiffs are thus entitled to preliminary and permanent injunctive relief.

## CAUSES OF ACTION

## COUNT I

### Unlawful Discrimination Under the Fair Housing Act, 42 U.S.C. § 3601 et seq.
### (All Plaintiffs against All Defendants)

127. Plaintiffs reallege and incorporate by reference paragraphs 1-126 above, as if fully set forth herein.

128. By the actions described above, Defendants have violated, and/or continue to violate, the rights of Plaintiffs, under the federal Fair Housing Act, 42 U.S.C. §3601 *et seq.* and implementing regulations, by:

(a)      Making unavailable or denying dwellings to persons because of race, color, and national origin, in violation of 42 U.S.C. § 3604(a) and implementing regulations; and

(b)      Discriminating on the basis of race, color and national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(b) and implementing regulations.

(c)      Coercing, intimidating or interfering with the Valentins' efforts to exercise or enjoy their rights to be free of discrimination on the basis of race, color or national origin, in violation of 42 U.S.C. § 3617 and implementing regulations.

129. By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against the Valentins due to their race, or the racial composition of their neighborhood, in violation of the Fair Housing Act.

130. The past and continuing acts and conduct of the individual Defendants, described above, were and are intentional, and have been carried out with malice and/or reckless indifference to the federally protected rights of Plaintiffs.

131. Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to Plaintiffs.

**COUNT II**
**Violation of 42 U.S.C § 1983 – Equal Protection**
**(All Plaintiffs against All Defendants)**

132. Plaintiffs reallege and incorporate by reference paragraphs 1-131 above, as if fully set forth herein.

133. The Fourteenth Amendment to the U.S. Constitution and the Massachusetts Declaration of Rights further guarantee that Plaintiffs be afforded the equal protection of the laws, which prohibit Defendants from treating Plaintiffs, in the exercise of their rights, differently than similarly situated persons and entities absent a compelling state interest, or even a substantial relation to an important or significant government purpose or a rational basis.

134. As people of color, the Valentins are members of a suspect class. As a result of the Valentins' race, Defendants treated the Valentins in a manner which they have never treated other developers who have applied for special permits in Natick. The Defendants have never subjected any similarly situated individual or entity applying for a permit to the species of process to which they subjected the Plaintiffs as a mechanism to ensuring that the neighbors of South Natick succeeded in repealing the New Bylaw in order to prevent the "attack" of people of color upon their neighborhood. Indeed, the myriad obstacles which the Defendants erected to prevent Plaintiffs from obtaining their special permit to develop their Property were intended to, and ultimately did, facilitate the unlawful and unconstitutional repeal of the New Bylaw to provide a purported basis for the Board to deny the Valentins' Second Application.

135. There is no rational basis, and certainly no compelling state interest, that can justify the Defendants' actions as described above, which led to the Board's denial of the Second Application.

136. The Defendants in this action have, with discriminatory intent or purpose, adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a policy, pattern, practice, or custom of violating the clearly established equal protection rights of the Plaintiffs.

137. The Defendants' conduct demonstrates their deliberate indifference to the violation of Plaintiffs' constitutional rights to equal protection.

138. As a direct and proximate result of the Defendants' violations of 42 U.S.C. § 1983, and as alleged in detail above, the Plaintiffs have suffered harm including, without limitation, the violation of their constitutional rights and further the income Plaintiffs would have earned through the development of the Property.

## COUNT III
### Violation of 42 U.S.C § 1983 – Substantive Due Process
### (All Plaintiffs Against All Defendants)

139. Plaintiffs reallege and incorporate by reference paragraphs 1-138 above, as if fully set forth herein.

140. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits deprivations of life, liberty, or property without fundamental fairness through governmental conduct that offends the community's sense of justice, decency, and fair play.  Substantive due process also prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.

141. The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a policy, pattern, practice, or custom of violating the

clearly established due process rights of the Plaintiffs, including, without limitation, by acquiescing the racially-motivated campaign of the South Natick neighbors to repeal the New Bylaw in order to prevent the Valentins as people of color from developing their Property.

142. Each of the Defendants knew or should have known that their conduct as described above was unlawful and unconstitutional. Their encouragement, condonation, or acquiescence to the use of the permitting application process to delay and manipulate the Plaintiffs' ability to obtain a special permit to develop their Property in order that the racist effort to repeal the New Bylaw constitutes gross negligence amounting to deliberate indifference to the constitutional rights of the Plaintiffs. Indeed, Defendants' course of conduct as described above reflects the clear intent of each to deprive Plaintiffs of their constitutional rights.

143. As a direct and proximate result of the Defendants' violations of 42 U.S.C. § 1983, and as alleged in detail above, the Plaintiffs have suffered harm including, without limitation, the violation of their constitutional rights and further the income Plaintiffs would have earned through the development of the Property.

## COUNT IV
### Violation of 42 U.S.C § 1983 – Procedural Due Process
### (All Plaintiffs Against All Defendants)

144. Plaintiffs reallege and incorporate by reference paragraphs 1-143 above, as if fully set forth herein.

145. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits deprivations of life, liberty, or property without adequate procedural safeguard, and protects the right to a fair hearing.

146. Defendants' acts as described above deprived the Plaintiffs of the right to develop the Property. Notably, the Board in ultimately denying the Second Application did not purport to

rely upon its discretion, but instead relied solely upon the repeal of the New Bylaw, which it facilitated in acquiescence to the racist campaign of the Valentins' neighbors. Indeed, the Board manipulated the entire application process to seek to ensure that the Valentins would not receive the permit to develop the Property consistent with the New Bylaw.

147. Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the Valentins by manipulating the permit application process to permit the repeal of the New Bylaw, even while they assured the Valentins that the repeal would have no impact upon the Second Application whatsoever.

148. The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a policy, pattern, practice, or custom of violating the clearly established due process rights of the Plaintiffs, including, without limitation, by acquiescing the racially-motivated campaign of the South Natick neighbors to repeal the New Bylaw in order to prevent the Valentins as people of color from developing their Property.

149. Each of the Defendants knew or should have known that their conduct as described above was unlawful and unconstitutional. Their encouragement, condonation, or acquiescence to the use of the permitting application process to delay and manipulate the Plaintiffs' ability to obtain a special permit to develop their Property in order that the racist effort to repeal the New Bylaw constitutes gross negligence amounting to deliberate indifference to the constitutional rights of the Plaintiffs. Indeed, the course of conduct described above reflects the intent of each of the Defendants to deprive the Plaintiffs of their constitutional rights.

150. As a direct and proximate result of the Defendants' violations of 42 U.S.C. § 1983, and as alleged in detail above, the Plaintiffs have suffered harm including, without limitation, the

violation of their constitutional rights and further the income Plaintiffs would have earned

through the development of the Property.

### COUNT V
**Violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H & 11I**
**(Plaintiffs Against Theresa Evans, Glen Glater, Andrew Meyer, Julian Munich, Peter**
**Nottonson, and Stephen Evers, each in his or her individual capacities)**

151. Plaintiffs reallege and incorporate by reference paragraphs 1-150 above, as if fully

set forth herein.

152. The Defendants interfered by threats, intimidation, or coercion, or attempted to

interfere by threats, intimidation, or coercion, with Plaintiffs' exercise or enjoyment of clearly

established rights secured by the constitution or laws of the United States or of rights secured by

the constitution or laws of the Commonwealth, including their procedural and substantive due

process rights, and their right to equal protection of the laws.

153. The Defendants' conduct also interfered with Plaintiffs' exercise or enjoyment of

other clearly established Federal and State rights as alleged in this Complaint.

154. At all relevant times, Defendants Theresa Evans, Glen Glater, Andrew Meyer, Julian

Munich, Peter Nottonson, and Stephen Evers were acted within the scope of their positions with

the Town of Natick.

155. As a direct and proximate result of the Defendants' violation of the Massachusetts

Civil Rights Act, Plaintiffs have suffered harm.

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A. Enter judgment in favor of Plaintiffs, and against Defendants, on all counts of the
Complaint;

B. Enter a declaratory judgment that the actions of Defendants complained of herein
are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 et
seq., the Equal Protection Clause of the U.S. Constitution, the Due Process Clause

of the U.S. Constitution, and Sections 11H and 11I of the Massachusetts Civil
Rights Act;

C.  Enter a declaratory judgment that Article 13 of the 2020 Natick Town Meeting
violates the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 et seq., the
Equal Protection Clause of the U.S. Constitution, the Due Process Clause of the
U.S. Constitution, and Sections 11H and 11I of the Massachusetts Civil Rights
Act and is therefore void and unenforceable;

D.  Enjoin Defendants, their agents, employees, representatives, and successors, or
any other person acting directly or indirectly with them from unlawfully
interfering with Plaintiffs' development and from taking any further action that
would hinder, delay or obstruct the Plaintiff's development of the Property, and
directing Defendants to take all affirmative steps necessary to remedy the effects
of the illegal, discriminatory conduct described herein and to prevent similar
occurrences in the future, including, but not limited to, approving Plaintiffs'
application for the development of their Property and issuing all permits
necessary for them to proceed with construction of the Property;

E.  Issue a writ of mandamus ordering the Defendants to approve Plaintiffs'
application for the development of the Property and issue all permits necessary for
them to proceed with construction of the Property under the New Bylaw that was
in place at the time of their application in August 2019;

F.  Award compensatory damages in an amount to be determined by the jury that
would fully compensate Plaintiffs for the loss that has been caused by the conduct
of Defendants alleged herein;

G.  Award punitive damages to Plaintiffs in an amount to be determined by the jury
that would punish Defendants for their willful, wanton, and reckless conduct
alleged herein and that would effectively deter Defendants from engaging in
similar conduct in the future;

H.  Award to Plaintiff and the Class their attorneys' fees, costs, and interest as
permitted by law; and

I.  Grant such further and other relief as may be just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS AND ISSUES SO
TRIABLE.**

Respectfully submitted,
LINDA and JOEL VALENTIN,

By their attorneys,

*/s/ Howard M. Cooper*
Howard M. Cooper (BBO # 543842)
Benjamin J. Wish (BBO # 672743)
Tara Dunn (BBO # 699329)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.coms
bwish@toddweld.com
tdunn@toddweld.com

Michael Allen
*Pro hac vice application pending to be filed
imminently*
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C.
20036
mallen@relmanlaw.com
202.728.1888 ext. 603

Dated:  May 19, 2021