THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LINDA VALENTIN, JOEL VALENTIN, and GRACE GABLE MANOIRS, LLC

Plaintiffs,

v.

TOWN OF NATICK, *et al.*,

Defendants.

C.A. No. 1:21-cv-10830-PBS
Leave to File Granted on August 26, 2021

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

This is a case of invidious discrimination, in which Defendants' decision-making was infected by antipathy towards Linda and Joel Valentin, a Black couple of Haitian origin seeking to develop property in a predominately white, suburban neighborhood. That infection resulted in the violation of their rights under the federal Fair Housing Act and the U.S. Constitution's promises of equal protection and due process. The Valentins have met their obligation at the pleading stage to set forth plausible claims by alleging facts and not mere conclusions. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Valentins allege no mere garden variety denial on the merits of a special permit application, and no mere exercise of discretion that resulted in a denial of development rights. Rather, they allege Defendants responded to discriminatory neighborhood opposition by manipulating the review process long enough to permit the repeal of the operative zoning bylaw. Once that had been accomplished, the Planning Board announced that it had no discretion to exercise, and it denied the Valentins' permit on the sole ground that the bylaw had been repealed.

This is the quintessential case where the Court need not be wary of enforcing civil rights and constitutional protections in the land use context. The Valentins have alleged that Defendants, without a permissible basis, intentionally treated them differently from similarly situated applicants because of their race, color and national origin. The Complaint adequately alleges that Defendants' actions were motivated by malicious or bad faith intent to injure the Valentins and identifies comparators that are sufficiently similar at the pleadings stage to withstand a motion to dismiss.

**BACKGROUND**

As detailed in the Complaint, Linda and Joel Valentin and their single-purpose LLC (collectively, "the Valentins") sought to preserve their historic property in South Natick—pursuant to a 2019 historic preservation zoning bylaw (the "New Bylaw")—by developing condominium units, some of which would be required to be affordable under the Town's inclusionary housing requirements. A handful of influential South Natick neighbors sought to derail the development because they feared an influx of people of color into the neighborhood if the condominium units were approved under the New Bylaw. *See* Complaint, ECF No. 1 ("Compl."), ¶¶ 44, 53, 57, 58. Their communications ranged from coded language that the suburbs were being "attack[ed]," to racial epithets such as the Valentins were "monkeying around" to manipulate the New Bylaw, and racially-coded insinuations that the Valentins lacked the intelligence or finances to carry out the project, and whether they were even taxpayers. *See* Compl., ¶ 59.

Once it realized the vehemence of the neighbors' opposition to the Valentins' development proposal, the Planning Board ("Board") withdrew its support for the New Bylaw and for that proposal. Compl., ¶ 61. In service to the neighbors' efforts to prevent the

development, the Board molded the review of the Valentins' application under the New Bylaw to delay, obfuscate, and frustrate the Valentins' efforts. Compl., ¶ 61. The Board repeatedly pushed the Valentins to downsize the project, applying a shifting, amorphous standard about whether it would be "detrimental to the neighborhood." In short, Defendants conspired to delay approval of the Valentins' special permit until the opponents could secure the repeal of the New Bylaw.

The troublesome, racially charged discussions surrounding the Valentins and their development did not go unnoticed. One of the members of the Board, Associate Board Member Susan Kang expressed her concern "about what the neighbors have said" questioning the "actual source of the meaning of [their] words" with respect to the accusations that the project will be "detrimental to the character of the neighborhood." Compl., ¶¶ 83-84. Several other individuals in Natick also expressed their concern to the Board about the racism undergirding the neighbors' opposition. Compl., ¶ 85; Exh. F. But individual Defendants adopted or acquiesced in these discriminatory views and lobbied the Board on behalf of the neighbors. Compl., ¶¶ 62, 92.

With racial animus undergirding the review and application process, it did not matter how many times the Valentins were given the opportunity to speak at the hearings. At the moment when "being heard" was most critical—the November 10, 2020, Town Meeting where repeal of took place—the Town Moderator forbade the Valentins from discussing the positive elements of their development while permitting opponents to couch their strident opposition exclusively in the context of the Valentins' proposal. Compl., ¶¶ 101-104. In the end, the "process" accorded the Valentins was hollow, and they were deprived of the "opportunity to be heard… at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Defendants' vacuous justifications for drawing out the approval process is perhaps the most convincing evidence that the ultimate rejection of the Valentins' project was largely

pretextual. For example, just a few months after the Board and the Valentins spent countless hours and resources working together to draft the New Bylaw, the Board disingenuously claimed that it did not understand the terms of its own New Bylaw. Compl., ¶¶ 66, 76, 115-117. Eight months after the Valentins submitted their project, the Board limited the scope of New Bylaw by essentially redefining terms in Section III-J.10.3.b. Compl., ¶¶ 76, 78, 79. In doing so, the Board ignored the clear and cogent opinion and recommendation of Town Counsel who had previously determined that the New Bylaw authorized the Valentins' updated model to replicate a historical barn structure on the property in the dimensions they proposed. *See* Compl., ¶ 79.

## LEGAL STANDARD

To survive a motion under Fed. R. Civ. P. 12(b)(6), the Valentins are required only to allege sufficient facts that make each of their claims "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). They must simply plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021). Review is limited to the contents of the complaint, with narrow exceptions. *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

## ARGUMENT

### I. THE VALENTINS HAVE PLAUSIBLY ALLEGED VIOLATIONS OF THE FAIR HOUSING ACT BY ALL DEFENDANTS

The Valentins have alleged facts sufficient to plausibly support their claims that Defendants violated 42 U.S.C. §§ 3604 and 3617 of the Fair Housing Act ("FHA"). The former section prohibits actions which "make unavailable or deny, a dwelling to any person because of race, color . . . or national origin." This section applies to a wide range of discriminatory actions,

including permit denials. *See Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*, 988 F.2d 252, 257 n.6 (1st Cir. 1993) ("The phrase 'otherwise make unavailable or deny' encompasses a wide array of housing practices . . . and specifically targets the discriminatory use of zoning laws . . . ."). Section 3617 makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section . . . 3604." *Id.* The term interference has been interpreted as a matter of plain text to mean "the act of meddling in or hampering an activity or process." *Revok v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113–14 (3d Cir. 2017) (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001)).

Defendants' contentions that the Complaint fails to allege sufficient facts and that Defendants Evers is entitled to First Amendment immunity, MTD at 6–7, completely ignore many of the Valentins' allegations with respect to discriminatory treatment and interference with rights protected by the FHA and improperly attempt to insert facts outside the complaint.

A. The Valentins have plausibly alleged violations of 42 U.S.C. § 3604

To sustain their claim at the pleading stage that Defendants treated them differently on account of their race, color, and national origin (and those of the prospective residents of the units the Valentins proposed to develop), the Valentins have plausibly alleged they are: (1) members of a protected class; (2) applied for a permit and was qualified to receive it; (3) the permit was denied despite their being qualified; and (4) the defendants approved the same type of permit for a similarly situated party during a period relatively near the time plaintiff was denied her permit. *Pina v. Town of Plympton*, 529 F. Supp. 2d 151, 156 (D. Mass. 2007); *see also Macone v. Town of Wakefield,* 277 F.3d 1, 5 (1st Cir. 2002).

The Valentins have adequately alleged all the necessary components of a disparate treatment claim. The allegation that they are "dark-skinned Haitians," Compl., ¶ 2, is sufficient

to identify membership in three protected classes: race, color, and national origin. The Valentins applied for permits under the New Bylaw several times and were denied or constructively denied each time despite conforming their applications precisely to the bylaw's specifications. *Id.*, ¶¶ 51, 63, 73, 82, 88, 93–96. Finally, the Sacred Heart Church project ("Church Project")—a development proposed by a white Natick resident, and which did not propose any affordable housing units—received approval for a very similar permit under a related zoning bylaw without any of the delays and hurdles to approval faced by the Valentins.[1] *Id.*, ¶¶ 115–19. This difference in treatment raises an inference of discrimination because the Valentins' race, color and national origin were the only meaningful differentiating factors between the two projects, as was the perceived race, color, and national origin of prospective residents. *Id.*, ¶¶ 3, 5, 58, 102.

Defendants contend that the Church Project is not similarly situated to the Valentins' proposal, but the only differences they cite are either irrelevant or pretextual. First, they seek to insert factual material in support of their motion which does not appear in the complaint, making it inappropriate for this court's consideration. MTD at 10–11. Even if the facts could be considered, they do not undermine the allegation that the projects are substantially similar. While it may be technically correct to say that the projects made use of different bylaws, both bylaws are aimed at historic preservation and both allow for multifamily (e.g., apartment or condominium) developments. Compl., ¶¶ 37, 39, 42, 45. Indeed, the Board sponsored the New Bylaw, section III.J.10, to expand the incentives for preservation through conversion to multifamily status contained in section III.J.7 of the 2014 Bylaw. *Id.*, ¶ 41. Defendants suggest the relative sizes and surroundings of the projects make a difference, but the alleged facts

[1] Defendants simply ignore that this comparator evidence forms a sufficient basis for the Valentins' FHA claim, treating it as only relevant to the equal protection claim. As catalogued below, the complaint contains a wealth of allegations independently supporting their FHA claim.

strongly suggest the Board intended and understood the New Bylaw to provide for larger, multifamily developments in residential areas throughout the Town—including South Natick—and did not intend different standards for parcels located in the "village," and the "residential, and almost rural" portions of Natick. *See* MTD at 11. In sponsoring the New Bylaw, the Board made clear that the bylaw's dimensional requirements would protect and complement *any* surrounding neighborhood. Compl., ¶ 44. Defendants concede that the Valentins' proposal was within the size limitations of the relevant bylaw, as was the Church Project. *See* MTD at 10–11. The complaint plausibly alleges that any reference to the projects' size or location as rendering them not similarly situated is pretextual and that other differences are inconsequential.[2]

Defendants are also wrong to suggest that the Valentins have not cleared the bar of plausibility on their disparate treatment claim. *See* MTD at 6. Even if the alleged comparator evidence did not plausibly satisfy the elements of a disparate treatment claim, Defendants ignore the mountain of alleged facts providing additional evidence of discrimination. Compl., ¶¶ 4, 7, 61, 62, 90, 112, 136, 141. It is a violation of Section 3604 to acquiesce in community opposition motivated by discriminatory animus, which is exactly what the Valentins have alleged. *Ass'n of Relatives & Friends of AIDS Patients v. Reguls. & Permits Admin.* (*A.R.P.E.*), 740 F. Supp. 95, 104 (D.P.R. 1990) ("[I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."); *accord LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Tsombanidis v. City of Westhaven*, 129 F. Supp. 2d 136, 152 (D. Conn. 2001); *Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*, 257 F. Supp. 2d 208, 227 (D.D.C. 2003).

---

[2] For this reason, *Clark v. Boscher* is inapposite—the court in that case reasoned that the city may have had genuine policy preferences explaining its differential treatment of the comparators. 514 F.3d 107, 114 (1st Cir. 2008).

Defendants are wrong that "Plaintiffs do not site [sic] a single statement, a single incident, or a single act, of a single member of the Planning Board" showing that Defendants acquiesced in discriminatory community opposition. MTD at 6. In fact, the complaint is replete with such facts. First, Defendants were aware of the community members' discriminatory views, which were evidenced by racialized comments concerning the Valentins' intelligence and status as taxpayers, and were publicized repeatedly, including on a website. Compl., ¶¶ 57–59. At least one Defendant actively collaborated with community members holding these views, amplifying those views himself by advocating for them to the Board and Town Meeting. *Id.*, ¶¶ 91–92, Ex. G, H, I; *see A.R.P.E.*, 740 F. Supp. at 105 (finding significant that "local opposition was duly noted by A.R.P.E. decisionmakers" and that the defendant zoning board "received pressure from political leaders who themselves expressed concern over public opposition"). Additionally, a member of the Planning Board, Susan Kang, recognized and called out the influence of discriminatory community views on the Board during a public hearing, an observation echoed by several other community members involved. Compl., ¶¶ 83–85; Ex. F.

Defendants' change of heart in the face of community opposition to the Valentins' proposal is also reasonably inferred from the Board's sudden reversal on the merits of that proposal and its feigned confusion about the language and scope of the New Bylaw, which occurred in close proximity to the onset of community opposition. *Id.*, ¶ 61. *See Cutting v. Muzzey*, 724 F.2d 259, 260–61 (1st Cir. 1984) (denying motion to dismiss where planning board "changed its position to impose more burdensome conditions on plaintiff than on others.")

After reviewing the Valentins' initial application (which proposed 11 condominium units), the Natick Historical Commission ("NHC") opined that the project would be a "great benefit to [Natick's] local historic character," and the preliminary discussions of the project were

favorable. Compl., ¶ 53–54. Indeed, the project met all dimensional specifications under the New Bylaw, a bylaw Evans specifically stated was clear and would protect the surrounding neighborhoods. *Id.*, ¶¶ 44, 51. However, after learning of the opposition of certain South Natick neighbors, the Board took repeated action to hamper the application's progress, often contradicting itself in the process. Among other things, the Board asked the Valentins to revise the first proposal by substantially reducing the project's size, expressed newfound doubt about how to apply the New Bylaw despite having previously lauded its clarity and referred to the project as an example of the bylaw's future application, and scheduled an unprecedented number of public hearings on the project, suggesting a real concern with community views on it. *Id.*, ¶¶ 7, 44, 46, 63, 66, 73; *see A.R.P.E.*, 740 F. Supp. at 105 (stated grounds for a permit denial were first addressed in the denial decision, supporting inference that the "late blooming concern" was "less than genuine").

Defendants also deviated from established procedure throughout their handling of the Valentins' proposals, supporting an inference that they acted upon the community's discriminatory views. *See Jackson v. Okaloosa County*, 21 F.3d 1531, 1542 n.18 (11th Cir. 1994) (finding procedural deviation undertaken "in response to white citizens' protests" supported FHA claim because "deviations from the procedural norm of local government provide evidence of the discriminatory nature of the challenged process."). For instance, Defendants rejected the expert legal advice of Town Counsel, who unequivocally opined that there was no ambiguity concerning the terms of the New Bylaw and that the Valentins' proposal fit within its parameters. Contrary to its practice, the Board also questioned the Building Commissioner's approval of volumetric calculations in the Valentins' proposal. Compl., ⁋ 66–68, 81; *see Avenue 6E Invs. v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) ("A city's decision to disregard the zoning

advice of its own experts can provide evidence of discriminatory intent….”). Additionally, after approving the Valentins' proposal for a smaller development, the Board took the procedurally unusual step of reserving a decision on the Valentins' final permit until after the Town Meeting vote on repealing the New Bylaw. Compl., ⁋ 99; *see Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (novel procedure allowing community to express its views through an opinion poll "immediately after expressions of racial opposition to the building of public housing units surfaced" evinced discriminatory intent).

B. The Valentins have plausibly alleged violations of 42 U.S.C. § 3617

To state a claim under Section 3617, a plaintiff must plead facts to show: "(1) the plaintiff is a member of an FHA-protected class; (2) the plaintiff exercised a right protected by §§ 3603–06 of the FHA, or aided others in exercising such rights; (3) the defendants' conduct was at least partially motivated by intentional discrimination; and (4) the defendants' conduct constituted coercion, intimidation, threat, or interference on account of having exercised, aided, or encouraged others in exercising a right protected by the FHA." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham* (*SMOC*), 752 F. Supp. 2d 85, 95 (D. Mass. 2010). The first and third elements are duplicative of the 3604 claim and are addressed above. The second element is satisfied by the fact that the Valentins sought to make use of a permitting process free of discrimination, a right they were denied by Defendants. Only the fourth element is in dispute, as Defendants assert none of the Valentins' allegations show that "the Natick Planning Board or Mr. Evers took any actions against the Valentins which constitute coercion, intimidation, threats, or interference with their efforts to cite and construct the Project." MTD at 7.

Defendants' actions in preventing the Valentins from obtaining a permit amount to interference with their FHA-protected rights. "[I]nterference encompasses more than physical

force or intimidation." *SMOC,* 752 F. Supp. 2d at 104. where Defendants were in charge of the permitting process, actions taken by those "in a position directly to disrupt the exercise or enjoyment of a protected right" are liable under Section 3617 for doing so with discriminatory intent. *Mich. Prot. & Advoc. Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994).

Utilizing their authority, Defendants took myriad actions to get in the way of the Valentins' project. They obstructed the process by scheduling 29 public hearings in which they invited and allowed every neighbor to speak, by falsely claiming uncertainty about the Bylaw's scope, and by refusing to expedite the project's final approval, giving the community adequate time to repeal the Bylaw. Compl., ¶¶ 6, 61, 72–74, 113, 119, 142, 155. They manipulated and frustrated the process by heaping abnormal procedural burdens on the Valentins,[3] rejecting town counsel's opinion, and ultimately denying the Valentins' proposals even though they complied with all specifications in the New Bylaw. Compl., ¶¶ 51, 63, 67, 68, 73, 82, 119, 142.

All of these actions constitute the kind of "meddling" that courts have found rises to the level of interference. *See Walker,* 272 F.3d at 1129 (finding interference based on, *inter alia*, city's denial of a contract to a fair housing organization and intensified supervision); *SMOC*, 2008 WL 4595369, at *13 (D. Mass. Sept. 30, 2008) (finding interference where defendants insisted on revisiting legal questions which were settled by town counsel and building commissioner and otherwise worked to make permitting process onerous).

The consummate example of interference with the Valentins' rights under the FHA was the repeated assurance by Town officials that a repeal of the New Bylaw would not impact the Valentins' proposal, and the reversal of that position once the New Bylaw had been repealed.

[3] These burdens include requiring multiple sets of three-dimensional plan drawings, refusing to give Plaintiffs guidance on how to improve the proposal, second-guessing volumetric calculations approved by the Building Commissioner, and selectively enforcing restrictions on the scope of debate at Town Meeting against Plaintiffs but not the New Bylaw's opposition. Compl. ¶ 81, 89, 101–03.

Compl., ¶¶ 93–97, 107, 108, Ex. J. Relying on these assurances, the Valentins allowed the Board to delay their final permit approval but would have objected had they had any inkling concerning this misrepresentation. *Id.*, ¶¶ 99, 100; *Gourlay v. Forest Lake Ests. Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003)( "interference" refers to conduct which has "the effect of causing a protected person to abandon the exercise of his or her housing rights") (vacated on other grounds).[4]

Defendant Evers and the NHC interfered with the Valentins' rights by pressing the Board to deny their application and the Town Meeting to repeal the New Bylaw. Compl., ¶¶ 91–93. This conduct is similar to that of the Board of Selectmen in *SMOC*, which engaged in its own lobbying campaign to increase the procedural burden on the plaintiff in that case. Explaining why such lobbying constitutes interference, Judge Woodlock wrote: "Section 3617 does not require that the actors have official or sanctioned authority over the housing-related decisions; but it does require that they have the power or position to influence, upset, or delay the process." *SMOC*, 752 F. Supp. 2d at 105. Judge Woodlock found that the Board of Selectmen had influence by virtue of their position as the "primary executive decision-maker in the Town," irrespective of their lack of direct involvement in the permitting process. *Id.* at 104. Evers and the NHC are designated as advisors in the review process under the New Bylaw, giving them direct influence, if not authority, over granting or denying proposals. Compl., ¶ 42. By utilizing that influence to oppose the Valentins' project—even where they were not meant to have any formal role—Evers and the NHC interfered with their rights.

[4] Because all of the foregoing actions described in this subsection were taken by the Planning Board as a collective body, the Board members were all involved in and responsible for the interference alleged. *Cf. SMOC*, 2008 WL 4595369, at *13 (dismissing Section 3617 claim against Town Manager because no facts were providing making plausible his involvement in the obstructing activities allegedly undertaken by Town Meeting Members).

Defendants cite to out-of-Circuit precedent in support of their contention that Evers is entitled to First Amendment immunity from Section 3617 liability, MTD at 7, but ignore persuasive precedent from this District. Judge Woodlock addressed this precise question in *SMOC*, finding it highly relevant that the lobbying in question was undertaken by town officials rather than private citizens. *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 112 (D. Mass. 2010) ("*Noerr–Pennington* doctrine does not apply to government activities."). Defendants in that case did not enjoy First Amendment protection because they "used their positions of authority to manipulate the treatment of [plaintiff's] permit applications." *Id.* Evers's advocacy represents similar manipulation. In an email to the Board, he wrote that the NHC planned to "oppose" various features of the Valentins' proposal, language suggesting an official action making use of official channels as opposed to an expression of opinion to a public body. Compl., Ex. H. Similarly, in stating its support in March 2020 for repeal of the New Bylaw, the NHC wrote that its "review" of the bylaw revealed that "many terms are misleading and misinterpreted," suggesting the NHC had conducted an official analysis of the bylaw and offered an expert opinion on the merits of repeal. *Id.*, Ex. I. This is particularly troubling, because it occurred nearly three months after Town Counsel had authoritatively opined that the language and purpose of the New Bylaw were clear and that the Valentins' proposal was well within the dimensional requirements of the New Bylaw. *Id.*, Ex. E. These actions by Evers go well beyond political speech and cross the line into official manipulation of process.

Finally, the First Amendment does not protect speech which is made to accomplish unlawful ends. *SMOC*, 2008 WL 4595369, at *13–19; *R.I. Seekonk Holdings, LLC v. Hines*, 425 F. Supp. 3d 37, 45 (D. Mass. 2019). The Valentins have alleged facts supporting the inference that Evers and the NHC reversed its opinion on the White Gables project in reaction to

discriminatory community opposition. Thus, they have plausibly alleged that Evers advocated against their project for the unlawful purpose of preventing the development of housing by and for families of color, making First Amendment immunity unavailable.

## II. THE VALENTINS HAVE STATED A CLAIM FOR A SECTION 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE

In an attempt to dispose of the Valentins' equal protection claim, Defendants ignore the foundational allegations of the Complaint: in service of the racial animus of the South Natick opposition, Defendants undertook a determined campaign to manipulate the permitting process long enough to facilitate a repeal of the New Bylaw. Compl., ¶¶ 5-7, 142, 146, 147, 149. Contrary to Defendants' intentional misreading of the Complaint, the Board's eventual denial of the application was no garden-variety exercise of discretion. It never purported to apply the considerations under the New Bylaw to decide whether to approve the Valentins' application. Rather, it did everything in its power to enable the opposition's goal to keep the Valentins from developing their property. Knowing there was no basis to deny the application, Defendants manipulated the permit application process via misrepresentations, delay, and obfuscation ***to avoid a decision on the merits*** until the repeal of the New Bylaw succeeded. Taking the allegations of the Complaint as true and giving the Valentins the benefit of appropriate inferences, there is no basis upon which to dismiss the Valentins' equal protection claim.

### A. Defendants' Justifications for Differential Treatment of the Valentins Cannot Withstand Strict Scrutiny

Whether the Court sees this as a classic equal protection claim or as a "class of one," the standard of review to be applied is strict scrutiny. It is black-letter law that equal protection prohibits discrimination based on race, national origin, or ethnicity and courts subject discrimination on those bases to strict scrutiny, which requires a "compelling governmental

interest and narrow tailoring." *Mass. v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 8-9 (1st Cir. 2012); *Commonwealth v. King*, 374 Mass. 5, 21 (1977); *see also Finch v. C'wealth Health Ins. Connector Auth.*, 459 Mass. 655, 672 (2011). Defendants do not seek to—and cannot—overcome this high hurdle. There can be no compelling government interest in subjecting the Valentins to unique speed bumps and roadblocks that had never been applied to similarly situated applicants. This is especially so when the objective was to eradicate the ordinance under which the applicant is able to seek a Special Permit in the first place, and when no other similar bylaw had ever been repealed. Compl., ¶¶ 113, 134.

The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). To establish a violation, the Valentins must prove that (1) they were selectively treated, as compared with others similarly situated; and (2) such selective treatment stemmed from "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen of Town of Randolph,* 878 F.2d 16, 21 (1st Cir. 1989).

Because of the Valentins' race and national origin, Defendants leveraged their control over the permit application and review process to facilitate the New Bylaw's repeal. Indeed, the Complaint alleges with great specificity the myriad respects in which Defendants worked with the South Natick opposition to keep the Valentins from converting their property into condominiums because of the opposition's racial animus towards the Valentins. Compl., ¶¶ 5, 9, 61, 90, 113, 134, 146. The extent to which racism catalyzed Defendants' treatment of the

Valentins was clear to anyone who cared to pay attention: a member of the Board recognized as much, as did multiple white Natick residents. *Id.* ¶¶ 8, 83, 84, 85. No other applicant seeking to construct condominiums in Natick has ever experienced such a manipulation of the process. In fact, every applicant in the past ten years has had a normal, by-the-book process, and has been approved. Compl., ¶¶ 111, 113.

The Valentins do not merely "assume" that the Board shares the views of the South Natick opposition. MTD at 8. At the pleading stage, their allegations that the Board cooperated and acquiesced in the racially motivated opposition of the neighbors is more than sufficient, particularly where those allegations are supported by details about the Board's reversal of treatment of the Valentins' application as well as the many ways in which the Board burdened the Valentins with a Kafkaesque process. Compl., ¶¶ 4, 7, 62, 90, 112, 136. Despite initially treating the application favorably, the Board reacted to community opposition by (i) repeatedly and categorically misrepresenting that any repeal of the New Bylaw would have no impact at all upon the Valentins' application, only to eventually reject the application on the basis of the repeal, *id.* at ¶¶ 95-97, 100; (ii) manufacturing disputes about invented "ambiguities" in the New Bylaw and then rejecting the opinion of Town Counsel because it favored the Valentins, *id.* at ¶¶ 7, 66-68, 77, 79, 113; and (iii) delaying the review of the Valentins' application to allow Town Meeting to vote on the repeal of the New Bylaw before the Board reached a final decision on the application. *Id.* at ¶¶ 6, 61, 72, 119.

Defendants attach some talismanic value to the claim that none of them made a "racist comment" or used any "code words" to signal a discriminatory mindset. MTD at 2, 6, 12. But the federal courts have long recognized that "clever men may easily conceal their motivations…." *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974). The

absence of overt racist proclamations does not diminish the Valentins' equal protection claims especially where, as here, the Complaint clearly alleges Defendants undertook a concrete course of conduct that did far more damage to the Valentins than a racist email or statement could. Compl., ¶¶ 5, 9, 79, 87, 104, 120-126. It is simply not the law that public officials who refrain from the use of racial epithets have a free pass to engage in racial discrimination.

B. The Valentins State a Claim for a Class-of-One Equal Protection Clause Claim

Class-of-one claims under the Equal Protection Clause typically apply where a plaintiff is not a member of a protected class, as the Valentins clearly are. But even under class-of-one analysis, Defendants' conduct—as alleged in the Complaint—cannot be squared with the equal protection guarantees of the Fourteenth Amendment.

As distinct from claims based upon injury to a group of individuals, the Supreme Court has recognized class-of-one claims in cases involving "the government's regulation of property" and held that there is "a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008*); see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (per curiam) (class-of-one challenge allowed as to municipality's requirement of an abnormally long easement); *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176–77 (11th Cir. 2018) (discussing a class-of-one claim against a zoning ordinance); *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006) (applying class-of-one analysis to a challenge of a zoning ordinance).

Such a claim exists where "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. To prevail on a class-of-one claim, a plaintiff must also show that the "selective treatment" was a product of "impermissible considerations

such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen of Town of Randolph*, 878 F.2d 16, 21 (1st Cir. 1989). "Generally, whether parties are similarly situated is a fact-intensive inquiry," such that disposition on a motion to dismiss is improper. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

The leading "class of one" equal protection case in the First Circuit is *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008). There, the Court of Appeals reversed a trial court's dismissal of a condominium developer's equal protection claim where it found the developer adequately to have alleged that it had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 34. The *SBT* Court held that—at the pleadings stage—a plaintiff must adequately "allege facts indicating that, 'compared with other similarly situated, [she] was selectively treated … based on impermissible considerations . . . .' " *Id.* (quoting *Rubinovitz v. Rogato,* 60 F. 3d 906, 901 (1st Cir. 1995). In assessing whether entities are similarly situated, the First Circuit directs trial courts to ask "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* (quoting in *Barrington Cove Ltd. Partnership v. Rhode Island Housing & Mortgage Finance Corp.,* 246 F.3d 1, 8 (1st Cir.2001)).

Where, as here, the Valentins' allege that the differential treatment is based on race, color, and national origin, Compl., ¶¶ 1, 3, 5, 121, 128, the Court is required to apply heightened scrutiny to Defendants' claims of justification. The Valentins identified several condominium developments as comparators. Compl., ¶¶ 111, 113, 115-119. None of these was subjected to the prolonged Board process the Valentins went through before the Board denied their application. The application closest in time is the so-called Church Project in which a White

developer sought to build a similar number of condominium units roughly one-half mile from the Valentins' property, in a similar zoning district under a similar historic preservation Bylaw. It secured an approval from the Board within five months, with much less onerous submission requirements and with a fraction of the public hearings to which the Valentins were subjected. The viability of the Church Project was never threatened by the repeal of the applicable Bylaw.

The cases on which Defendants rely highlight that the Valentins' class-of-one equal protection claim is highly plausible. Each describes a situation in which a plaintiff claimed that a zoning board had exercised its discretion to deny a special permit where it had granted such a permit to similarly situated comparators. Here, by contrast, the Board did not exercise any discretion; it knew that there was no basis to deny the Valentins' application so instead of approving it the Defendants worked together to undermine the New Bylaw. For example, in *Burns v. Town of Palm Beach*, upon which Defendants rely, the Eleventh Circuit found that a class-of-one claim failed because the defendant-board exercised its discretion to deny a special permit for a mansion and defendant failed to identify a "similarly situated" comparator because those proffered comparators were not similar in "all relevant respects." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1352 (11th Cir. 2021). Defendants' reliance on *Aponte-Torres v. Univ. Of Puerto Rico*, 445 F.3d 50, 53 (1st Cir. 2006), is also misplaced because those plaintiffs alleged no facts related to alleged disparate treatment at all, claiming only that the defendant-employer treated them differently because of so-called "suspicious" files. *Id.*

The Valentins allege far more than the plaintiffs in the cases upon which Defendants rely. They do not merely claim that Defendants acted "suspiciously" as in *Aponte-Torres,* or that the Board exercised its discretion in a manner that was inconsistent with its treatment of other applicants, as in *Burns*. Rather, the Valentins allege that Defendants took the only course of

action available to appease the opposition by delaying the process until the New Bylaw could be repealed. The Board did so by manipulating the application process, making misrepresentations to the Valentins and rejecting the opinion of Town Counsel.

The Valentins allege that they were treated unfavorably as compared to every other applicant for a condominium special permit in Natick over at least the past ten years, each of which was "similarly situated" in all material respects. Compl., ¶¶ 111, 113. Each sought a special permit and each was entitled to a fair process. Defendants had no rational basis upon which to have denied the Valentins that same ordinary process leading to a decision on whether to approve the application on its merits. Rather, the only logical inference is exactly the opposite.

## III. THE VALENTINS HAVE ADEQUATELY PLED A PROCEDURAL DUE PROCESS CLAIM

In seeking to dismiss the Valentins' procedural due process claim, Defendants ignore the proverbial elephant in the room: the allegations of racial and ethnic discrimination, looming in the background of each of the Valentins' claims. The focus in such a claim is not whether Defendants checked off the boxes by holding literal hearings and casting literal votes; rather, the Court must inquire whether the process afforded to the Valentins was "adequate" and "fair." *See Licari v. Ferruzzi*, 22 F.3d 344, 347 (1st Cir.1994); *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 30 (1st Cir.1991) (overruled on other grounds). Here, far from affording the Valentins a meaningful opportunity to be heard, the Board weaponized the meetings to both amplify the voices of the Natick opposition and fatally delay a decision on the Valentins' project. Holding meetings does not, in and of itself, represent any meaningful process. The Board cannot sanitize the myriad respects in which it manipulated the process simply by declaring the Valentins had enough meetings.

A process infected by racial animus that deprives a party of a property interest *cannot* be fair no matter how many hearings are held. *See Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990). In assessing whether racial animus has infected the process courts focus not on the origin of the racial animus or whether the decision makers share in it, but whether the decision makers acquiesced to the impermissible influence. *See Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 67 (D. Mass. 2013) (the First Circuit has "suggested a procedural due process claim might arise if a plaintiff were denied permits by a supposedly neutral body based on the opposition of certain politicians and local residents, rather than . . . on the regulations under which [the neutral body] operates.").

Determining whether an invidious discriminatory purpose was a motivating factor in municipal action "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available . . . The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977). At the pleadings stage, the Valentins need not produce evidence that a majority of the Board personally shared these views, because a decision-maker can be liable even if she did not share the discriminatory views of others, but merely gave way to them. *See Redgrave v. Bos. Symph. Orch., Inc.*, 399 Mass. 93, 100-01 (Mass. 1987).

The timeline alleged in the Complaint is a study in the use of "process" to undermine the Valentins' rights. On November 4, 2020, six days prior to the Town Meeting vote to repeal the New Bylaw, the Board voted to approve the massing, scale and layout of the Valentins' project but withheld a final decision as to whether to grant the special permit. Compl., ¶ 98. Instead of moving to a discussion and vote to grant the special permit at that time, or a special permit

conditioned upon subsequent approvals as had been the case for White developers, the Board elected to continue the matter for a hearing ***after*** the Town vote to repeal the New Bylaw. Compl., ¶ 99. After (disingenuously) assuring the Valentins that the repeal of the Bylaw would not impact the project, Compl., ¶ 96; Ex. J, the Board denied the Valentins' Second Application exclusively on the basis that Town Meeting had repealed the New Bylaw. Compl., ¶105. Nothing in the Defendants' motion acknowledges the fundamental unfairness of this "bait and switch" tactic, which was critical to the denial of the Valentins' application.

These pretextual reasons have in common a complete disregard for the essential components and purpose of the Section III-J.10. *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 143 (2000) ("[A] plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"). Defendants' alleged grounds for denying the Valentins' requests are so lacking in support or logic that they cannot be the true basis for denying the Valentins the permit to develop their property in accordance with Section III-J.10. As pled in the Complaint, Defendants' purported grounds for denying and delaying the special permit until the New Bylaw was rescinded were not logical and did not align with the reasoning of Town Counsel, especially in light of the time and resources the Valentins devoted to obtaining the special permit. When the pretextual reasons are stripped away, it is at the very least plausible that the antipathy to the Valentins' race, color and national origin was a substantial motivating factor for the rejection. No more need be shown to defeat the motion to dismiss Count IV.

Defendants wrongly assert that the Valentins' procedural due process claim fails because a hypothetical, post-deprivation remedy may be available. *See* MTD, p. 14. The mere existence of such remedies is insufficient to defeat a procedural due process claim, because courts engage

in a fact-based analysis to determine whether those remedies are adequate and fair in light of the plaintiffs' allegations. *See,* e.g., *Brockton Power LLC*, 948 F. Supp. 2d at 67–68.

In fact, plaintiffs are not even required to fully exhaust those remedies in order to bring a claim. *See, e.g*., *Collier v. Town of Harvard*, No. 95-11652, 1997 WL 33781338, at *6 (D. Mass. Mar. 28, 1997) (plaintiff's withdrawal of zoning application did not bar his federal substantive due process claim); *Kennie v. Natural Res. Dep't of Dennis*, 451 Mass. 754, 751-758 (2008) (plaintiff's withdrawal of his permit application was not a barrier to a state Civil Rights Act claim where a necessary element was interference with the exercise of a protected right). As such, the Valentins' withdrawal of their complaint from the land court to file a comprehensive complaint that adequately addressed the breadth of issues before this Court does not bar a claim for deprivation of procedural due process. The Valentins' request to have the repeal of the New Bylaw disapproved under the statutory process requiring Attorney General review of Zoning Bylaw changes likewise is of no moment. MTD at p. 14.

## IV. THE VALENTINS HAVE ALLEGED SUFFICIENT FACTS TO ESTABLISH THEIR CLAIM FOR SUBSTANTIVE DUE PROCESS.

### A. A Permitting Process Infected by Racial Animus is an Abuse of Government Power That Shocks the Conscience

Defendants' persistent and successful attempts to subvert the Valentins efforts to develop their property in service of the racial animus of the South Natick opposition represents exactly the "truly horrendous situation[]" where a substantive due process claim exists in the zoning context. *See Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992). Though courts typically do not recognize ordinary, discretionary permitting decisions as substantive due process violations, Defendants never made any discretionary decision about the

Valentins' application. Instead, they short-circuited the substantive decision-making process and criteria in the New Bylaw by enabling the racially motivated repeal of the New Bylaw.

Nevertheless, Defendants seek refuge in the jurisprudence holding that substantive due process should not apply to "reasonable decision-making" and "discretionary permitting" decisions. MTD at 11–12. Consistent with most of their other arguments in the Motion, Defendants' intentionally incomplete reading of the Complaint undermines their bid to have this Court dismiss the substantive due process claim.

The very facts Defendants ignore enable the Valentins to meet the "shock the conscience" standard based on the presence of "fundamental procedural irregularity" in the permitting process. *See Brockton Power LLC*, 948 F. Supp. 2d at 70 (holding plaintiffs had stated a substantive due process claim based on conscience-shocking nature of defendants' actions, including acting against advice of legal counsel); *Maroney v. Fiorentini*, No. 16-CV-11575-DLC, 2017 WL 6063064 at *7 (D. Mass. Dec. 7, 2017) (plaintiffs "have done enough… to state a valid substantive due process claim" where the City demanded defendants go well beyond the requirements to obtain a permit). While Defendants are right that mere mistakes are an insufficient basis for a substantive due process claim, *see* MTD at 13 (citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 831-832 (1st Cir. 1982), the suggestion that Defendants' campaign against the Valentins in acquiescence to racial animus amounts to such a run-of-the-mill mistake is not credible.

Indeed, in *Brockton Power LLC v. City of Brockton*, for example, this Court (Sorokin, J.) denied the motion to dismiss a substantive due process claim where the plaintiffs alleged the same species of conspiratorial campaign to prevent the development of land that the Valentins allege here. 948 F. Supp. 2d 48 (D. Mass. 2013). There, a developer had begun to build an

electric power generating plant on a parcel zoned for industrial uses, and received necessary permits and other approvals. *Id.* at 55. Plaintiff continued the development efforts in 2006, securing state agency approval conditioned compliance with local zoning and permitting procedures. *Id.* at 55-56. Plaintiff alleged local government defendants engaged in a political conspiracy to "reject, deny and starve" the project in order "to fatally delay and ultimately kill it." *Id.* at 56. Among the elements that shocked the conscience were Defendants' refusal to process project plans and applications, disregarding the advice of its own lawyer and caving into opponents of the project. *Id.* at 57. As the Valentins have here, the plaintiff "allege[d] that no other developer of a project in the City has had to endure a targeted campaign like the one visited upon the plaintiffs here." *Id.* at 56.

Massachusetts courts permit substantive due process claims where a plaintiff alleges defendants abused the decision-making process to prevent the plaintiff from developing property or accessing permits. *See*, *Thyng v. City of Quincy*, 2014 WL 3697077, at *5 (Mass. Super. June 2, 2014). There, the City was accused of perpetuating the "selective treatment of subjecting one individual to more delays and obstructions than other applicants, in effort to wear down his will to develop the Property." *Id.* at *6. The court found that it was exactly the "fundamental procedural irregularity" sufficient to support a substantive due process claim. *Id*. at *5.

The "fundamental procedural irregularity" to which Defendants subjected the Valentins surpasses the conduct of the defendants in *Brockton* and *Quincy*. The racial animus underlying Defendants' manipulation of the permitting process compounds the egregious conduct here which "shocks the conscience." *See, e.g., Vill. of Arlington Heights,* 429 U.S. at 270–71 (applying strict scrutiny to rezoning for affordable housing); *Creative Environments, Inc.*, 680 F.2d at 833 (substantive due process claims in land use context require evidence of

"fundamental procedural irregularity, racial animus, or the like"); *Porcaro v. Town of Hopkinton*, No. CIV.A. 96-5438, 2001 WL 34387909, at *8 (Mass. Super. May 22, 2001) (allegations of ethnic bias in a building permit case are not "quintessential run-of-the mill" land use cases). And Defendants' leveraging of the permitting process is worse than in *Brockton* or *Quincy*. Defendants here used every lever at their disposal to ensure the Valentins failed, including rejecting the advice of their counsel and delaying proceedings. Compl., ¶¶ 6, 61, 66-68, 72. Here, Defendants went much further, by misrepresenting that any repeal of the New Bylaw would have any impact on the Valentins application. And they undertook all of that effort in service to the racial animus of the opposition. *Id.* ¶¶ 61, 112, 114.

## V. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting with approval from *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). But that general rule cannot shield Defendants from liability here, for at least two reasons. First, where subjective intent is at-issue, as it is here, qualified immunity does not bar claims at the motion to dismiss stage. Second, Defendants' constitutional violations are clearly established; hijacking a permitting process to serve the racist motivations of others is a clear violation of the Valentins' constitutional rights.

### A. Qualified Immunity Cannot Bar Plaintiffs' Constitutional Claims at the Pleadings Stage, as those Claims Are Based on Defendants' Subjective Intent

The First Circuit has held that for constitutional violations that "include defendants' motivations as a foundational element of the tort . . . . a defendant's subjective intent is indeed relevant in motive-based constitutional tort . . . " through the qualified immunity analysis. *See*

*Mihos v. Swift*, 358 F.3d 91, 105 (1st Cir. 2004). The Valentins have alleged violations of the FHA, due process and equal protection clauses, all of which require an inquiry into whether Defendants had impermissible motivations. At this juncture, the court must accept as true the Valentins' allegations concerning such motivation. *See, Id.* at 107. Thus, "if the thrust of [Defendants'] motion to dismiss is simply to deny that [they] acted with the constitutionally proscribed motive, [Defendants are] unlikely to succeed." *Id*.

Defendants here argue that the exercise of discretion is generally shielded, because they were "simply carrying out statutory duties" and effectively deny that they acted with any improper purpose. MTD at 17–18. This is precisely the kind of argument the First Circuit has rejected. Not only does this explanation fail to refute the allegations of racial discrimination but it fails to even acknowledge them. Defendants apparently assume that racist, impermissible motivations and wanting the Valentins to reduce the size of their project are mutually exclusive. The *Mihos* court rejected the defendant's argument that she was "motivated by her legitimate concerns for the public's interest rather than by a desire to politically retaliate against [plaintiff]" because "on a motion to dismiss we must accept as true the allegations in [plaintiff's] complaint about [the defendant's] motivation." *Id*. Because the Valentins have pled sufficient facts to support their claims of impermissible motivations, such allegations "produce a decisive tilt" in the qualified immunity analysis for the Valentins. *Id*.

B. <u>A Reasonable Person Would Have Known of the Clearly Established Law Protecting the Valentins Against Discriminatory Decision-Making</u>

Assuming that the qualified immunity question can be resolved at the pleadings stage—and it should not be—Defendants' argument fails because the statutory and constitutional violations the Valentins allege were clearly established. Defendants choose to ignore the actual allegations of the Complaint in favor of their own (impermissible) characterization of the facts.

According to Defendants, they did nothing more than "express[] concern about a particular project on the size and scope." MTD at 18. Of course, the Valentins allege far more.

The "salient question" for courts in this analysis is "whether the state of the law . . . gave respondents fair warning that [their] alleged treatment of [plaintiffs] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 731 (2002). "A legal principle can be 'clearly established' without factually identical precedent, [but] the existing case law must have placed the constitutional . . . question 'beyond debate.'" *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 2019 WL 1306382 (1st Cir. Mar. 22, 2019) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

The Valentins have alleged sufficient facts to avoid dismissal on qualified immunity grounds. As in *Brockton Power LLC v. City of Brockton*, 948 F.Supp.2d 48 (D. Mass. 2013), the Valentins have alleged that each defendant acted as part of a broader effort to deprive them of the ability to develop their land under the New Bylaw. Compl., ¶¶ 7, 9, 61, 72. It is "beyond debate" that orchestrating a byzantine permitting process to facilitate the repeal of the operative ordinance in acquiescence to racist motives is unconstitutional. Two Town officials went out of their way to warn the Board that its course of conduct was legally troublesome. Karis North provided a legal opinion finding that the terms of the New Bylaw clearly permitted the Valentins' development just as they had proposed it. *Id.,* ¶¶ 66-68. Susan Kang, an associate Board member expressed her deep concern about how discriminatory views of opponents infected the Board's decision-making process. *Id.*, ¶¶ 83–85.

The cases upon which Defendants rely are not to the contrary. Rather, *Creative Environments, Inc.*, 680 F.2d at 829 (1st Cir. 1982) and *Chiplin Enterprises, Inc.*, 712 F.2d 1524 (1st Cir. 1987) are cases in which the defendants did what Defendants here imagine Plaintiffs alleged: they simply carried out their duties in evaluating proposed projects. *See* MTD at 18.

Indeed, the First Circuit's articulation of plaintiffs' claims in *Creative Environments, Inc.* makes plain that they represented a garden-variety zoning dispute, not the species of racially tainted process manipulation set out here: "[T]he conventional planning dispute—at least when not tainted with fundamental procedural irregularity, ***racial animus, or the like***—which takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution." 680 F.2d at 833 (emphasis supplied). Because the Valentins have plausibly alleged "racial animus, or the like," the Motion must fail with respect to qualified immunity.

## VI. DEFENDANTS' CONDUCT FALLS SQUARELY WITHIN THE MASSACHUSETTS CIVIL RIGHTS ACT

The Complaint plausibly pleads a violation of the Massachusetts Civil Rights Act (MCRA), which provides for a claim "[w]henever any person or persons . . . interfere [or attempt to interfere] by threats, intimidation or coercion . . . with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." M.G.L. c. 12, §§ 11H & 11I. The constitutional violations underpinning the Valentins' MCRA claims are discussed elsewhere in this brief. With regard to the "threats, intimidation or coercion" element of the claim, at a bare minimum the imposition of a prolonged and twisted process that provided an ongoing forum for the South Natick opposition to rail against the Valentins resulted in intimidation and coercion.

Defendants' process subjected these Haitian immigrants to repeated demands to modify an already-compliant proposal, spurious legal issues which contradicted the Board's own recent positions, and misrepresentations that any repeal of the New Bylaw would have no impact on the Valentins' proposal. Defendants' suggestion that none of those tactics was not intimidating or coercive belies reality, and the plain allegations of the Complaint. But for Defendants' coercive

and intimidating conduct, the Valentins would never have repeatedly agreed to modify their proposal and would never have tolerated the never-ending delays that enabled the repeal of the New Bylaw. Defendants' conduct intimidated the Valentins under the MCRA because it constituted the "creation of fear to compel conduct," namely to continually revise the application to suit Defendants' demands even though the application at all times complied with the New Bylaw. *Delaney v. Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 409 (1989). They were coerced because Defendants' conducted "constrain[ed] [them] to do against [their] will something [they] would not otherwise have done," namely tolerated the interminable delays. *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994).

Rather than confront the allegations of the Complaint, Defendants try to shoo away the issue by saying only that they "need not tarry" on the issue. MTD at 16. Defendants' consistent reluctance to address the allegations of the Complaint does not permit them to escape those allegations, however. The case upon which Defendants principally rely to seek to shuck off the MCRA claim, *Marchand v. Town of Hamilton*, is nothing like the situation here. *See* No. CIV.A. 09-10433-LTS, 2009 WL 3246607, at *3 (D. Mass. Oct. 5, 2009). The plaintiff in that case was a police officer who claimed myriad false allegations were lodged against him, though none of the defendants had disciplined him. *Id.* While he complained that defendants investigated him, but he did not allege that they intimidated, threatened, or coerced him to do anything at all. *Id.* The Valentins' allegations, on the other hand, describe Defendants' concerted course of conduct to ensure that the Valentins sought to placate the Board and took no action in advance of the repeal of the New Bylaw, exactly the type of coercion and intimidation which the MCRA prohibits.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs pray that the Motion to Dismiss be denied.

Respectfully submitted,
LINDA and JOEL VALENTIN and GRACE GABLE MANOIRS, LLC,

By their attorneys,

*/s/ Benjamin J. Wish*
Howard M. Cooper (BBO # 543842)
Benjamin J. Wish (BBO # 672743)
Tara Dunn (BBO # 699329)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
bwish@toddweld.com
tdunn@toddweld.com

Michael Allen
*Admitted pro hac vice*
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888, ext. 603
mallen@relmanlaw.com

Dated: September 1, 2021

**CERTIFICATE OF SERVICE**

I, Benjamin J. Wish, hereby certify that on this 1st day of September 2021, a true copy of the foregoing *Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss* was filed through the ECF System, which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served upon anyone indicated as a non-registered participant.

*/s/ Benjamin J. Wish*
Benjamin J. Wish