### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                                        )
LINDA VALENTIN, JOEL VALENTIN, and      )
GRACE GABLE MANOIRS, LLC,               )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )          Civil Action
                                        )          No. 21-10830-PBS
TOWN OF NATICK, et al.,                 )
                                        )
                    Defendants.         )
_____)
```

### MEMORANDUM AND ORDER

September 27, 2022

Saris, D.J.

### INTRODUCTION

This case arises from the denial of Linda and Joel Valentin's application for a permit to develop a condominium project, which included affordable housing, in a predominately white neighborhood in Natick, Massachusetts.  The Valentins are a black couple of Haitian origin who have lived in Natick for 30 years.  They bring this action against the Town of Natick, the Planning Board of the Town (the "Board" or "Planning Board"), five individual members of the Board, the Natick Historical Commission, and Historical

Commission Chair Stephen Evers, alleging discrimination on the basis of race, color, and national origin.[1]

Defendants have moved to dismiss for failure to state a claim and assert the defense of qualified immunity.  After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. 66).

## FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the plaintiffs, the Complaint alleges the following facts:

### I.    **The New Bylaw**

In November 2005, the Valentins bought historic property at 50 Pleasant Street in South Natick, a predominantly white neighborhood.  The property consists of 63,246 square feet of land, located in a single-family residential zoning district, and contains a single-family dwelling that is one of the oldest buildings in Natick.  It qualifies as a "historic structure."

---

[1] Plaintiffs bring claims sounding in the Fair Housing Act, 42 U.S.C. §§ 3604 and 3617 (Count I); 42 U.S.C. § 1983 for violations of their constitutional rights to Equal Protection (Count II); Substantive Due Process (Count III); and Procedural Due Process (Count IV).  They also assert claims against the individual defendants under the Massachusetts Civil Rights Act, Mass. Gen Laws c. 12, § 11H (Count V).

In early 2019, the Valentins worked closely with the Natick Planning Board to develop Natick's Historic Preservation Bylaw ("New Bylaw"), which sought to preserve certain historic properties, labeled "smaller estates," by permitting redevelopment in the form of condominiums or other multi-family units.  The planning Board Chair, Theresa Evans, supported the New Bylaw, and gave as an example of the need for the New Bylaw the Valentins' plan to restore a historic barn which could not be accomplished under the old bylaw.  The Town Meeting passed the Bylaw by a vote of 96 in favor, 4 against, 3 abstentions.

On August 28, 2019, the Valentins applied for a special permit and site plan approval under the New Bylaw. They proposed to renovate the existing house at 50 Pleasant Street with additions, reconstruct a historical barn and carriage house, and add underground parking. This proposal, which would allow for eleven condominium units, including affordable housing units, complied with all dimensional requirements of the New Bylaw.

## II.  **Neighborhood Opposition to the Project**

Initially, the Planning Board received the project favorably. In a September 9, 2019 letter, the Historical Commission wrote to the Planning Board that they "believe[] the proposed project will have great benefit to our local historic character and architecture

by the preservation of the house and development of the reproduced buildings on the site." Dkt. 1 ¶ 54.

Several South Natick neighbors began a campaign against the Valentins' project, and created an opposition website, www.stop50pleasant.org.  On the website, neighbors directed allegedly "racist" comments at the Valentins. One neighbor questioned whether the Valentins were intelligent enough to carry out the project, asserting they were being coached by others. Another questioned whether the Valentins were "monkeying around" or manipulating the Bylaw. Dkt. 1 ¶ 59. The project was described as an "attack on South Natick." Id.

In response to this neighborhood opposition, the Board informed the Valentins that it would not approve the project without a substantial revision of the plans. In the fall of 2019, the Valentins submitted a revised plan eliminating the carriage house and the eleventh condominium unit from the proposal. Addressing the revised proposal at a public meeting attended by neighbors opposing the project, the Board expressed confusion over how to interpret the New Bylaw.  The Board sought a legal opinion from Town Counsel as to whether the revised proposal was authorized under the New Bylaw. In December 2019, Town Counsel issued an opinion that the proposal comported with the New Bylaw.  But the Board nonetheless interpreted the Bylaw to curtail the proposed

project. In January 2020, the Board suggested that the Valentins withdraw their application without prejudice. Believing they had no other option, the Valentins agreed.

### III. **Repeal**

On February 24, 2020, the Valentins renewed their application under the New Bylaw. By this time, the neighbors had begun a campaign to repeal the New Bylaw. The Board delayed a final decision on the application until the repeal could be decided at the Town Meeting in the fall of 2020. It scheduled seventeen public hearings on the application between April 1, 2020 and December 16, 2020. Altogether the Board held 29 hearings and 14 work-group sessions about the project.

On April 22, 2020, the Board declared two new interpretations of the New Bylaw. They interpreted "historic building" in the bylaw to refer only to buildings still standing, even though the bylaw explicitly provides for "replication of documented previous structures." Dkt. 1 ¶ 76. They also interpreted the New Bylaw to have only one size limitation for all new construction, rather than separate limits for wholly new construction and new construction replicating previously documented structures. These interpretations reduced allowable new construction by one-third. And in May 2020, contrary to the prior legal opinion of Town

Counsel, the Board reduced the gross volume of the proposed barn replication at 50 Pleasant Street.

In the July 2020 meeting, one Board member expressed "concern[] about what the neighbors have said," asking "people to reflect very carefully" before commenting that the project was "detrimental to the character of the neighborhood." Id. ¶ 84.

In October 2020, the Valentins again submitted revised plans, lowering the number of units from eleven to seven and replacing the underground parking with individual garages, reducing the scale of the project by a third, well under the floor area ratio allowed under the New Bylaw.

At this point the Chair of the Natick Historic Commission, Stephen Evers, who had been corresponding with certain South Natick neighbors, forwarded to Board members their concerns that the project was too big. Evers also joined the campaign to repeal the New Bylaw, writing a letter from the Historical Commission endorsing the repeal.

During public hearings in September and October 2020, Board Chair Evans twice insisted that the repeal of the New Bylaw would not adversely affect any application before the Board, explicitly answering Ms. Valentin's question as to her own project. The Town's Director of Community & Economic Development similarly confirmed

to the Valentins, after consulting Town Counsel, that their project would be grandfathered in the event of repeal of the New Bylaw.

On November 4, 2020, the Board voted to approve the massing, scale, and layout of the Valentins' project, concluding it met the criteria of the New Bylaw because it was "not substantially more detrimental to abutting properties and neighborhood." Dkt. 1 ¶ 98. But the Board did not move on to a discussion or a vote on whether to grant the special permit, as it had done for other developments. It continued the matter for another hearing, scheduled after the Town Meeting vote on repealing the New Bylaw.

On November 10, 2020, the Town Meeting held a vote on repealing the New Bylaw. Proponents of the repeal criticized the Valentins' project and displayed designs for the Property throughout their presentation. The Valentins expressed their opposition to the repeal. Ultimately, the Town Meeting voted to repeal the New Bylaw.

On December 2, 2020, the Board denied the Valentins' application solely on the basis of the repeal of the New Bylaw. The Board read excerpts of a legal opinion from Town Counsel that it claimed required this result, but refused to produce a full copy of this legal opinion reversing the Board's former position. The project was not grandfathered in.

## IV.  **Comparator Church Project**

The Complaint alleges that the Board had not denied a permit to any condominium project for over a decade. Each of these projects was sponsored by white applicants.

The Valentins cite as a comparator an application for a historic preservation permit to convert a former church into a mixed-use project including seven condominium units ("Church Project"). That application, submitted under the old 2014 bylaw by a group of white individuals, was approved by the Board within six months after ten public hearings, some of which were only held because the project was amended to double the proposed size of the development. The Board approved the project based on hand-drawn plans. In contrast, as noted above, the Valentins were subjected to 29 hearings over 16 months and were required to submit three-dimensional drawings.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions." Id. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

## ANALYSIS

### I.   Fair Housing Act Claims

The Valentins allege that Defendants engaged in "a policy, pattern, and practice of discrimination against the Valentins due to their race, or the racial composition of their neighborhood, in violation of the Fair Housing Act." Dkt. 1 ¶ 129. Plaintiffs bring claims under 4 U.S.C. §§ 3604 and 3617 of the Fair Housing Act ("FHA").

#### A. Section 3604

The FHA is broadly construed to effectuate its remedial purpose to foster "truly integrated and blended living patterns." Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 211–12 (1972). Section 3604 of the FHA prohibits discrimination in housing based on race, color, and national origin. See 42 U.S.C. § 3604. The FHA "specifically targets the discriminatory use of zoning laws." Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo, 988 F.2d 252, 257 n.6 (1st Cir. 1993). To prove a violation of the FHA, a

plaintiff must show either discriminatory intent or a disparate impact. See Macone v. Town of Wakefield, 277 F.3d 1, 5 (1st Cir. 2002) (holding that procedural abnormalities can be the basis for finding discriminatory intent but only within the larger scope of the evidence).

Courts analyze FHA disparate treatment claims under Title VII's three-stage McDonnell Douglas test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   In the FHA context, a plaintiff must allege that:

> (1) she is a member of a protected class; (2) she applied for a permit and was qualified to receive it; (3) the permit was denied despite plaintiff being qualified; and (4) the defendant approved the same type of permit for a similarly situated party during a period relatively near the time plaintiff was denied her permit.

Gamble v. City of Escondido, 104 F.3d 300, 305 (9th Cir. 1997)).

Here, the Valentins have alleged that they are members of a protected class, and they were qualified for a permit that they applied for and were denied. In support they point out that Town Counsel issued an opinion that the first proposal comported with the New Bylaw. And on November 4, 2020, the Board voted to approve the massing, scale, and layout of the Valentins' project, concluding it met the criteria of the New Bylaw. At the third step, plaintiffs allege that the Board did not then grant the permit, delaying a decision until after the vote on repealing the New

Bylaw, and ultimately denying the permit based on this repeal despite promises that their proposal would be grandfathered in.

That leaves the fourth factor. Plaintiffs allege that the Town granted a permit for the church project which was similarly situated because it was a proposed conversion of a historical building in a residential neighborhood into condominium units. Defendants contend that the Church Project was not similarly situated to the Valentins' proposal, given that it was proposed under the 2014 Bylaw, not the New Bylaw, and that there are factual differences with the comparison. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) ("While an exact correlation is not necessary, the proponent must demonstrate that the cases are 'fair congeners.'"). While it is true that the "comparator project" was approved under the 2014 Bylaw, the sequence of events leading up to the denial, the differences in procedural treatment (i.e. the number of hearings), provide circumstantial evidence of a discriminatory intent.

**B. Section 3617**

This circumstantial evidence also suffices under § 3617. This section makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights granted under § 3604. 42 U.S.C. § 3617. To prevail, a plaintiff must show:

> (1) the plaintiff is a member of an FHA-protected class;
> (2) the plaintiff exercised a right protected by §§ 3603–
> 06 of the FHA, or aided others in exercising such rights;
> (3) the defendants' conduct was at least partially
> motivated by intentional discrimination; and (4) the
> defendants' conduct constituted coercion, intimidation,
> threat, or interference on account of having exercised,
> aided, or encouraged others in exercising a right
> protected by the FHA.

S. Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 95 (D. Mass. 2010) ("SMOC"). Here, only the fourth element is truly in dispute. Interference encompasses more than physical force or intimidation. See id. at 104 (collecting cases). Here, defendants are alleged to have delayed the project, asked for expert opinions and then ignored them, and misrepresented the consequences of the repeal. The complaint alleges a plausible claim that defendants interfered with the Valentins' rights.

## II.  **Equal Protection Claim**

The Valentins bring their § 1983 Equal Protection claim under two theories: classic equal protection and "class of one" equal protection. Defendants attack these, noting that the First Circuit has expressed an "extreme reluctance to entertain equal protection challenges to local planning decisions." Macone, 277 F.3d at 10. Again, Defendants argue there is no evidence of discriminatory intent. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.
252, 266 (1977) (discussing a Fourteenth Amendment claim).
Circumstantial evidence includes "[t]he historical background of
the decision," "[t]he specific sequence of events leading up to
the challenged decision," "[d]epartures from the normal procedural
sequence," and "contemporary statements by members of the
decisionmaking body." Id. at 267–68.

    Plaintiffs argue that planning board members violated their
equal protection rights when they effectuated the discriminatory
intent of the neighborhood by raising procedural hurdles to slow
down the permitting process and thwart the project. See Dailey v.
City of Lawton, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of
a civil right violation depends on an open statement by an official
of an intent to discriminate, the Fourteenth Amendment offers
little solace to those seeking its protection.  In our opinion it
is enough for the complaining parties to show that the local
officials are effectuating the discriminatory designs of private
individuals."); LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425
(2d Cir. 1995) ("[A] plaintiff can establish a prima facie case by
showing that animus against the group 'was a significant factor in
the position taken' by the municipal decision-makers themselves or
by those to whom the decision-makers were knowingly responsive.")
(emphasis added); Assoc. of Relatives and Friends of AIDS Patients
(A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de

13

Reglamentos y Permisos, 740 F. Supp. 95, 103 (D.P.R. 1990) ("[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decision making process . . . . [I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."); see also Gilead Comm. Servs., Inc. v. Town of Cromwell, 432 F. Supp. 3d 46, 75 (D. Conn. 2019) (same); Jackson v. Okaloosa Cty., Fla., 21 F.3d 1531, 1542 n.18 (11th Cir. 1994) (finding a plausible § 3604 violation where a policy "was enacted specifically in response to white citizens' protests" through deviations from local procedural norms).

In support of this contention, the Complaint alleges that the Board initially extolled the virtues of the project, but reversed course after the opposition movement arose, holding an inordinate number of meetings.   There are allegations of "racist" comments by neighborhood opposition lobbying to oppose the project and repeal the Bylaw.   The Board reversed course twice as to the 2019 Bylaw—first finding that its once clear requirements were so confusing that it disagreed with the Town Counsel opinion it had sought and later finding its repeal applied to pre-existing proposals, contrary to its previous reassurances about grandfathering.   Based on these allegations, the Valentins state

a plausible claim that actions of the town were in violation of their Equal Protection rights.

The Valentins' alternative theory of a "class of one" claim would also survive based on the Church Project comparator and the treatment of other projects. See Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) ("Generally, whether parties are similarly situated is a fact-intensive inquiry.").

## III. **Substantive Due Process Claim**

"The due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes" because "[i]n the vast majority of instances, local and state agencies and courts are closer to the situation and better equipped to provide relief." Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992). The First Circuit has only "left the door slightly ajar for federal relief in truly horrendous situations." Id. The applicable standard is that the abuse of power must "shock[] the conscience" and violate the "decencies of civilized conduct." Id. (quoting Rochin v. California, 342 U.S. 165, 172-73 (1952)). "[I]n order to shock the conscience, conduct must at the very least be extreme and outrageous, or, put another way, truly outrageous, uncivilized, and intolerable." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006) (cleaned up).

However, the First Circuit has suggested that a planning dispute "tainted with fundamental procedural irregularity, racial animus, or the like" may shock the conscience. Create Env'ts, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982); see also Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48, 69 (D. Mass. 2013). The Valentins have plausibly alleged procedural irregularities in the number of hearings and delays, along with acquiescence to the racist opposition sufficient to state a substantive due process claim.

## IV.   Procedural Due Process Claim

Alleged inadequate process in the moment does not always amount to a due process violation. See generally Hudson v. Palmer, 468 U.S. 517, 530–34 (1984) ("[A]n unauthorized intentional [or negligent] deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."). "[W]hen a state official is not acting pursuant to established state procedure, the state is not in a position to provide anything other than such postdeprivation remedies." Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992); see also Hadfield v. McDonough, 407 F.3d 11, 20 (1st Cir. 2005) (holding postdeprivation remedies are

sufficient "when the challenged state action is a flaw in the official's conduct rather than a flaw in the state law itself").

The First Circuit has held that "[w]here a state has provided reasonable remedies to rectify a legal error by a local administrative body," such as "avenues of appeal to the state courts," due process has been provided and "section 1983 is not a means for litigating the correctness of the state or local administrative decision in a federal forum." Creative Env'ts, 680 F.2d at 832 n.9; see also Chongris v. Bd. of Appeals of Town of Andover, 811 F.2d 36, 40 (1st Cir. 1987) ("Where state procedures— though arguably imperfect—provide a suitable form of predeprivation hearing coupled with the availability of meaningful judicial review, the fourteenth amendment guarantee of procedural due process is not embarrassed.") (citing Creative Env'ts, 680 F.2d at 829–30).

Here, the Valentins pursued their statutory remedy under state law, Mass. Gen. Laws c. 40A, § 17, and then voluntarily withdrew their complaint in Land Court. This statutory means of judicial review for "[a]ny person aggrieved by a decision of . . . any special permit granting authority or by the failure . . . to take final action concerning any application for a special permit," Mass. Gen. Laws c. 40A, § 17, is a sufficient postdeprivation remedy. See Holdcraft v. Town of Brookfield, 365 F. Supp. 3d 190, 198 (D. Mass. 2019) ("Chapter 40A provides an

adequate post-deprivation remedy."). The Court dismisses the procedural due process claim.

## V.   **Massachusetts Civil Rights Act Claim**

The MCRA provides a cause of action against any person who interferes or attempts to interfere with the rights of another "by threats, intimidation or coercion." Mass. Gen. Laws c. 12, § 11H. Here, the Valentins have plausibly alleged that Defendants interfered with their rights. However, they must also allege that interference was by "threats, intimidation or coercion." The Valentins argue that "the imposition of a prolonged and twisted process that provided an ongoing forum for the South Natick opposition to rail against the Valentins resulted in intimidation and coercion." Dkt. 71 at 29. There was no intimidation or coercion here. See Kennie v. Nat. Res. Dept. of Dennis, 889 N.E.2d 936, 944 (Mass. 2008) ("Both threats and intimidation often rely on an element of actual or threatened physical force.").

Moreover, "[a]dverse administrative action, at least when not part of a scheme of harassment, does not rise to the level of threats, intimidation or coercion." Murphy v. Town of Duxbury, 665 N.E.2d 1014, 1018 (Mass. Appt. Ct. 1996); see also Sena v. Com., 629 N.E.2d 986, 994 (Mass. 1994) ("Generally, by itself, a threat to use lawful means to reach an intended result is not actionable

under § 11I."). The Valentins have failed to state a claim under the MCRA.

## VI.  <u>Qualified Immunity</u>

Defendants argue that the individual defendants are entitled to qualified immunity from suit because "their conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Public officers are protected by qualified immunity unless "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

Here, for the reasons stated above, plaintiffs have plausibly alleged that the town violated their rights under the Fair Housing Act and the Fourteenth Amendment. While there are no allegations that any individual member of the planning board made any racist comments, the Complaint alleges that all the members of the planning board took procedural steps to thwart the project in light of private community opposition based on race. It has long been established by the Supreme Court that the state cannot base decisions depriving black persons of housing as a result of the discriminatory intent of private citizens. <u>E.g.</u>, <u>Shelley v.</u>

<u>Kraemer</u> 334 U.S. 1, 21 (1948) (holding that state courts violated the Fourteenth Amendment equal protection of the laws by enforcing private covenants excluding black persons from ownership or occupying property.)  The Court will revisit the issue of qualified immunity at summary judgment on a fuller record with respect to each of the town officials' individual actions.

## VII. <u>First Amendment</u>

Finally, Defendants argue that Evers' comments are protected by the First Amendment. A public employee is entitled to constitutional protection when speaking as a private citizen about matters on public concern, but "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421 (2006). Courts are to consider many factors in determining whether speech was made pursuant to official duties. <u>See generally</u> <u>Decotiss v. Whittemore</u>, 635 F.3d 22, 31-32 (1st Cir. 2011).

Under the New Bylaw, the Historical Commission and the Design Review Board were to review the architectural design of proposed projects. Evers' advocacy against the project was in his capacity as Chair of the Historical Commission, not as a private citizen. <u>Cf.</u> <u>SMOC</u>, 752 F. Supp. 2d at 113 (finding no First Amendment immunity where "the Defendants used their positions of authority

to manipulate the treatment of SMOC's permit applications."). Because Evers' alleged advocacy, including an email to a Board member indicating the Historical Commission opposed the Valentins' project, was pursuant to his official duties, this motion to dismiss the claim that his speech is protected under the First Amendment is denied without prejudice to renewal at summary judgment after further development of the relevant facts.

## ORDER

After hearing, for the reasons stated above, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. 66).

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge