UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LINDA VALENTIN et al.<br>Plaintiffs,<br><br>VS.<br><br>TOWN OF NATICK et al.<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 1:21-cv-10830-PBS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Preliminary Statement**

The Fair Housing Act did not abrogate the First Amendment. On the contrary, the principal section of the Fair Housing Act provides, "It is the policy of the United States to provide, *within constitutional limitations*, for fair housing throughout the United States." 42 U.S.C. § 3601 (emphasis added) (alternatively the "Act" or the "FHA"). Here, based on no more than a handful of comments of neighborhood residents who were opposed to the sheer size of their proposal to develop the property on 50 Pleasant Street, Natick, MA. (the "Property"), Linda and Joel Valentin (the "Valentins"), seek to hold the Town of Natick, the Natick Planning Board (the "NPB"), the Natick Historical Commission ("Commission"), and the Chair of the Natick Historical Commission, Stephen Evers (collectively, the "Town Officials"), liable for "acquiescing" to the "hateful" comments contained in these comments. The "racist" comments of which the Valentins complain were not made, authored, or condoned by the Town Officials and these comments and emails—all sent by private citizens—do not render the Town Officials liable under the Fair Housing Act. Similarly, the discovery record establishes beyond cavil that the Town Officials did not coerce, intimidate, threaten, or interfere with the Valentins' rights under the FHA.

The Valentins take issue with the length of time the NPB took to review the multiple iterations of their efforts to develop the Property. Time and again, the Valentins were told that their

proposal to build eleven 3,000 square-foot condominiums with a swimming pool and underground parking was simply too big for the "historic" restoration of a single-family home in a single-family-only residential district.[1] The Valentins ignored these concerns and, instead, submitted virtually identical proposals to the NPB, which proposals contained only a negligible decrease in size. Having *now* decreased their project to five condominium units, on February 15, 2023, the NPB voted to conditionally approve a historic preservation Special Permit for the Property.

The focus of the Valentins' equal protection claim fails for the same reasons as their FHA claims, i.e., a lack of race-based animus on the Town Officials' part. Their class-of-one equal protection claim fails because the only "comparator" identified in the Complaint is not sufficiently akin to their project in all meaningful respects. Finally, the Valentins' substantive due process claim fails under the First Circuit's decision in *Pagan v. Calderone*, (citation omitted), and because the Town Officials conduct did not arise to "conscious shocking" level necessary to maintain such a claim. Similarly, the discovery record has made clear that Steve Evers, the Chair of the Commission, was acting as a private citizen when he conveyed his own concerns with the operation of the so-called "New Bylaw" to several Town residents who shared this concern. Finally, the NPB members are individually entitled to quasi-judicial immunity, qualified immunity, and/or legislative immunity. Accordingly, as explained more fully below, the Town Officials respectfully request that the Court allow their motion for summary judgment in its entirety.

[1] Under Section III-J of the Natick Zoning Bylaw (Historic Preservation), uses beyond single family homes, including town houses and apartment houses, are allowed in single-family zones, where the project undertaken preserves and continues the use of buildings of historic or architectural significance. [SOMF ¶ 11].

## I. STATEMENT OF FACTS[2]

In November, 2006, the Valentins purchased the property and structures located on 50 Pleasant Street from Brian C. Broderick and Cathleen N. Broderick. [SOMF at ¶ 8]. The property is in a district zoned Single Family Residential. [SOMF at ¶ 8]. After their purchase, the house was stripped bare by the Valentins, and it sat vacant for 13 years. [SOMF at ¶ 10]. On July 16, 2018, the Commission determined that the Property is of architectural significance to the Town and is therefore subject to the opportunities and obligations of the Town's Historic Preservation Bylaw (Section III-J-1-9). [SOMF at ¶ 16]. On April 25, 2019, Town Meeting passed (96-4) an amendment to the Historic Preservation Bylaw (Section III-J-10), which, among other things, increased the amount of new construction allowed on a parcel deemed to be of "historic" significance by the Commission. [SOMF at ¶ 23].[3] The original sponsors of the Article were Linda and Joel Valentin and their local land use attorney, George Richards. [SOMF at ¶ 24]. Notably, after a number of NPB hearings to review the details and implications of the proposed amendment to Section III-J, on January 23, 2019, the NPB voted (5-0) to sponsor the amendment to the Historic Preservation Zoning Bylaw at the upcoming Town Meeting.[4] [SOMF at ¶ 20]. The Spring 2019 Town Meeting overwhelmingly vote in favor of the New Bylaw. [SOMF at ¶ 23].

---

[2] The Town Officials will endeavor to be brief. A fuller account of the salient facts is found in the Town Officials' Concise Statement of Material Facts filed in accordance with Local Rule 56.1. At the outset, the Town Officials note that the Valentins' contend, and the Town Officials agree, that at all times they were acting in their official capacity. [Ex. 1, Complaint at ¶ 25].

[3] Town Meeting is "a special form of government dating back to the colonial era and often considered an exemplar of pure democracy. Town meetings in colonial times were charged with administrative and judicial as well as legislative duties." *Curnin v. Town of Egremont*, 510 F.3d 24, 26 (1st Cir. 2007) (citations omitted).

[4] Of course, the so-called "New Bylaw" can't be viewed in a vacuum. Of relevance here, M.G.L. c. 40A, § 9, provides, in relevant part, that "[s]pecial permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use." However, Section 9 does not define or explain how a special permit granting

On August 28, 2019, the Valentins submitted an Application for a Special Permit and Site Plan Review in their efforts to develop the 100-year-old home and carriage house at 50 Pleasant Street, Natick, MA.[5] [SOMF at ¶ 24]. The Valentins sought to develop the Property under the Town's Historic Preservation Bylaw, referred to by the parties as the "New Bylaw." [SOMF at ¶ 24]. As mentioned above, the New Bylaw was intended to foster the development of properties which were determined to be of historic, architectural, or cultural significance by the Commission.[6] [SOMF at ¶¶ 4, 11].

Around this time, several neighbors and abutters who were opposed to the size of the Valentins' project at 50 Pleasant Street, formed a private webpage titled, "Stop50pleasant.org." [SOMF at ¶ 29]. From the outset, the neighbors—some of whom retained their own counsel—repeatedly voiced concerns with the size of the Valentins' project and the fact that the Project did not preserve the historic character of the Main House.[7] [SOMF at ¶ 42]. Indeed, the Valentins'

authority is to assess whether and under what circumstances a project is "substantially detrimental to the character of the neighborhood." Still, the phrase has been considered in countless land use cases. See, e.g., *Nextel Commcns. of Mid-Atl., Inc. v. Town of Hanson*, 311 F. Supp. 2d 142, 147 (D. Mass. 2004); *Nextel Commcns. of the Mid-Atl., Inc. v. Town of Brookline, Mass.*, 520 F. Supp. 2d 238, 247 (D. Mass. 2007).

5 The Planning Board is the Special Permit Granting Authority for the Town of Natick. [SOMF at ¶ 1].

6 On July 16, 2018, the Commission made such a finding with respect to the Valentins' original proposal to develop the Property. [SOMF at ¶ 16]. This *approval* represents the Commission's only involvement in the Valentins' efforts to develop the Property, and is the only official role the Commission has in the Historic Preservation special permit process. On this basis alone, the Valentins' claims against the Commission should be dismissed. Moreover, Stephen Evers is one member of a ten-person body. [SOMF at ¶ 4]. There is nothing in the ample discovery record upon which plaintiffs can assess liability against him (Evers) in either his individual or official capacities.

7 By way of example, one neighbor observed at a Planning Board meeting that the Valentins' original proposal was "five times the size of the original house." On September 9, 2019, the Natick Historical Commission advised the Planning Board that, "while the former barn was similar in its materials to the house, it was agreed that the overall site appearance is now similar to a 'grand hotel.'" [Ex. A. Complaint at Ex. D].

original proposal called for building 11 condominiums of approximately 3,500 sq.ft. each, an underground parking garage with spaces for 24 cars, and a swimming pool. [SOMF at ¶ 24]. All of this on a lot that is 1.45 acres and sits in a district that is zoned single family residential only. [SOMF at ¶¶ 8-9]. Contrary to the allegations in the Complaint at ¶ 3, the Valentins did not intend to offer two of the units as so-called "affordable housing." [SOMF at ¶ 93]. Instead, their architect, Kent Duckham, told the NPB (October 16, 2019), that they had met with the Town's Affordable Housing Trust and the Valentins would instead make some unspecified contribution to the Town's Affordable Housing Trust Fund, which finances such projects.[8] [SOMF at ¶ 93].

The NPB never voted on the Valentins' initial proposal because it was withdrawn by the Valentins during a multi-board meeting held on January 15, 2020. [SOMF at ¶ 39]. At that meeting, members of the NPB, the Commission, and the DRB all stated their objection to the massing and location of the Valentins' Project. Considering these concerns, the Valentins asked and were given permission to withdraw their application without prejudice.[9] [SOMF at ¶ 36].

[8] On January 13, 2021, one of the Valentins' supporters, Tom Daly, wrote to the MA. Office of the Attorney General ("OAG") to complain about what he referred to as the real "[e]lephant in the Room, the fact that the Valentins' are proposing to make a portion of the condos subsidized housing." [Complaint, Ex. F]. A few months later (April, 2021), the Valentins' counsel, Todd & Weld, sent a letter with exhibits totaling several hundred pages to the OAG complaining that the Natick Planning Board had violated the Valentins' civil rights under the Fair Housing Act. Two months later, the Valentins' Washington D.C. counsel registered a similar complaint with the U.S. Dept. of Housing & Urban Development ("HUD"). To date, neither the OAG nor HUD has acted on the Valentins' counsel's complaints. Further, the Valentins and their architect have confirmed that they were in fact not seeking to include affordable units within their development, and never presented any plan for such affordable units to the Town. It's also notable that Natick has an inclusionary zoning bylaw, which requires affordable units (or a fee in lieu) to be part of any development over five units. So, the fact that the Valentins' project included any affordable housing component was because it is a Town of Natick requirement, not because the Valentins chose to do so on their own.

[9] Around this time, the Valentins submitted plans to build a school on the site under the protections afforded them under the Dover Act, M.G.L. c. 40A, § 3, which significantly limits the oversight of local officials for projects allowed thereunder; however, in short shrift, the Valentins requested, and the NPB voted to allow them, to withdraw this proposal as well.

On February 5, 2020, one of the abutters to 50 Pleasant Street raised the notion of repealing the New Bylaw via a Citizen's Petition to be presented at and voted on at 2020 Spring Annual Town Meeting. [SOMF at ¶ 39]. Ms. Valentin responded to the notion of a repeal by stating that it was specific to her project "and insulting." [SOMF at ¶ 39]. Around this time, two NPB members—Peter Nottonson and Andrew Meyer—volunteered to participate in a smaller "Working Group" in an effort to shepherd the Valentins' project to and through approval for a Special Permit/Site Plan Review. [SOMF at ¶ 37]. [10] A few weeks later, Ms. Valentin received what she claims is a favorable opinion from Town Counsel on the so-called grandfathering issue.[11] [Ex. 1 at Exh. J]. Two things about this email chain (February 26, 2020). First, the email of the former Director of Community & Economic Development, James Freas, parrots a conversation that he (Freas) supposedly had with Town Counsel, but Town Counsel testified unequivocally that she never spoke with Freas about whether the repeal of the New Bylaw would affect the Valentin's Project. [SOMF at ¶¶ 67, 69]. Second, the Valentins' own attorney, Eric Goldberg, is "cc'd" on this email. [Ex. 1 at Exh. J]. Whether or not Attorney Goldberg agreed with the contents of the email is largely beside the point: the Valentins had every opportunity to obtain and, according to Mr. Valentin, did obtain advice on the grandfathering issue from *their own* counsel. [SOMF at ¶ 53, 63].

On June 17, 2020, and in conjunction with the Commission and the DRB, the NPB held a hearing in connection with the Valentins revised proposal, *to wit*, nine townhouses with a single

---

10 For some inexplicable reason, the Valentins did not take the deposition of three members of the NPB—Peter Nottonson; Julian Munnich; and Glen Glater.

11 The Town Officials recognize that the term "grandfathering . . . has racist origins." *Comstock v. Zoning Bd. of Appeals of Gloucester*, 98 Mass. App. Ct. 168, 173 n.11 (2020). However, because the plaintiffs have employed the term throughout this litigation, e.g. Ex. 1 at ¶¶ 9, 97, the Town Officials do so as well for the sake of consistency and clarity.

underground garage for 18 cars. [SOMF at ¶ 47].[12] These same three Boards continued to express significant reservations about the massing and location of the project. [SOMF at ¶ 47].

On July 8, 2020, the NPB again met with the Commission and the DRB. [SOMF at ¶ 49]. Consistent with their prior comments, several neighbors and abutters of 50 Pleasant Street conveyed their concerns about the size of the Valentins' project and its impact on the character of the neighborhood. [SOMF at ¶ 49]. One neighbor, Marie Forbes, commented that the project would impact abutters who are taxpayers and hard working. Contrary to what is stated in the Complaint (at ¶ 59), Ms. Forbes *never stated* or insinuated that the Valentins do not pay their taxes. [SOMF at ¶ 50]. Yet, this is one of the handful of "racist" comments that the Valentins maintain were made by the "white neighbors" opposed to their Project. [SOMF at ¶ 50]. Following this colloquy, NPB member Andrew Meyer observed that the NPB "has a case where the developers would like the project approved immediately without delay and the neighbors are unanimously opposed to the scope, size, and scale of the Project."[13] [SOMF at ¶ 50]. In this vein, James Freas, the former Director of Community & Economic Development, testified that he never heard a single member of the NPB make what he thought was a racist comment directed at the Valentins or

---

[12] In addition to Attorney Eric Goldberg being present, Attorney Benjamin Tariri introduced himself as a civil rights attorney representing the Valentins.

[13] In their responses to the Defendants' First Set of Requests For Admission, the Valentins admit that none of the Planning Board members has ever made a racist comment about either of them in their presence. In fact, they only take exception with two comments made by one member of the Planning Board and one member of the Historic Commission—notwithstanding that the NPB held approximately 25 hearings about 50 Pleasant Street. In one instance, a local newspaper reported that Glen Gater stated, "If I lived an any houses around [50 Pleasant Street] and that barn was going up, I would be crying every night." In a separate response, the Valentins stated that Stephen Evers used language that the Valentins considered to be racially coded when he told Andrew Meyer via email that the Valentins' development was "like putting Disneyworld in suburbia." [Ex. 9 at No. 13].

otherwise. [SOMF at ¶ 65].[14] On the contrary, Freas testified that the neighborhood opposition to the Valentins' project was based on their view that "it was too big." [SOMF at ¶ 43].

On August 12, 2020, the NPB voted on the same unaltered proposal that had been evaluated and rejected via straw poll only a month beforehand.[15] [SOMF at ¶ 52]. The NPB voted (3-2) to deny the Valentins' application without prejudice because, as then-NPB Chair Evans stated, "we have spent months trying to turn this project" into one that can overcome concerns about its massing and scale and "it has not gotten there."[16] [Ex. 12 at 9]. Nonetheless, the NPB scheduled additional meetings to allow the Valentins to continue in their efforts to get approval for their Project. [Ex. 12 at 9].

At a NPB meeting on September 9, 2020, then-Chair Evans offered her opinion that if the New Bylaw were repealed, it would not adversely affect "any active application that is before the Board." [SOMF at ¶ 53]. The Valentins' counsel, Attorney Eric Goldberg, attended this NPB meeting, and he did not say anything in response to Chair Evans's comment one way or the other. [SOMF at ¶ 53]. Around this time, the Valentins reduced the number of units in their project from 11 to 9. [SOMF at ¶ 54]. At the NPB meeting a few weeks later (October 21, 2020), Chairwoman Evans noted that over the course of the hearing process, "the Planning Board would state its

---

14 A neighbor and local architect approached by the Valentins to be the architect on the Project, Michael Collins, also testified that he never heard a member of the NPB make a racist comment about Linda or Joel Valentin. [SOMF at ¶ 27].

15 While straw polls are non-binding, they are often taken by boards to signal to applicants the potential fate of an application, without taking a formal vote to deny the application. Most applicants would be motivated by such a poll to make revisions to the application at that time. The Valentins were not.

16 The NPB vote to deny the Valentins' application without prejudice was held in abeyance before finally being nullified at the NPB meeting on October 21, 2020. Chairwoman Evans stated that this decision was not based on a statute or regulation, but rather on the recommendation of Town Counsel that the vote was invalid because the Planning Board did not follow its practice of allowing petitioners to revise their application after a NPB vote. If anything, this is evidence of the manner in which the Valentins were treated by the NPB *devoid* of any racism whatsoever.

concerns at one hearing only to be facing the same issues with the Applicant at the next." [SOMF at ¶ ].

On November 4, 2020, after discussions between the Valentins' counsel and Town Counsel which further modified the Project, the Planning Board voted (4-1) to approve the massing and location of the buildings (Main House and separate barn) for this again revised version of the Project, now reduced to seven condominiums total. [SOMF at ¶ 57]. On November 10, 2020, Town Meeting voted to repeal the New Bylaw. [SOMF at ¶ 60]. Notably, the Article to repeal was sponsored by two Town residents, not the NPB. [SOMF at ¶ 60]. In fact, the NPB voted *not* to support the repeal of the New Bylaw.[17] [SOMF at ¶ 58].

By December 2, 2020, the NPB received a legal opinion from Town Counsel (later produced in this Action), that "without a permit in hand, the applicant does not have vested rights and is not protected by changes," namely, the Town Meeting vote which repealed the New Bylaw. [SOMF at ¶ 72]. As a result, there was no instrument available to approve the Valentins' application. Ms. Valentin responded by stating that she had known that the New Bylaw would be repealed "because it had been written by immigrants who are people of color." [SOMF at ¶ 72]. Not only does this statement mischaracterize who wrote the New Bylaw (principally, the Valentins' own attorney, George Richards), but also attributes a racially motivated animus to the

[17] As noted above, Natick Town Meeting is the legislative body of the Town of Natick, which operates on a one person, one vote format. Changes to bylaws voted at Town Meeting are subject to review and approval by the Massachusetts Attorney General (MA OAG). M.G.L. c. 40 § 32. Notably, the Valentins filed a request with the MA OAG asking the OAG to disapprove the Town Meeting vote which repealed the New Bylaw. [SOMF at ¶ 77]. The OAG declined to do so. [SOMF at ¶ 81]. In this regard, at his deposition, James Freas testified that no member of the Natick Planning Board ever told him that the NPB "ran the clock out" by design in an effort to thwart the Valentins' efforts to develop the Property. [SOMF at ¶ 64].

Town's entire legislative body, Town Meeting.[18] In any event, the NPB then voted (5-0) to deny the application for a Special Permit and Site Plan Review. [SOMF at ¶ 73]. On January 7, 2021, pursuant to M.G.L. c. 40A, § 17, the Valentins filed suit in the Land Court Department of the Massachusetts Trial Court appealing the decision of the NPB denying their application for a Special Permit and Site Plan Review. [SOMF at ¶ 76]. On April 9, 2021, the Valentins voluntarily dismissed their Land Court action without prejudice. [SOMF at ¶ 76].

The Town Officials pause here to comment on what the parties have referred to as the "grandfathering" issue. At the outset, it is critical to consider that the Valentins were represented by their own counsel throughout these proceedings and, according to Mr. Valentin, their counsel did provide them with legal advice on the grandfathering issue. [SOMF at ¶¶ 53, 63]. Moreover, the Valentins' counsel, Eric Goldberg, attended the very NPB meetings where Chair Evans made the statements which the Valentins claim "misled" them and he (Goldberg) never corrected Chairwoman Evans or asked for any sort of clarification. [SOMF at ¶ 53]. Furthermore, as was made clear at the deposition of Town Counsel, Karis North, following the Town Meeting vote repealing the New Bylaw, *both* the Valentins' counsel and one of the neighbor's counsel chimed in on the legal impact of the repeal on the Valentins' Project prior to the next Planning Board meeting where this issue was taken up. [SOMF at ¶ 71]. If any more need be said, the Town Officials point out the First Circuit's caution that "[promissory] estoppel against the government if it exists at all is hen's-teeth rare." *Costa v. I.N.S.*, 233 F.3d 31, 38 (1st Cir. 2000) (noting that, among other things, the proponent must demonstrate that "government agents have been guilty of affirmative misconduct").

---

[18] It is well-established that the debate surrounding and the votes taken at Town Meeting to repeal the New Bylaw cannot form the basis of liability here regardless of the Valentins' legal theory. See *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (applying legislative immunity of Speech and Debate clause to local and regional legislators).

## II. LEGAL STANDARD

The Town Officials understand the Court is familiar with the operative standard of review. *See, e.g., Cordi-Allen v. Conlon*, 2006 WL 2033897, *aff'd.*, 494 F.3d 245 (1st Cir. 2007). *Cf. Medina-Munoz v. R. J. Reynolds Tobacco Co*., 896 F. 2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (affirming summary judgment on plaintiff's age discrimination claim).

## III. STATUTORY FRAMEWORK

### A. Massachusetts General Laws Chapter 40A.

The Special Permits section of the Massachusetts Zoning Act provides, in relevant part, as follows:

> Zoning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit. Special permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards, and limitations on time or use.

M.G.L. c. 40A, § 9, para. one.[19] A party aggrieved by the decision of a special permitting authority may appeal to either the Massachusetts Superior Court or the Land Court. See M.G.L. c. 40A, § 17. Furthermore, a party aggrieved by the decision of either Superior Court or the Land Court may seek appellate review, in the first instance from the Massachusetts Appeals Court. M.G.L. c. 211A, § 10.

### B. Natick Zoning Bylaw Section III-J (Historic Preservation).

The Natick Bylaw applicable to sites of historic significance provides in relevant part that a special permit to all for a Historic Preservation project shall be granted by the Planning Board

[19] Nothing in Chapter 40A states or defines what constitutes "harmony with the general purpose. . . ."

only upon a determination "that the Plan superior to conventional site development." Section III-J.9 (Natick Zoning Bylaw). Among other criteria, the Planning Board shall use in making this determination are the following:

1. The proposed project substantially preserves the building or structure; and,
2. Determination that the development is not substantially more detrimental to abutting properties and neighborhood.
3. Appropriate use of materials and manner of construction.
4. Preservation of landscape features and scenic views.

Id.

The Town Officials start with certain abecedarian principles. There is no right to a special permit; it is discretionary with the permit granting authority. *Gulf Oil Corp. v. Board of Appeals of Framingham*, 355 Mass. 275, 277 (1969) (it is for local board to determine whether "the public welfare will be served and neighborhood will not be substantially injured."); *Zaltman v. Board of Appeals of Stoneham*, 357 Mass. 482, 483 (1970) (upholding decision of board of appeals denying special permit to construct a convalescent home in a residentially zoned area which would not "substantially serve the public interest."). "Among the purposes of the Zoning Act is to achieve greater implementation of the powers granted to municipalities, including restricting, prohibiting or regulating the uses of land. These powers are not to be narrowly construed." *Wendy's Old Fashioned Hamburgers of New York, Inc. v. Board of Appeals of Billerica*, 454 Mass. 374, 381 (2009) (internal quotations citations omitted). "In the end, the court must affirm the board's decision unless it finds that the denial of the application was based on a legally untenable ground, or was unreasonable, whimsical, capricious or arbitrary." *MacGibbon v. Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970). The Town Officials understand that the Valentins' maintain that the Town Officials and the NPB based its decisions on grounds that the Valentins believe were "legally untenable," namely, in violation of the Fair Housing Act discussed below.

## IV. LEGAL ARGUMENT.

### A. The Valentins Have Failed to Prove Their Claims Under the Fair Housing Act.

As this Court set forth the standards for maintaining a claim under the Fair Housing Act, 42 U.S.C. §§ 3604 and 3617 of the Fair Housing Act ("FHA"), in its Memorandum & Order on the Defendants' Motion To Dismiss, the Town Officials will proceed to the heart of the matter.[20]

1. The Plaintiffs' Have Failed to Establish A Section 3604 Claim.

Section 3604 of the FHA prohibits discrimination in housing based on race, color, and national origin. See 42 U.S.C. § 3604.[21] The FHA "specifically targets the discriminatory use of zoning laws. . . ." *Casa Marie, Inc. v. Superior Court of P.R. for Dist. Of Arecibo*, 988 F.2d 252, 257 n.6 (1st Cir. 1993).[22] In the absence of direct evidence of discriminatory intent, the Valentins' FHA claim is considered under the familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Casa Marie*, 988 F.2d at 269 (plaintiff must show that the defendant's discriminatory intent was a "substantial motivating factor" and provide a

---

[20] It appears the Court did not consider the Valentins' Complaint as including a claim based on discriminatory impact. [ECF No. 76 at 10]. If the Town Officials are mistaken, then, if necessary, they will address such a claim in their Reply Memorandum of Law. The Valentins' FHA claim names "All Defendants."

[21] The Valentins invoke both §§ 3604(a) & (b). [Ex. 1 at ¶ 120]. However, by its terms, Section 3604(b) prohibits discrimination "in connection with the sale or rental of a building." This Action does not concern the sale or rental of a building and, hence, the Valentins have no basis for proceeding under Section 3604(b). See, e.g., *Lawrence v. Courtyards at Deerwood Assn., Inc.*, 318 F. Supp. 2d 1133, 1142-1143 (S.D. Fla. 2004).

[22] The Valentins spend a fair amount of their Complaint commenting on the fact that Natick is a predominantly white community. This is apropos of nothing in a vacuum and the Valentins did nothing to create a record in this regard. Notably, the Town of Natick has been and remains at the 10% percent threshold for purposes of complying with the State's Affordable Housing Law a/k/a Chapter 40B, and, as mentioned above, Natick Town Meeting passed an inclusionary zoning bylaw, which mandates affordable housing or a payment in lieu be included in all new developments above a certain threshold. In any event, as the First Circuit pointed out in its decision in *Macone*, Arlington Heights had 27 black residents out or a total population of 64,000 when the village refused to rezone a parcel of land to accommodate a proposed low-income housing development, yet the Supreme Court found no violation of the Fair Housing Act. *Macone v. Town of Wakefield*, 277 F.3d 1, 8 (1st Cir. 2002) (citations omitted).

causal link between a defendant's discriminatory actions and his injury); see also *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n. 21 (1977) (plaintiff's proof of defendant's racial animus imposes on the defendant "the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered"). Assuming the Valentins have made a *prima face* case of unlawful discrimination, that is, their Project qualified to receive a special permit from the NPB, "the burden shifts to the Town Officials to advance some legitimate and nondiscriminatory reason for [their] actions." *Casa Marie, Inc.*, 988 F.2d at 269 n.20. The Town Officials have done so. First, the fact that the NPB initially supported the idea behind the New Bylaw, i.e., expanding the number of properties that might be considered of historic significance, and then changed their view as the New Bylaw applies to the Valentins' original proposal, is of no moment. [SOMF at ¶ 11]. See *Macone v. Town of Wakefield*, 277 F.3d 1, 5-6 (1st Cir. 2002) (affirming summary judgment in FHA case which, like this one, plaintiffs based their claim on the fact that town officials assisted local opposition to the plaintiff's proposed 40B project, in which a significant number of units would have been geared to low-income and minority families and explaining that *even comments made by board members* may be insufficient to thwart summary judgment). Next, that the Valentins first proposal fit within the physical space limits of the New Bylaw, is also of no moment. As noted above, the New Bylaw sets forth several other criteria for the issuance of a special permit including the project's physical and visual impact on abutters and the surrounding neighborhood. In this regard, one of the Project's neighbors, Pam Cokin, sent Steve Evers an email that is particularly compelling, as follows:

> Some questions I think should be posed to the owners at the next meeting are:
>
> What about the new building will be historic? Is any of the interior being maintained? What is the plan to "preserve" the outside? It is entirely rotted. How does building a new structure and generally copying some of the exterior aesthetics, but distorting its size, imprint, interior layout and purpose, and destroying its framework and identity have any historical

> significance? Is this really "saving" a house? Or is it just another way of destroying it? When completed, will residents and passersby look at the condo complex and say "how nice that they preserved a historic home" or will they say "what a shame that they destroyed a historic home and built condominiums instead"?

This is exactly the kind of concern that the NPB persistently conveyed to the Valentins, which the Valentins persistently ignored. Indeed, this same concern was shared by the very architect, Michael Collins, who the Valentins first approached to work on their Project. [SOMF at ¶ 27]. Likewise, the Valentins' architect, Kent Duckham, testified that neighborhood opposition to projects in residentially zoned areas is hardly uncommon and is something he has encountered in any number of towns in the Metrowest area. [SOMF at ¶ 45].[23] These concerns have nothing to do with the Valentins' race, but, instead, have everything to do with the size of their Project. If the proof is in the pudding, then the Court need not go beyond the fact the NPB recently *approved the Valentins'* most recent application for a project that is half-the-size of this original one. [SOMF at ¶ 83].

Since the NPB has articulated a legitimate, non-discriminatory reason for its decision based on the sheer size of the Valentins' project, the burden shifts to the Valentins to prove discriminatory intent. *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 96 (D. Mass. 2010) ("*SMOC*"). Courts have found "discriminatory intent may be established where animus toward a protected group is a significant factor in the community opposition to which the commissioners are responding." *A.F.A.P.S. v. Regulations & Permits Administration*., 740 F. Supp. 95, 104 (D.P.R. 1990).[24] The Valentins' efforts to establish

---

[23] Neighborhood involvement in the zoning process writ large is nothing new nor is it intrinsically impermissible. See generally, Ellis, H., *Neighborhood Opposition And The Permissible Purposes Of Zoning*, 7 J. Land Use & Envtl. Law 275 (Spring 1992).

[24] In stark comparison to the neighborhood opposition conveyed on stop50Pleasant.com, the neighbors' opposition to the plaintiff's hospice in *AFAPS* included constructing a building directly across the street to monitor the activities of the hospice round-the-clock, petitions, picket lines, graffiti, an administrative complaint, letters to various public bodies, a local court action and appearances on local television programs. *AFAPS*, 740 F. Supp. at 99. Other than sending emails to NPB conveying their

discriminatory intent rest virtually entirely on their presumption that a handful of allegedly racist emails from neighbors of 50 Pleasant Street constitutes a "significant factor" in the overall community opposition, which, throughout the NPB hearings, actually concerned the size of the Project, and that the Town Officials acquiesced to the neighbors' "racism." [SOMF at ¶¶ 45-46, 51-52]. However, as noted above, the Valentins did not depose anyone representing stop50Pleasant.org or otherwise take any discovery to attempt to measure the magnitude of the "neighbors" opposition to their Project. Thus, any reference to opposition of Town "residents" as a "racist" is altogether misleading. Opponents of residential housing are often labeled this way but rarely is this accompanied by survey data or a clear indication that this is a representative voice of a community's residents rather than a select few outliers. People who attend neighborhood meetings, zoning hearings, and similar public forums do not necessarily represent the broader community. The Valentins have not adduced any evidence that the relatively small group of neighbors who were opposed to their Project are representative of the entire citizenry of the Town of Natick and, moreover, that their opposition to the Project was on account of the Valentins' race.[25] A policy disagreement is respectable. A spurious charge of racism is not. For all of the reasons discussed above, the Valentins have failed to make a showing of discriminatory intent and their § 3604 claim should be dismissed.

2. The Plaintiffs' Section 3617 Claim Fails as a Matter of Law.

Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any

---

concern with the size of the Valentins' Project, and attending NPB meetings, their South Natick neighbors did not engage in *any* of these activities .

25 For example, recently the news has been filled with stories of those in favor of and those opposed to the so-called "15-minute city." See, e.g., "The pushback against the 15-minute city," Boston Globe, March 6, 2023, A-9. This latest brouhaha about urban development has nothing to do with race.

person in the exercise or enjoyment of" rights granted under Section 3604. 42 U.S.C. § 3617.[26]

To prevail on a § 3617 claim, a plaintiff must show:

1) the plaintiff is a member of an FHA-protected class;
2) the plaintiff exercised a right protected by §§ 3603- 06 of the FHA, or aided others in exercising such rights;
3) the defendants' conduct was at least partially motivated by intentional discrimination; and
4) the defendants' conduct constituted coercion, intimidation, threat, or interference on account aided, or encouraged others in protected by the FHA.

*SMOC*, 752 F. Supp. 2d at 95 n. 4.[27]

The Town Officials submit that the Valentins have failed to adduce evidence to support the last two prongs. First, nothing in the ample discovery record supports a finding that the NPB's conduct was at least partially motivated by *intentional* discrimination. Of the scores, if not

[26] At the pleadings stage, this Court dismissed the Valentins' claim (Count V) under the Mass. Civil Rights Act ("MCRA"). The MCRA contains language, *i.e.* threats, intimidation, or coercion, that is substantially similar to Section 3617. The only difference is that Section 3617 contains the additional word "interference." The Town Officials submit that the Valentins have failed to establish that each one of the individual Town Officials, acting in their individual capacities, engaged in conduct which constitutes "interference" under and within the meaning of Section 3617. See *SMOC*, 752 F. Supp. at 104 (noting difference in case law as to whether interference encompasses more than physical force or intimidation and concluding that interference under the FHA may be based on "a pattern of harassment, invidiously motivated.") (citation omitted). Even accepting this broader view of what may constitute interference under Section 3617 and putting aside whether their conduct was "invidiously motivated," the Valentins *have not even alleged*, let alone established, that the Town Officials engaged in conduct that remotely constitutes a "pattern of harassment" on their part. On the contrary, the Valentins alleged that the NPB failed to admonish those people who allegedly made racist comments at a few of the NPB hearings. But this allegation cannot be squared with the discovery record, which shows that Chairwoman Evans objected to comments by neighbors and abutters who claimed the Project was an attack on the suburbs and/or an attack on South Natick. [SOMF at ¶ 33]. For this reason alone, the Court should now dismiss the Valentins' Section 3617 claim. See, e.g., *Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 347-348 (6th Cir. 1994) (affirming summary judgment on plaintiff's FHA §3617 claim against, among others, neighbors notwithstanding that there was some evidence of discriminatory animus on the neighbors' part).

[27] Citing Judge Woodlock's decision in *SMOC*, the Valentins' contend that because the actions of the NPB were taken as a "collective body," then all of the Board members are responsible for the "interference alleged." [EFC No. 31 at 12 n.4]. This proposition is contrary to well-established First Circuit law. See e.g., *Collins v. Nuzzo*, 244 F.3d 246, 251 (1st Cir. 2001)**;** *Yerardis v. Bd. Selectmen of Town of Randolph*, 878 F.2d 16, 20 (1989) (reversing denial of summary judgment on qualified immunity grounds and holding that courts must view "each defendant's actions, not the actions of the Board collectively").

hundreds of hours of hearings before the NPB, the Valentins cite a single statement by a single member of the NPB, Glen Glater, [Ex. 1 at ¶ 84], which evinces no suggestion of discrimination.[28] Instead, the Valentins maintain that the NPB acquiesced to the neighbors who were opposed to their Project, *i.e.*, stop50Pleasantst.com. The Valentins only took the deposition of two members of the NPB and they did not depose a single neighbor of 50 Pleasant Street.[29] Hence, there is nothing in the record to support the Valentins' claims concerning the so-called "acquiescence" of a single member the NPB, let alone a majority of the NPB. The two NPB members who were deposed—Theresa Evans and Andrew Meyer—are not members of stop50Pleasant.com nor is there any evidence that they were swayed by its members to not approve the Valentins' original or second proposal for the Property.[30] Moreover, Chair Evans expressly testified that she objected to comments from members of the public that the Project "was an attack on the suburbs and/or an attack on South Natick." [SOMF at ¶ 33]. The ample discovery record does not support a theory of acquiescence. Second, the Town Officials did not engage in any conduct that HUD defines as "coercion, intimidation, threat, or interference" under the FHA. See 24 C.F.R. §100.400.[31] Any

[28] As the First Circuit observed, this one statement would not and does not "support a finding of discriminatory intent on the part of the [entire] Board." *Macone, supra*, 277 F.3d at 6.

[29] Conspicuously, the Valentins did not depose the one NPB member, Glen Glater, who allegedly made the statement with which they take issue, to wit it would "make him sick" if he lived next door to the Project.

[30] The NPB is a duly-elected independent body and the Valentins have not established whether any of the members of the NPB were supported financially or otherwise by the South Natick neighborhood which contains 50 Pleasant Street. In fact, there is no evidence that any of the NPB live in South Natick. Hence, the notion that the members of the NPB "acquiesced" to the "white neighbors" of South Natick to secure their re-election to the NPB is without any basis whatsoever.

[31] The Town Officials are aware that the conduct described Section 100.400 may not be exhaustive. Still, the term "interference" is not without limitation. See *Gourlay v. Forest Lake Estates Civic Ass'n. of Port Richey, Inc*., 276 F. Supp. 2d 1222, 1235 (M D. Fl. 2003) (concluding that the phrase "interference" in Section 3617 "extends only to discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights."). Far from

delay in voting on the Valentins' Project was borne of the Valentins' own intransigence with respect to their multiple submissions (each requiring the publication of notice of a public hearing at least 14 days in advance), withdrawal of those submissions, and refusal to submit a proposal which was responsive to the NPB's concerns about the size and massing of the Project—as they were repeatedly urged to do by the NPB. [SOMF at ¶ 41].

As to any "misrepresentations" concerning the consequences of the repeal of the New Bylaw, apparently, the Valentins' own lawyer agreed with Theresa Evans (a non-lawyer) when she made this comment at the NPB as he (Eric Goldberg) was present and did not correct her at the time or ever offer a contradictory legal opinion to or for the NPB. [SOMF at ¶ 53]. Moreover, Chair Evans testified that she based her statements on her understanding that the Valentins' Project would be treated the same as a project under Massachusetts subdivision control law, which provides that a project filed as part of the approval of a subdivision is protected from the date of the filing of the plan, while the subdivision application is pending. M.G.L. c. 40A, § 6. Chair Evans was mistaken; however, her misunderstanding of the law does not support a finding that the NPB intentionally interfered with the Valentins' rights under the FHA.[32] In sum, the Valentins have failed to establish that the NPB's conduct was at least partially motivated by their race and, accordingly, the Town and Town Officials should be awarded summary judgment on their FHA claims.

---

"abandoning" their plans to develop 50 Pleasant Street, the NPB recently voted to approve the Valentins' request for a Special Permit. [SOMF at ¶ 83].

[32] As noted above, it is for precisely this reason the promissory estoppel against public officials is highly disfavored.

### B. The Valentins' Equal Protection Claim Fails Because They Have Not Identified a Legally Adequate Comparator.

"Section 1983 is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights" under color of state law. *Alston v. Spiegel*, 988 F.3d 564, 574 (1st Cir. 2021) (citation omitted).[33] To prosecute a claim under Section 1983, the Valentins must show that they were deprived of a constitutional or federal right, that a causal connection exists between their conduct and the deprivation of that right, and that the Town Officials' conduct constitutes state action. *Id.* (citations omitted). The Valentins' equal protection claim rests on the same infirm pillar as their FHA claims. As this Court observed in its earlier decision, "'[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" [ECF No. 76 at 12-13 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (discussing a Fourteenth Amendment claim)]. "Circumstantial evidence includes "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decision making body." *Id*. at 267–68. [ECF No. 76 at 12-13]. It bears repeating, as the First Circuit commented in a similar setting, "[t]he [Valentins] aspired to build a compound." *Cordi-Allen v. Conlon*, 494 F.3d 245, 249 (1st Cir. 2007) (affirming summary judgment in plaintiff's class-of-one equal protection claim).

---

33 It is worth noting that in *Alston*, the First Circuit emphasized that even at the pleadings stage, "we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted." 988 F.3d at 573 (emphasis in original). Here, as they stated in their Opposition Memorandum, [Doc. No. 31 at 3], the Valentins maintain as follows: "In short, Defendants conspired to delay approval of the Valentins' special permit until the opponents could secure repeal of the New Bylaw." The members of the NPB are not sooth sayers. Even assuming *arguendo* that this was their collective goal, there is no way the NPB could have predicted the outcome of a Town Meeting one-person, one-vote on the repeal of the New Bylaw. Indeed, at her deposition, Chair Evans testified, "It was like no, there's no way that this is going to be repealed. It didn't cross my mind." [SOMF at ¶ 59].

The Town Officials start with the allegations of "racist" comments by neighborhood opposition lobbying to oppose the Project and repeal the New Bylaw. The Valentins rely on a handful of allegedly racist comments made over the course of nearly 14 months of hearings about 50 Pleasant Street and not a single racist comment made by a single member of the NPB.[34] Indeed, the Valentins conceded as much in their Responses to the Defendants' Requests for Admissions. [SOMF at ¶ 30]. Next, in addition to the support the Valentins received from Natick Black Lives Matters, there were a number of Town residents who sent emails to the NPB *supporting* their efforts to develop 50 Pleasant Street. Moreover, the NPB as a body voted *not to support* repeal of the New Bylaw.[35] [SOMF at ¶¶ 56, 58]. Finally, Chair Evans admonished certain neighbors/abutters who made comments about the Project being an attack on the suburbs/an attack on South Natick. [SOMF at ¶ 33]. If any inference can be drawn from these facts, it is that the NPB did not acquiesce to the opposition of the "racist" comments of a handful of neighbors who live near 50 Pleasant Street. "The fact that the Town did not act as expeditiously as Plaintiff[s] wanted does not mean that the Town violated [their] constitutional rights." *Wall Street Group, LLC v. Epro*, 564 F. Supp.2d 84, 93 (D. Mass. 2008) (allowing the Town officials motion for judgment on the pleadings with respect to plaintiff-developer's equal protection claim). It is also worth noting that on February 15, 2023, the NPB approved the Valentins' application for a historic preservation special permit (with conditions) *four months* after they submitted their most recent application for a project which is roughly half-the-size of their original proposal. [SOMF at ¶ 83].

---

[34] Among other alleged "racist' comments, the Valentins claim that one person opposed to their Project accused the Valentins of not paying their taxes. [SOMF at ¶ 50]. The actual comment made does not refer to and has nothing to do with the Valentins—not even remotely. [SOMF at ¶ 50].

[35] Whatever the nature of the Valentins' claim against Steve Evers, it cannot be based on his (Evers') advocacy at Town Meeting to repeal or modify the New Bylaw. See *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (applying legislative immunity of Speech and Debate clause to local and regional legislators).

Likewise, for the reasons explained above, the Valentins' alternative theory of a "class of one" claim based on the Eliot Street Church Project (Church Project) comparator should now be dismissed. Courts should proceed with caution in considering class-of-one equal protection claims. "It is always possible for persons aggrieved by government action to allege . . . that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1121 (10th Cir. 2004). To begin with, the burden is on the Valentins to "first identify and relate specific instances where persons *similarly situated in all relevant aspects* were treated differently." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original) (internal quotation mark omitted). The Valentins have failed to do so. The Valentins have identified a single comparator, The Church Project, and rely entirely on the shorter length of time the NPB spent in hearings related to that project. [Ex. 1 at ¶¶ 81, 99, 115, 117, 119]. However, the Church Project is different for a number of reasons. First, it was decided under a different section of the Town's Historic Preservation Bylaw before the New Bylaw was enacted. [SOMF at ¶ 85]. Second, the Church Project is a project of a much different scale; the Church Project (under the Old Bylaw) was only allowed up to 10% additional square footage from the original footprint, as opposed to the Valentin's Project which (under the New Bylaw) permitted up to 100% replication of the original footprint. [SOMF at ¶¶ 86-87]. Third, the Church Project does not have an in-ground pool or underground parking. [SOMF at ¶¶ 88-89]. Fourth, the Church Project proposed preserving the entire building with only nominal changes to the exterior of the church structure and limited landscaping. [SOMF at ¶ 90]. Finally, the Church Project is in a "town center" more densely populated area of South Natick, which allows a mix of commercial and residential, with smaller lot sizes. The Valentins' Project is in the single-family residential portion of South Natick, with much lower density. Comparing the Church

Project and the Valentins' Project is like comparing apples to oranges. [SOMF at ¶ 91]. Indeed, Michael Collins testified that, unlike the Valentins' Project, the Church Project did not attempt to more than double the size of the building and was actually planning on restoring the structure to its historic standards. [SOMF at ¶ 92]. Under the circumstances, the Valentins have not met the "more stringent burden" of proof that the First Circuit has recognized applies in class of one equal protection cases. *Cordi-Allen*, 494 F.3d at 252 (warning that federal courts should not become "transmogrified into a supercharged version of a local zoning board—a zoning board on steroids, as it were."). For all of these reasons, the Town and Town Officials should be awarded summary judgment on the Valentins' equal protection claim.

### C. The Valentins' Substantive Due Process Claim Fails as a Matter of Law Because They Are Not Entitled to a Special Permit as of Right and, in Any Event, the Town Officials' Conduct Does Not "Shock the Conscience."

At the outset, the Town Officials note that the First Circuit has held where, as here, plaintiff relies on another constitutional provision, a substantive due process claim is disfavored. *See Pagan v. Calderone*, 448 F.3d 16, 32-33 (1st Cir. 2006); see also *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (same). "The due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes" because "[i]n the vast majority of instances, local and state agencies and courts are closer to the situation and better equipped to provide relief." *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992). The First Circuit has only "left the door slightly ajar for federal relief in truly horrendous situations." *Id*. The applicable standard is that the abuse of power must "shock[] the conscience" and violate the "decencies of civilized conduct." *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "[I]n order to shock the conscience, conduct must at the very least be extreme and outrageous, or, put another way, truly outrageous, uncivilized, and intolerable." *Pagan*, 448 F.3d at 32.

The Valentins have failed to establish that they have a "legitimate claim of entitlement" to

the special permit they were seeking from the NPB. *Macone*, 277 F.3d at 9; see also *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."); cf. *Miller v. Town of Wenham Massachusetts*, 833 F.3d 46, 52 (1st Cir. 2016) (no protected property interest in "having the [local] Building Inspector pursue enforcement" of zoning ordinance or bylaw). Hence, the Court need not proceed beyond this point.

Continuing, nonetheless, the NPB was presented with a proposal that many of its members, and at least one local architect (Michael Collins) believed was too large for the property and barely, if at all, did anything to preserve the historic character of the Main House. [SOMF at ¶ 92]. The NPB's concerns included not just the size of the Project, but also the impact on local traffic, flooding on to neighbors' properties and safety around certain site lines, related to entering and exiting the Project. [SOMF at ¶ 44]. That a number of neighbors near 50 Pleasant Street expressed the same concerns does not lessen their legitimacy. And, that some of the neighbors' concerns about the size of the project, traffic, run-off and the like, were considered by the NPB, does not amount to a due process violation. As the First Circuit said in *Nestor Colon*, "[t]hat is what politicians are paid to do. For federal courts to attempt to regulate, as a matter of substantive due process, the permissible extent to which government administrators may take such opposition into account would seriously embroil them in unpromising and unwarranted efforts to tailor the democratic process." *Nestor Colon*, 964 F. 2d at 47. Taken together with the Valentins' failure to establish that the "delay" caused by the NPB was the result of any racial animus of the NPB, the Valentins' substantive due process claim should now be dismissed. See, e.g., *Collins*, 244 F.3d at 251 (a licensing board member's personal animus toward the plaintiff—which the Valentins have

neither alleged nor proven here—does not satisfy the shock-the-conscience test).

**D. The Individual Town Officials Are Immune from Suit.**

As public officials, the individual Town Officials are entitled to immunity from suit under numerous constitutional and common law principles. All individual Town Officials are entitled to qualified immunity. In addition, the members of the NPB (Theresa Evans, Andrew Meyer, Julian Munnich, Glen Glater, and Peter Nottonson) are each entitled to quasi-judicial immunity. Finally, the NPD members who are also elected Town Meeting member are entitled to absolute legislative immunity to the extent any claim is predicated on anything they said or any votes they took at the Fall 2020 Town Meeting session on November 10, 2020.[36] The individual Town Officials address these arguments in turn, below.

1. The Individual Town Officials are Entitled to Qualified Immunity.

In its decision on the Defendants' Motion to Dismiss, this Court stated that it would revisit the issue of qualified immunity at summary judgment on a fuller record with respect to *each* of the town officials' *individual* actions. [ECF No. 76 at 20]. Here, Steve Evers stands somewhat apart from the other Town Officials. Steve Evers is one-member of a ten-person board, the Historical Commission, [SOMF at ¶ 4],which, as the Valentins concede, on July 16, 2018 voted *unanimously* to declare 50 Pleasant Street a site of historical significance. [Ex. 1 at Ex. C; SOMF at ¶ 16]. Under the circumstances, Evers cannot be held liable to the Valentins in his official capacity. In his individual capacity, Evers' emails with those Town residents who supported repealing the New Bylaw were sent from his own private email address. [SOMF at ¶ 55]. Thus, contrary to the several town officials who used their *official* position to "manipulate the treatment of plaintiff's permit applications" in *SMOC v. Town of Framingham* (citation omitted), here, Evers exercised his own

[36] Julian Munnich, Andrew Meyer, Peter Nottonson, Glen Glater and Theresa Evans. [SOMF at ¶ 61].

First Amendment rights when advocating to repeal or revise the New Bylaw. As the First Circuit has stated, "members of local boards have considerable leeway for the free exercise of their personal views before any possible due process claim might exist." *Raskiewicz v. Town of New Boston*, 754 F.2d 38, 45 n.5 (1st Cir. 1985) (affirming summary judgment in plaintiff's Section 1983 claim against Select Board arising from plaintiff-landowner's attempts to secure a gravel removal permit for use at his property)). Furthermore, since the NPB alone is the Town's special permit granting authority, Evers had neither the ability nor authority to "manipulate" the NPD's own deliberations. Evers is therefore entitled to qualified immunity.

What then did each member of the NPB do in his/her individual capacity which would forfeit their right to qualified immunity from suit? The simple answer is "nothing." To begin with, there is nothing in the discovery record that suggests any NPB members were acting other than in his/her official capacity, and the Complaint alleges that the members were at all times acting in their official capacity. [Ex. A at ¶ 25, 154]. This distinguishes the conduct of the NPB members from the public officials in *Shelley v. Kramemer*, who allowed restrictive covenants to parcels of land based on race, thus, denying equal protection of the laws guaranteed by the Fourteenth Amendment. 334 U.S. 1 (1948).[37] Next, even assuming *arguendo* that the Valentins' property rights were clearly established at the time of the hearings before the Natick Planning Board, the individual members of the NPB are entitled to qualified immunity from suit because they did not, as this Court observed earlier, take "procedural steps to thwart the project in light of private

[37] As noted above, the Town Officials suspect that the Valentins will argue that NPB Chair Evans made certain affirmative comments at two Planning Board meetings and at Town Meeting about the so-called "grandfathering" issue and the Valentins relied on her statements to their detriment. At least with respect to any such comments Evans made at Town Meeting, her motivation for doing so is not attributable to the entire Town Meeting including any members of the NPB who are also Town Meeting members. See *United States v. Jimenez-Joachin*, 2022 WL 17736798 at *4 (D. Mass. Dec. 16, 2022) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it[.]")(citing *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

community opposition based on race." The Town Officials were and are aware that any less favorable treatment of the Valentins on account of their race is impermissible. The Valentins have produced no evidence that the white developers of the Church Project were treated more favorably than the Valentins. Moreover, harkening back to the *McDonnell-Douglas* paradigm, the Town Officials have established that the NPB would have taken the same conduct notwithstanding the Valentins' race for reasons having nothing to do with their race. Therefore, the NPB members are entitled to qualified immunity from suit.

2. <u>The Town Officials Are Entitled to Quasi-Judicial Immunity</u>.

At common law, municipal officials are entitled to immunity from suit where they act in a quasi-judicial role. See, e.g., *Bettencourt v. Bd. of Registration In Med. of Com. of Mass*., 904 F.2d 772, 784 (1st Cir. 1990) (quasi-judicial immunity appropriate for members of Massachusetts medical licensing board); see also *Butz v. Economou*, 438 U.S. 478, 508 (1977) ("there are some [public] officials whose special functions require a full exemption from liability."). When determining whether an official is entitled to quasi-judicial immunity from suit, courts consider three factors:

> First, does a Board member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the complaining party's] rights?

*Diva's Inc. v. City of Bangor*, 411 F.3d 30, 41 (1st Cir. 2005) (alterations in original) (quoting *Bettencourt*, 904 F.2d at 783). Because the NPB members here meet all three factors set forth in *Bettencourt*, they are entitled to quasi-judicial immunity from suit.

In *Diva's Inc*., the owners of a semi-nude dancing establishment sued the City of Bangor and the individual members of the Bangor City Council asserting Section 1983 and state-law tort

claims in connection with the denial of a special amusement permit. 411 F.3d at 33, 35-36. As relevant here, both the district court and the First Circuit determined that the individual City Council members were entitled to quasi-judicial immunity from suit "because they were acting in a quasi-judicial capacity when they denied the special amusement permit. . . ." *Id*. at 41. In reaching this conclusion, the First Circuit noted made the following observations:

> [T]he Council members performed an "adjudicatory" function when they reviewed and voted on Diva's special amusement permit: they held a hearing, heard testimony, asked questions, discussed the matter, made their decision, and then provided a written explanation of their reasoning. Second, the act of denying a special amusement permit can be controversial, and can prompt litigation, as it did in this case. . . . Lastly, there are procedural safeguards that operate to protect a special amusement permit applicant from the violation of its constitutional rights. Indeed, this case presents a perfect example: Diva's exercised its statutory right to (1) request a written explanation of the reasons justifying the Council's denial of the special amusement permit, . . . and (2) appeal the decision to the Bangor Board of Appeals. . . . And, if Diva's had lost its appeal to the Bangor Board of Appeals, it had recourse to the Maine state courts. . . .

*Id*. (internal citations omitted).

*Diva's Inc*. applies on all four with the present case. Like the City Council in *Diva's Inc*., the NPB members here held numerous public hearings, heard testimony from the Valentines and their supporters and detractors, discussed the matter, made their decision, and then, with the assistance of Town Counsel, issued a written decision explaining their reasoning. Indeed, the bulk of the meetings were spent attempting in good faith to apply the legal requirements of the New Bylaw to the Valentin's Project, and consisted of extensive testimony from the Valentins, their supporters, their architect, and certain abutters who opposed the project. [SOMF at ¶ 41]. The NPB members, therefore, meet the first factor. Additionally, the act of hearing and then denying the special permit application clearly was controversial for at least two reasons. First, the application prompted strong opposition from the abutters—which the Valentins do not dispute—and, second it prompted almost immediate litigation by the Valentins in both the Massachusetts Land Court

and in this Court. [SOMF at ¶¶ 44-45, 76]. The NPB members, therefore, meet the second factor. Finally, there are procedural safeguards to protect the Valentins from alleged violations of their rights. As true in *Diva's Inc*., here the Valentins have and, in fact, exercised their statutory right to appeal the NPB's decision to the Massachusetts Superior Court or Land Court pursuant to M.G.L. c. 40A, § 17. Furthermore, the Valentins could seek appellate review of any adverse finding by the Land Court or Superior Court. See M.G.L. c. 211A, § 10 (the Appeals Court "shall have . . . appellate jurisdiction . . . with respect to a determination made in . . . the superior court department [and] . . . the land court department"). The NPB members, therefore, meet the third factor. Because the NPB members were acting in a quasi-judicial role when they heard, deliberated, and ultimately voted on the Valentins' special permit application, they are individually entitled to quasi-judicial immunity from suit. See *Quarterman v. City of Springfield*, 716 F.Supp. 67, 75-76 (2009) (Ponsor, J.) (granting city official's motion for summary judgment in part based on quasi-judicial immunity on a claim that denial of liquor license transfer by the City Council was motivated by racial animus).

3. The Town Officials Are Entitled to Legislative Immunity to the Extent any Liability is Alleged from their Votes at Town Meeting.

Although not articulated with any clarity, to the extent the Valentins' claims are predicated on any statements made or votes taken during the 2020 Fall Town Meeting, including the November 10, 2022 session, absolute legislative immunity applies. As noted above, Town Meeting is "a special form of government dating back to the colonial era and often considered an exemplar of pure democracy. Town meetings in colonial times were charged with administrative and judicial as well as legislative duties." *Curnin*, 510 F.3d at 26 (citations omitted). In Natick, Town Meeting represents the legislative arm of municipal government. [SOMF at ¶ 2]. The Supreme Court has extended absolute legislative immunity to local legislators, including municipal officials. See, e.g.,

*Bogan*, 523 U.S. at 49, 52. Here, Theresa Evans, Andrew Meyer, Julian Munnich, Glen Glater, and Peter Nottonson were all Town Meeting members, *i.e.* local legislators, at the November 2020 Town Meeting at which the New Bylaw was repealed. [SOMF at ¶ 61]. As such, any liability against them that is predicated on statements they made or votes they took on the floor of Town Meeting is barred by absolute legislative immunity. See, e.g., *Carlow v. Mruk*, 425 F.Supp.2d 225, 235-236, 239 (D.R.I. 2006) (Smith, J.) (legislative immunity protected moderator at a fire district meeting when he announced a rule of order prohibiting videotaping except by the press and enforced a rule of order that banned nonresidents from speaking or otherwise participating); *Fountain v. City of Methuen*, U.S. Dist. C.t, No. 21-CV-11046-AK, 2022 WL 4382386, at *4 (D. Mass. Sept. 22, 2022) (Kelley, J.) (legislative immunity applied to statements made by Methuen City Council members during a public meeting leading up to a city council vote).

## CONCLUSION

Wherefore, the Town of Natick and the Natick Officials respectfully submit that this Court should award them summary judgment on all of Plaintiffs' claims together with such other relief as the Court deems just and proper.

Respectfully submitted,

The Defendants,

TOWN OF NATICK, PLANNING BOARD OF THE TOWN OF NATICK, THERESA EVANS in her individual capacity and in her official capacity as planning board member for the Town of Natick, ANDREW MEYER in his individual capacity and in his official capacity as planning board member for the Town of Natick, JULIAN MUNNICH in his individual capacity and in his official capacity as planning board member for the Town of Natick, GLEN GLATER in his individual capacity and in his official capacity as planning board member for the Town of Natick, PETER NOTTONSON in his individual capacity and in his official capacity as planning board member for the Town of Natick, NATICK HISTORICAL COMMISSION, and STEPHEN EVERS, In his individual capacity and in his official capacity as Chair of the Natick Historical Commission,

By their Attorneys,

**PIERCE DAVIS & PERRITANO LLP**

*/s/ Adam Simms*

Adam Simms, BBO #632617
Justin L. Amos, BBO #697232
Colleen M. Howard, BBO #710250
10 Post Office Square, Suite 1100N
Boston, MA 02109
(617) 350-0950
asimms@piercedavis.com
jamos@piercedavis.com
choward@piercedavis.com

Dated: April 4, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on April 4, 2023.

*/s/ Adam Simms*

Adam Simms, Esq.