**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LINDA VALENTIN, JOEL VALENTIN, and GRACE GABLE MANOIRS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TOWN OF NATICK, et al.,<br><br>Defendants. | Case No. 1:21-cv-10830-PBS<br><br>Judge Patti B. Saris<br>Magistrate Judge Paul G. Levenson<br><br>Jury Trial Demanded |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES ........ ii**
**INTRODUCTION........ 1**
**FACTUAL BACKGROUND ........ 1**

A. Plaintiffs, their Project, and the New Bylaw........ 1
B. Societal context of the race-based opposition to the Valentins' project........ 3
C. Neighbor opposition motivated by racial and national origin-based animus ........ 4
D. Defendants acquiesce to the racially charged opposition to the Project........ 6
E. The successful campaign to repeal the New Bylaw and doom the Project ........ 8
F. The Second Town Counsel Opinion and the denial of the Valentins' Project ........ 9
G. White developers received much better treatment from the NPB ........ 10

**LEGAL STANDARD ........ 11**
**ARGUMENT........ 11**

**I. A Reasonable Jury May Find that Defendants Discriminated Against Plaintiffs in Violation of the Fair Housing Act ........ 11**

A. Summary judgment is unwarranted on Plaintiffs' § 3604 claim ........ 11
B. A reasonable jury may find Defendants liable under 42 U.S.C. § 3617........ 20

**II. Factual Issues Preclude Granting Summary Judgment to Defendants on Plaintiffs' Equal Protection Claim ........ 22**

A. A reasonable jury could find that Defendants subjected the Valentins to selective treatment on account of their race........ 22
B. A reasonable jury could find Defendants liable under a class-of-one Equal Protection theory........ 25

**III. Factual Issues Preclude Summary Judgment for Defendants on Plaintiffs' Substantive Due Process Claim ........ 26**

A. The NPB's treatment of the Valentins shocks the conscience........ 26
B. A jury could find the Valentins were entitled to a permit........ 28

**IV. No Individual Defendant is Entitled to Immunity from Suit........ 28**

A. The Individual Defendants are not entitled to qualified immunity........ 28
B. The Individual Defendants are not entitled to quasi-judicial immunity ........ 29

**CONCLUSION ........ 30**
**REQUEST FOR ORAL ARGUMENT........ 30**

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ahmed v. Johnson*,
752 F.3d 490 (1st Cir. 2014)....................13, 14

*Ass'n of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Reglamentos y Permisos (A.R.P.E.)*,
740 F. Supp. 95 (D.P.R. 1990)....................12, 22

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
818 F.3d 493 (9th Cir. 2016)....................14, 16

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)....................28

*Brockton Power LLC v. City of Brockton*,
948 F. Supp. 2d 48 (D. Mass. 2013)....................27

*Buchanan v. Maine*,
469 F.3d 158 (1st Cir. 2006)....................23

*Carlson v. Univ. of New England*,
899 F.3d 36 (1st Cir. 2018)....................11

*Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*,
988 F.2d 252 (1st Cir. 1993)....................12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................13

*Centro Presente v. United States Dep't of Homeland Sec.*,
332 F. Supp. 3d 393 (D. Mass. 2018)....................14, 15, 18, 19

*Collier v. Town of Harvard*,
No. CIV.A.95-11652-DPW, 1997 WL 33781338 (D. Mass. Mar. 28, 1997)....................28

*Cordi-Allen v. Conlon*,
494 F.3d 245 (1st Cir. 2007)....................26

*Del Rio Gordo v. Hosp. Ryder Mem'l Inc.*,
No. 13-1145(BJM), 2018 WL 542222 (D.P.R. Jan. 23, 2018)....................12

*Diva's Inc. v. City of Bangor*,
411 F.3d 30 (1st Cir. 2005)....................30

*Fife v. MetLife Grp., Inc.*,
411 F. Supp. 3d 149 (D. Mass. 2019)....................11

*Fortress Bible Church v. Feiner*,
694 F.3d 208 (2d Cir. 2012)........................................25

*KG Urb. Enterprises, LLC v. Patrick*,
No. CIV.A. 11-12070-NMG, 2014 WL 108307 (D. Mass. Jan. 9, 2014) ..........24

*Koss v. Palmer Fire Dist. No. One*,
53 F. Supp. 3d 416 (D. Mass. 2014) ........................................12

*LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412 (2d Cir. 1995)........................................12, 14

*Martinez v. Cui*,
608 F.3d 54 (1st Cir. 2010)........................................26

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016)........................................14, 15, 24

*Mihos v. Swift*,
358 F.3d 91 (1st Cir. 2004)........................................29

*Mongeau v. City of Marlborough*,
492 F.3d 14 (1st Cir. 2007)........................................27

*Norton v. Autoridad de Acueductos y Alcantarillados*,
898 F. Supp. 2d 396 (D.P.R. 2012)........................................25

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000)........................................13

*Revok v. Cowpet Bay W. Condo. Ass'n*,
853 F.3d 96 (3d Cir. 2017)........................................21

*Rubinovitz v. Rogato*,
60 F.3d 906 (1st Cir. 1995)........................................24

*S. Middlesex Opportunity Council, Inc. v. Town of Framingham (SMOC)*,
752 F. Supp. 2d 85 (D. Mass. 2010) ........................................20, 21

*SBT Holdings, LLC v. Town of Westminster*,
547 F.3d 28 (1st Cir. 2008)........................................23

*Swain v. Spinney*,
117 F.3d 1 (1st Cir. 1997)........................................29

*Taite v. Bridgewater State Univ., Bd. of Trustees*,
999 F.3d 86 (1st Cir. 2021)........................................11

*Tapalian v. Tusino*,
377 F.3d 1 (1st Cir. 2004) .....22

*Valentin v. Town of Natick*,
— F. Supp 3d. —, 2022 WL 4481412 (D. Mass. Sept. 27, 2022) ..... *passim*

*Velez v. Thermo King de Puerto Rico, Inc.*,
585 F.3d 441 (1st Cir. 2009) .....14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ..... *passim*

*Village of Willowbrook v. Olech*,
528 U.S. 562 (2000) .....25

**Statutes**

42 U.S.C. § 3604 ..... *passim*

42 U.S.C. § 3617 .....20

Mass. Gen. Laws Ann. ch. 40A, § 17 .....30

**Other Authorities**

24 C.F.R. § 100.85 .....5

Fed. R. Civ. P. 12) .....30

## INTRODUCTION

Plaintiffs Linda Valentin, Joel Valentin, and Grace Gable Manoirs, LLC (collectively, "Plaintiffs" or the "Valentins") sought to develop residential condominiums at their historic property at 50 Pleasant Street in South Natick, an area with exceedingly few Black residents. But the Valentins were stymied by racially charged neighborhood opposition and an acquiescent Natick Planning Board (NPB). The record demonstrates material disputes of fact that preclude summary judgment for each of Plaintiffs' claims. Rather than identifying the portions of the record that show a lack of a genuine factual dispute, Defendants' Memorandum of Law (Dkt. 109) (hereinafter "Mot.") asserts factual arguments that are reserved for a jury at trial. Summary judgment is not appropriate, and the Court should deny Defendants' motion in full.

## FACTUAL BACKGROUND

### A. Plaintiffs, their Project, and the New Bylaw

Plaintiffs Joel and Linda Valentin are Black Haitian immigrants who reside in Natick, MA. Plaintiffs' Supplemental Statement of Material Facts ("Pl. SOMF") ¶ 1. Since at least 2018, the Valentins have sought to develop their property at 50 Pleasant Street in South Natick (the "Property") by building new residential condominium units (the "Project"). *Id.* ¶ 7. The Property sits on a 63,256 square foot lot in a community where only 1.3% of residents are Black.[1] *Id.* ¶ 8.

To achieve their vision, the Valentins worked closely with the NPB to draft what eventually became Section III-J-10[2] of the Natick Zoning Bylaws (the "New Bylaw"). *Id.* ¶ 9. Defendants Teresa Evans, Andrew Meyer, Julian Munnich, Glen Glater, and Peter Nottonson are

---

[1] *See How many people live in Census Tract 3823, Middlesex County, Massachusetts*, Reno Gazette Journal, available at https://data.rgj.com/census/total-population/occupied-housing-units/census-tract-3823-middlesex-county-massachusetts/140-25017382300/.

[2] Section III-J of the Natick Zoning Bylaw is Natick's Historic Preservation Bylaw. The New Bylaw was codified as an addendum to §§ III.J-1–9, referred to herein as the "Old Bylaw," which was adopted by Natick Town Meeting in Fall 2014. Pl. SOMF ¶ 16.

members of the NPB, and have all continuously served since at least January 2015. *Id.* ¶¶ 2–3. In early 2019, the NPB devoted several public meetings to working with the Valentins to craft the language of the New Bylaw prior to sponsoring it to the Natick Town Meeting. *Id.* ¶ 9 The Valentins were the first Black residents of Natick to work with the NPB to draft a zoning bylaw. *Id.* ¶ 10. Evans spoke on behalf of the Planning Board at the Spring 2019 Town Meeting. *Id.* ¶ 13. She praised the New Bylaw's clarity and reported that the NPB had worked on the language until it felt "comfortable with its application," both to the Project and elsewhere in Natick. *Id.*

The New Bylaw contained precise formulas and criteria to instruct the NPB on how to apply it. *Id.* ¶ 18. These included: (1) a maximum number of dwelling units equal to the size of the lot divided by 6,000, rounded to the nearest whole number, (2) allowing new construction up to "100 percent of the interior habitable floor area or above grade gross volume of the historic building" for existing structures and up to "200 percent of the interior habitable floor area or above grade gross volume of the historic building" for "replication of documented previous structures," (3) a 0.5 limitation on Floor Area Ratio[3] (FAR), (4) a requirement that the Planning Board seek input from the Natick Historical Commission (NHC) in reviewing applications, and (5) a requirement that any proposal under the New Bylaw not be "substantially more detrimental" to the neighborhood than a conventional use.[4] *Id.* ¶ 17. The New Bylaw also created an advisory role for Defendant NHC. Defendant Steve Evers, the longtime chair of the NHC,

---

[3] FAR is defined by the Natick Zoning Bylaws as "the ratio between the gross floor area of all buildings on a parcel, including accessory buildings, and the total area of the parcel." *See* Town of Natick Zoning Bylaw, Art. I, § 200 (available at: https://www.natickma.gov/DocumentCenter/View/4489/Section-I---General).

[4] As Community and Economic Development Director James Freas explained in a memo to the NPB, the fact that the language of the Bylaw allowed for up to a 200% increase the size of a historic property indicated that "Town Meeting must have intended that relatively large-scale developments could be reconciled with not violating the substantially more detrimental standard." Pl. SOMF ¶ 98.

understood that the NHC's role was limited to aesthetics and historical appropriateness of design, and that scale, massing, and neighborhood fit were under the purview of the NPB. *Id.* ¶¶ 19–20.

On August 28, 2019, the Valentins submitted an application to develop condominiums at the Property pursuant to the New Bylaw. *Id.* ¶ 27 The Valentins proposed building eleven residential units in three buildings, with a total floor area of 34,623 feet and a calculated FAR of 0.5. *Id.* After conducting a "detailed review" of the full plans, the NHC and the Design Review Board (DRB) lauded the Project, saying in a letter to the NPB that it "will have great benefit to our local historic character and architecture." *Id.* ¶ 28. As of September 2019, before the neighbors' racially charged opposition campaign began, both the NPB and the NHC were on record having expressed favorable views of the Project. *Id.* ¶ 30.

### B. Societal context of the race-based opposition to the Valentins' project

The NPB deliberated the Valentins' Project over a total of twenty-nine full NPB meetings and fourteen working group meetings over sixteen months. *Id.* ¶ 61. Many of the public hearings deliberating the project took place after May 25, 2020, when Derek Chauvin killed George Floyd in Minneapolis. In Natick—as in the rest of the country—Black Lives Matter (BLM) and other groups were involved in public education about the impact of racial discrimination and segregation in the community. During much of the time the Valentins' Project was pending before the NPB, the 2020 presidential campaign was also in high gear.[5] A main theme of Donlad Trump's campaign was that enforcement of the Fair Housing Act (FHA) (and its obligation on

[5] Donald Trump became the presumptive nominee for the Republican Party on March 17, 2020, and Joe Biden became the presumptive nominee for the Democratic Party in early April, 2020. *See Trump wins enough delegates to become GOP's presumptive nominee*, PBS (March 17, 2020), https://www.pbs.org/newshour/politics/trump-wins-enough-delegates-to-become-gops-presumptive-nominee; Sydney Ember, *Bernie Sanders Drops Out of 2020 Democratic Race for President*, NY Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/politics/bernie-sanders-drops-out.html.

local governments to "affirmatively further fair housing") amounted to "an attack on the suburbs."[6] This context is helpful to fully understand the NPB's acquiescence to the South Natick community's vitriolic and racially charged opposition to the Project.

**C. Neighbor opposition motivated by racial and national origin-based animus**

In or about September 2019, residents of South Natick (hereinafter, the "neighbors") began to campaign against the Project. They created a website, stop50pleasant.org, dedicated to opposing the Project, and distributed "Stop 50 Pleasant" yard signs. Pl. SOMF ¶ 31. The neighbors started a petition, which included racially coded comments including that the Project "would destroy the culture of the neighborhood" and that Plaintiffs had been "coached" because they were incapable of undertaking the Project on their own. *Id.* ¶ 33. The neighbors started a letter writing campaign, sending dozens of letters—many expressing racially charged language—to the NPB. *Id.* ¶ 34. Neighbors called the Project "an assault on the neighborhood[]" of South Natick, declared that "South Natick is not the place for urban sprawl," and said the Project would "destroy and annihilate the existing character of our neighborhood." *Id.* ¶¶ 35–37. Early in the application process, the Valentins were leaving an NPB Meeting when a neighbor accused them of "monkeying around" with the New Bylaw. *Id.* ¶ 44.

Recollecting the scare tactics used in Boston and its suburbs in the 1960s and 1970s,[7] neighbor James Yannes (who identified himself as being in his 80s), wrote repeatedly to Evans,

[6] Trump repealed the Obama-era AFFH regulations in July 2020, and tweeted: "I am happy to inform all the people living their Suburban Lifestyle Dream that you will no longer be bothered or financially hurt by having low[-]income housing built in your neighborhood." *See* Ken Meyer, *Trump Axes Obama-Era Fair Housing Rule, Saying Suburbanites Will 'No Longer Be Bothered' by 'Low Income' People, Crime*, Mediaite (July 29, 2020), https://www.mediaite.com/trump/trump-axes-obama-era-fair-housing-rule-saying-suburbanites-will-no-longer-be-bothered-by-low-income-people-crime.

[7] *See* Lew Finfer, *The 'good intentions' program that devastated Boston's neighborhoods*, Boston Globe (Jan. 18, 2019),

claiming that the Valentins' Project was a "Block Buster" that would "destroy a stable community," *Id.* ¶ 46, and "in my day this would be termed a NEIGHBORHOOD BUSTER."[8] *Id.* ¶ 47 (capitalization in the original). Rather than distance herself from the ugly specter of racism embedded in those terms, Evans politely thanked Yannes for his input. *Id*. Text messages from one of the principal opponents to the Project, Pamela Cokin declared that, if the Valentins had visited her, she "would have freaked out and called the police."[9] *Id.* ¶ 39. Marie Forbes, who was eventually elected as a Natick Town Meeting Member after running on a platform of opposing the Project, objected to the Project because it would impact the neighbors, who were "taxpayers and hard working," implying that the Valentins, as immigrants, were neither. *Id.* ¶ 49. At the September 9, 2020 NPB meeting, Yannes echoed Donald Trump in claiming that—on account of the Valentins' Project—the "suburbs were under attack," and that the Project was "an attack on South Natick." *Id.* ¶ 50.

The neighborhood opposition came out in force to nearly every NPB meeting, whether in person or on Zoom, creating an oppressive environment. Given the events of the time, the meaning of phrases like "the suburbs are under attack" was perfectly clear to the Valentins and others in attendance. The Valentins, frequently the only Black people in the room, believed the comments were dangerous and felt a constant animosity directed at them. *Id.* ¶ 53. At one point,

---

https://www.bostonglobe.com/opinion/2019/01/18/the-good-intentions-program-that-devastated-boston-neighborhoods/7ZWLqOYfM03SaTBJn4jRiK/story.html

[8] HUD regulations helpfully define what "blockbusting" meant "in [Yannes's] day." *See* "Blockbusting," 24 C.F.R. § 100.85 ("It shall be unlawful, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race . . . or national origin.").

[9] Errin Haines, *'This invokes a history of terror': Central Park incident between white woman and black man is part of a fraught legacy*, Wash. Post (May 27, 2020), https://www.washingtonpost.com/nation/2020/05/27/this-invokes-history-terror-central-park-incident-between-white-woman-black-man-is-part-fraught-legacy/.

they felt it necessary to lodge a complaint with the Natick Police Department because the neighborhood opposition to the Project made them feel "unsafe" living in Natick. *Id.* ¶ 54.

The NPB was aware of the undertones of racial and national origin-based animus from the neighbors' correspondence and from comments made during public NPB meetings. The Valentins themselves also made the NPB aware of the nature of the neighborhood opposition to their Project. *Id.* ¶ 58. When Meyer received a letter from Linda Valentin describing the treatment the Valentins' application was receiving, he wrote to a member of the Selectboard, "Lord help us – We are going to end up with a BLM issue at the [NPB]." *Id.* ¶ 59.

When Yannes made his "the suburbs are under attack" comment, Evans ignored the racial implications and thanked him for his comment. *Id.* ¶ 60. It was only ten minutes later, after three intervening speakers—a civil rights lawyer, the President of Natick Black Lives Matter, and Linda Valentin—all objected to the "racial undertones" of Yannes's statement, that Evans said that "'The suburbs are under attack' . . . has become something of a dog whistle in this very fr[aught] time." *Id.* Rather than forcefully objecting to the discriminatory tenor of the opposition to the Project, Evans cautioned the crowd to "be careful in the language [they] use." *Id.*

### D. Defendants acquiesce to the racially charged opposition to the Project

Throughout the forty-three hearings over sixteen months that the NPB considered the Project, the Valentins repeatedly asked the NPB for guidance on what sort of project would be acceptable to the NPB, but the NPB refused to provide concrete guidance. *Id.* ¶¶ 61, 63–67, 70–73, 91–100. When the Valentins reduced the size of the Project to meet the wishes of the NPB, the goalposts shifted and the Valentins were sent back to square one. *Id.* At multiple points in the process, members of the NPB claimed the language of the New Bylaw—the very language the NPB had helped craft, and the language Evans praised for its clarity at the Spring 2019 Town Meeting—was confusing. *Id.* ¶¶ 13, 64, 93.

The NPB repeatedly took cues from the neighborhood opposition. *See, e.g.*, *id*. ¶¶ 67–68, 93–95. On November 20, 2019, the NPB relied on a letter from an attorney representing one of the neighbors to justify seeking a legal opinion from Town Counsel on three distinct issues related to the New Bylaw. *Id.* ¶¶ 67–68. When that December 19, 2019 opinion (the "First TC Opinion") was favorable for the Valentins, the NPB again caved to neighborhood pressure and rejected the substance of the opinion. *Id.* ¶ 73. Meyer accepts the opinions of town professionals "999 out of 1000" times, but he rejected the First TC Opinion and chose instead to follow an opinion provided by a neighbor's attorney. *Id.* ¶¶ 73–74. Neither Evans, Meyer, Associate Planning Board Member Susan Kang, nor Freas could recall a single other instance in which the NPB had rejected the opinion of Town Counsel. *Id.* ¶ 76. Freas acknowledged that, by April 2020, the neighbors' continued opposition had affected the NPB's understanding of the New Bylaw. *Id.* ¶ 93. While he could not recall the precise date and context in which he heard it, Freas recalled Meyer conceding that the Planning Board "knew all along how to interpret the [New Bylaw]." *Id.*

Throughout the deliberation process, the NPB steadily expanded the scope of the NHC's advisory review role. On November 8, 2019, Evers described NHC's role as limited to "sav[ing] the existing mansion and perform[ing] design review of its restoration and any additions or alterations." *Id.* ¶ 21. After additional months of neighborhood pressure to resist the Project, on December 13, 2019, Evans asked NHC to "comment[] on [the] scale and impact" of the Project on the neighborhood. *Id.* ¶ 69. By the end of the process, the Board was actively seeking NHC's views on "historical appropriateness of the size and placement of the proposed buildings." *Id.* ¶ 115. Evers abused the expanded scope of the NHC to demand that Plaintiffs satisfied the neighbors' expectations for the Project as a condition for favorable NHC review. *Id.* ¶ 106, 117.

The NPB continued to filibuster consideration of the Project through October 2020, and the Valentins repeatedly reduced the size of their proposal in an attempt to learn what would be acceptable to the NPB. *Id.* ¶¶ 91, 95, 100, 103–104. By the November 4, 2020 NPB meeting, the Valentins' Project had been reduced to seven units and 21,751 square feet of habitable floor area—a reduction of more than a third both in terms of number of units and total size. *Id.* ¶ 104. At the November 4 hearing, the NPB voted to approve the placement and scale of the Project but refused to grant the Valentins' request for a special permit with conditions subsequent, despite such conditional permits according with the NPB's common practice. *Id.* ¶ 105. This vote included an NPB determination that the Project was *not* "substantially more detrimental" to the community than a conventional use. *Id.*

**E. The successful campaign to repeal the New Bylaw and doom the Project**

In the November 19, 2019 NPB meeting, Glater suggested that the neighbors attempt to repeal the New Bylaw at Town Meeting. *Id.* ¶ 79. Taking the suggestion, the neighbors organized a broad campaign to repeal the New Bylaw that was specifically focused on the Valentins' Project. *Id.* ¶¶ 78, 80–81. The neighbors found a willing partner in Evers. He provided detailed feedback on the warrant articles to repeal the New Bylaw, advocated for the repeal at Town Meeting, and wrote a formal letter on behalf of the NHC supporting the repeal effort—the only time in more than 30 years that the NHC has taken a formal position on a zoning bylaw before Town Meeting. *Id.* ¶¶ 82, 84, 90, 110.

Alarmed by repeal campaign, the Valentins inquired about whether the Project would be affected by a repeal of the New Bylaw, and they were repeatedly assured that the repeal would have *no effect* on their application. Freas told Linda Valentin this in person in February 2020 and emphasized in an email on February 26, 2020 that he had confirmed with Town Counsel that the repeal would not affect the Project. *Id.* ¶¶ 86–87. The Valentins also received multiple

assurances from Evans, who emphatically stated that the repeal of the New Bylaw would not affect the Project during NPB meetings on September 9, 2020 and October 21, 2020. *Id.* ¶ 101.

Before the Town Meeting session on November 10, 2020 (in which the repeal was to be discussed), Town Meeting Moderator Frank Foss explicitly prohibited the Valentins from discussing their Project because it was not "within the scope of the article on the floor." *Id.* ¶ 108. He also prohibited "any discussion . . . or spoken facts that expose racism." *Id.* But during the debate over the repeal, Foss allowed the neighbors to display an image of the first and largest Project application on the Zoom meeting screen, permitting Town Meeting members to incorrectly infer that the vote on the repeal constituted a vote on the Valentins' Project. *Id.* ¶ 109.

During this Town Meeting session, Town Counsel indicated for the *first time* that the repeal of the New Bylaw might have an impact on the viability of the Project. *Id.* ¶ 111. Even after learning that Town officials had misled the Valentins' for *months* about the effect of the repeal, Meyer was the only NPB member to vote against the repeal at Town Meeting. *Id.* ¶ 113. Not one NPB member spoke up at Town Meeting to warn the voters about the representations made to the Valentins and the possible consequences of the repeal. *Id.* ¶ 112. Town Meeting repealed the New Bylaw. *Id.* ¶ 107.

### F. The Second Town Counsel Opinion and the denial of the Valentins' Project

On November 29, 2020, Town Counsel issued a second opinion discussing the impact of the repeal (the "Second TC Opinion"). *Id.* ¶ 118. The opinion an "equitable option" in which the NPB could construe the November 4 vote on placement and massing as a conditional permit and a second option (mirroring an argument advanced by a neighbor's attorney) under which the NPB could deny the Project based solely on the repeal of the New Bylaw. *Id.* ¶¶ 118–119. The Second TC Opinion ultimately recommended denying the Project under the second option. *Id.*

The NPB met with Town Counsel in executive session on November 30, 2020 to discuss the Second TC Opinion. *Id.* ¶ 120. After discussing both options presented, the NPB chose to reject the equitable option and instead deny the Project based on the repeal of the New Bylaw, adopting the recommendation of Town Counsel and, implicitly, the neighbor's attorney. *Id.* ¶ 121. The NPB voted to deny the Valentins' application at the December 2, 2020 NPB meeting, relying solely on the repeal of the New Bylaw. *Id.* ¶ 124. During this meeting, Evans selectively quoted from the Second TC Opinion to justify denying the application but withheld the "equitable option" that favored not denying the Valentins' application. *Id.* ¶¶ 125–126.

After sixteen months, forty-three total hearings, and repeated assurances that the Project would be protected if the New Bylaw was repealed, the Project was unceremoniously denied solely because of the repeal. After investing countless hours attempting to satisfy the NPB that the Project met all requirements of the New Bylaw—and incurring tens of thousands of dollars in pre-development costs—the Valentins were deprived of the opportunity offered by the New Bylaw to preserve their historic Property and help Natick diversify its housing stock.

### G. White developers received much better treatment from the NPB

The only other proposal the NPB considered under Natick's Historic Preservation bylaw received starkly better treatment than the Project. *Id.* ¶ 132. In 2015, two white developers proposed expanding the Sacred Heart Church and its rectory to build residential condominiums (hereinafter, the "Church Project"). *Id.* ¶¶ 135–136. Like the Valentins, developer Randy Johnson worked with the NPB to draft the bylaw that allowed his project. *Id.* ¶ 140. Despite neighborhood opposition, the NPB had no difficulty interpreting and applying a new bylaw for the first time. *Id.* ¶¶ 139, 141. The NPB granted Johnson and Horne a special permit with conditions subsequent after six months and ten hearings, despite the application being supported in part by hand-drawn plans. *Id.* ¶¶ 134, 138. The three other multifamily permit applications

approved by the NPB since 2013 were also all approved in ten or fewer hearings and granted permits with conditions subsequent. *Id.* ¶ 143.

## LEGAL STANDARD

Summary judgment is appropriate only if "there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Fife v. MetLife Grp., Inc.*, 411 F. Supp. 3d 149, 156 (D. Mass. 2019) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trustees*, 999 F.3d 86, 92–93 (1st Cir. 2021) (quotations and citations omitted). A court "must view the facts in the light most favorable to the non-moving party," here, the Plaintiffs, "and draw all reasonable inferences in [their] favor." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018).

## ARGUMENT

### I. A REASONABLE JURY MAY FIND THAT DEFENDANTS DISCRIMINATED AGAINST PLAINTIFFS IN VIOLATION OF THE FAIR HOUSING ACT

#### A. Summary judgment is unwarranted on Plaintiffs' § 3604 claim

Section 3604(a) of the FHA prohibits actions which "make unavailable or deny, a dwelling to any person because of race, color . . . or national origin." 42 U.S.C. § 3604(a). The First Circuit has explained that the "phrase 'otherwise make unavailable or deny' encompasses a wide array of housing practices . . . and specifically targets the discriminatory use of zoning laws . . . ." *Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*, 988 F.2d 252, 257 n.6 (1st Cir. 1993). To defeat summary judgment on a § 3604 claim, a plaintiff need only create an inference that the challenged action was motivated in part—not solely or predominantly—by race. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)

(explaining that a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes"); *see also Del Rio Gordo v. Hosp. Ryder Mem'l Inc.*, No. 13-1145(BJM), 2018 WL 542222 (D.P.R. Jan. 23, 2018). A discriminatory motive violates the FHA if it belongs to "municipal decision-makers themselves or . . . those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *see also Ass'n of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Reglamentos y Permisos (A.R.P.E.)*, 740 F. Supp. 95, 104 (D.P.R. 1990) ("[I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."). Assessing discriminatory animus is a fact intensive inquiry, and "trial courts should use restraint in granting summary judgment where impermissible animus is in issue." *Koss v. Palmer Fire Dist. No. One*, 53 F. Supp. 3d 416, 425 (D. Mass. 2014) (cleaned up).

As this Court recognized, "[c]ourts analyze FHA disparate treatment claims under Title VII's three-stage *McDonnell Douglas* test."[10] *Valentin v. Town of Natick*, — F. Supp 3d. —, 2022 WL 4481412, at *4 (D. Mass. Sept. 27, 2022). Defendants concede that Plaintiffs have

[10] *McDonnell Douglas* has three steps: (1) "the plaintiff must first establish a prima facie case of discrimination[,]" (2) the defendant must "produce evidence that the challenged . . . action was taken for a legitimate, non-discriminatory reason[,]" and (3) the burden returns to the plaintiff to prove that the "proffered reason is pretextual[.]" *Ahmed v. Johnson*, 752 F.3d 490, 495–96 (1st Cir. 2014).

Plaintiffs also note that they do not "have to rely on the McDonnell Douglas approach to create a triable issue of fact regarding discriminatory intent in a disparate treatment case. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (cleaned up). They may also "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Id.* (cleaned up).

demonstrated a prima facie case under *McDonnell Douglas*,[11] and argue that the size of Plaintiffs' Project is a legitimate, non-discriminatory reason for denying Plaintiffs' application. Mot. at 14–15. As an initial matter, there is a material dispute of fact as to whether the size of the Project was a legitimate, non-discriminatory reason for denying the Valentins' application.[12] This alone precludes summary judgment on Plaintiffs' § 3604 claim. Even if the court were to accept Defendants' proffered reason, the "ultimate question" at the third step of *McDonnell Douglas* is "whether [Defendants] intentionally discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000) (*see also Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009) ("[T]he sole remaining issue," at the *McDonnell Douglas* step three is "discrimination *vel non.*" (quotation omitted)). Because of the unique challenges of evaluating the motives of a multi-member governmental body, the *Arlington Heights* framework is particularly appropriate to assess Plaintiffs' evidence of Defendants' discriminatory intent. *See*

[11] Defendants, as the moving party, "bear[] the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that they "believe[] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). By "[a]ssuming that the Valentins have made a prima facie case of unlawful discrimination," Mot. at 14, Defendants concede that Plaintiffs have met their burden.

Plaintiffs have established their prima facie case, nonetheless. They have adduced evidence showing that they are members of a protected class, Pl. SOMF ¶ 1, that they applied for and were qualified to receive a special permit for the Project, *id.* ¶¶ 27, 91, 98, 100, 105, that their application was denied, *id.* ¶ 124, and that the NPB approved the same type of permit for the Church Project—a similarly situated application, *id.* ¶¶ 132–143. *See Valentin v. Town of Natick*, — F. Supp. 3d —, 2022 WL 4481412, at *5 (D. Mass. Sept. 27, 2022) (quoting *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997) for the applicable framework).

[12] Each version of the Project was qualified to receive a special permit under the New Bylaw. *See* Pl. SOMF ¶¶ 27, 91, 100. The NPB's November 4, 2020 vote to approve the placement and scale of the buildings included a finding that the Project met the discretionary requirement that it not be "substantially more detrimental" than a conventional use. *Id.* ¶ 105. Finally, as Freas explained to the NPB, the language of the New Bylaw indicated that "Town meeting Must have intended that relatively large-scale developments could be reconciled with not violating the substantially more detrimental standard." *Id.* ¶ 98. A jury could find from these facts that Defendants have failed to meet their step-two burden.

*Arlington Heights*, 429 U.S. at 265–66; *see also Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 497, 504 (9th Cir. 2016) (applying *Arlington Heights* factors to find discriminatory intent when city officials "capitulat[ed] to the animus of the development's opponents"); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (same).

*Arlington Heights* requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," 429 U.S. at 266, based on factors including "the historical background of the decision; the specific sequence of events leading up to the challenged decision; any departures from the normal procedural sequence; any substantive departures[,] particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; [and] the legislative or administrative history, including contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. . . ." *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 410 (D. Mass. 2018) (quoting *Arlington Heights*, 429 U.S. at 266–68) (internal quotation marks omitted). "These elements are non-exhaustive . . . and a plaintiff need not establish any particular element in order to prevail." *Ave. 6E Invs.*, 818 F.3d at 504. Finally, "[d]iscriminatory intent may be inferred from the totality of the circumstances." *LeBlanc-Sternberg*, 67 F.3d at 425. Here, application of the *Arlington Heights* factors demonstrates ample evidence "from which a reasonable jury could find discrimination." *Ahmed*, 752 F.3d at 498.

*1. Historical background of the decision*

The historical background of the NPB's decision to delay approval of—and eventually deny—Plaintiffs' application begins with Plaintiffs working hand in hand with the NPB to develop the New Bylaw. Pl. SOMF ¶ 9. The NPB was proud of the New Bylaw, which it sponsored at Town Meeting, and Evans was "enthusiastic" about the Project. *Id.* ¶¶ 11–13. Evans spoke in support of the New Bylaw at Town Meeting and declared that the NPB felt

"comfortable" with applying the New Bylaw. *Id*. ¶ 13. Similarly, Evers and the NHC conducted a "detailed review" of the full plans for the Project in September 2019, lauding them and opining that the Project would "have great benefit to our local historic character and architecture." *Id.* ¶ 28. Shortly thereafter, the neighbors' discriminatory opposition kicked into high gear, and Defendants did an about-face, abandoning their favorable opinions of the Project. *Id.* ¶ 30.

*2. The sequence of events leading to the denial and Defendants' departures from the normal procedural sequence*

The next *Arlington Heights* factors consider the "the specific sequence of events leading up to the challenged decision," and "any departures from the normal procedural sequence." *Centro Presente*, 332 F. Supp. 3d at 410 (alterations omitted). These factors include Defendants' abrupt change in course in response to the outpouring of race-based opposition to the Project, which commenced in September 2019, shortly after the Valentins submitted their application. Pl. SOMF ¶¶ 27, 31. That opposition—expressed through letters to Defendants, petitions, and statements made at NPB hearings—was laced with coded language connoting racial animus.[13] One neighbor invoked discriminatory scare tactics, claiming that the Valentins' project was a "Block Buster" and "a NEIGHBORHOOD BUSTER" that would "destroy a stable community." *Id.* ¶¶ 46–47. Another revealed her racial bias by declaring that she would "freak[] out and call[] the police" should the Valentins ever pay her a visit. *Id.* ¶ 39. A third referenced derogatory

[13] It is well established that "racially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany*, 819 F.3d at 608–09 (cleaned up) (affirming an inference of racial animus in statements that a new development would change the "flavor" and "character" of a community and that multifamily housing might "depress the market" for current residents); *see also Ave. 6E Invs.*, 818 F.3d at 506 (holding that references to "large households," and description residents who "own numerous vehicles which they park in the streets and yards, fail to maintain their residences, and lack pride of ownership" to be coded language demonstrating anti-Latino bias).

stereotypes for immigrants when she implicitly contrasted the Valentins to the neighbors, who were "taxpayers and hard working." *Id.* ¶ 49.

Other neighbors described the Valentins as engaged in an "assault on the neighborhood," an "attack on South Natick," and creating "urban sprawl." *Id.* ¶¶ 35–36, 50. Another alleged the Valentins had to be "coached" by others because they were incapable of undertaking the project on their own. *Id.* ¶ 33. Invoking "one of the oldest and most profoundly racist slanders in American history,"[14] one neighbor accused the Valentins of "monkeying around" with the New Bylaw. *Id.* ¶ 44. According to the opponents, allowing the Valentins to develop their project "would destroy the culture" and "destroy and annihilate the existing character" of South Natick. *Id.* ¶¶ 33, 37. These comments "relevant for what they reveal—the intent of the speaker. A reasonable jury could find that statements like the ones [] made in this case send a clear message and carry the distinct tone of racial motivations and implications." *Ave. 6E Invs.*, 818 F.3d at 506 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)).

Defendants were aware of the discriminatory racial undertones of the neighborhood opposition from the neighbors' correspondence and comments made during NPB meetings. Pl. SOMF ¶ 58. Plaintiffs and third parties also made the NPB aware of the nature and motivation of the neighborhood opposition to their project. *Id.* ¶¶ 58–60. In response to the virulent, racially charged neighborhood opposition, the NPB departed dramatically from its typical process of expeditiously reviewing permit applications. It usually approved multifamily applications—such as the Church Project and three other comparable projects—after ten or fewer public hearings

[14] *Cf.* Brent Staples, *The Racist Trope That Won't Die*, NY Times (June 17, 2018), https://www.nytimes.com/2018/06/17/opinion/roseanne-racism-blacks-apes.html.

over six or fewer months, *Id.* ¶¶ 134, 143, but the NPB subjected the Valentins to twenty-nine public hearings and fourteen Working Group sessions over sixteen months. *Id.* ¶ 61.

The NPB repeatedly caved to legal pressure from neighborhood opponents. At its November 20, 2019 public hearing, and at the behest of the neighbors' lawyer, the NPB claimed the New Bylaw was confusing and that it needed an opinion from Town Counsel concerning how to apply it to the Valentins' Project (the "First TC Opinion"). *Id.* ¶ 67. But when the First TC Opinion confirmed that the Valentins' Project complied with all dimensional requirements of the New Bylaw, the NPB again gave in to neighborhood pressure, rejected the opinion and told the Valentins they would have to make their Project much smaller if they wanted a permit. *Id.* ¶¶ 67, 70–73. Plaintiffs repeatedly asked for guidance on what would be acceptable to the NPB, but the NPB's response continually shifted. When Plaintiffs reduced the Project's size in accordance with the NPB's request, the goalposts shifted and the NPB determined the project was still too large. *Id.* ¶¶ 61–67, 70–73, 91–100. Contrast that treatment with that of the Church Project; when that developer sought guidance from the NPB, Glater responded within hours. *Id.* ¶ 142.

The NPB imposed onerous, atypical requirements on the Valentins, including asking for numerous three-dimensional renderings of the Project. *Id.* ¶ 97. The NPB also departed from its normal process when, after approving the massing and scale of the Project on November 4, 2020, it refused to grant Plaintiffs a special permit with conditions subsequent as it did for the Church Project and all other multifamily permit applications approved since 2013. *Id.* ¶¶ 105, 138, 143.

The NPB also perverted its normal process as to the advisory roles of the DRB and the NHC. The NPB invited the DRB to consult on the project, adding a layer of additional review, even though the DRB's stated purpose is limited to the downtown mixed-use district. *Id.* ¶ 62.

The NPB also steadily increased the authority of Evers and the NHC over the Valentins' Project well beyond its normal advisory role, limited to aesthetics and historical appropriateness of design. *Id.* ¶ 20. By December 13, 2019, the NPB was asking NHC to "comment[] on [the] scale and impact" of the Project on the neighborhood. *Id.* ¶ 69. By the end of the process, the Board was actively seeking NHC's views on "historical appropriateness of the size and placement of the proposed buildings." *Id.* ¶ 115. Evers, in turn, perverted the advisory role of the NHC, using his authority as NHC chair to demand that Plaintiffs satisfied the neighbors' expectations for the Project as a condition for favorable NHC review. *Id.* ¶¶ 106, 117.

*3. Defendants' substantive departures from the normal process*

The next *Arlington Heights* factor is the extent of "any substantive departures[,] particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Centro Presente*, 332 F. Supp. 3d at 410 (quoting *Arlington Heights*, 429 U.S. at 267). Under this factor, Plaintiffs have adduced evidence showing that the NPB rejected the December 2019 First TC Opinion, which was favorable to Plaintiffs. Pl. SOMF ¶ 70. The NPB "[f]ollowed Town Counsel's opinion regularly," and Defendants were unable to recall a single other instance in which the NPB rejected a Town Counsel opinion. *Id.* ¶¶ 74–76. Nearly a year later, at its December 2, 2020 public hearing, the NPB departed again from its normal process when it denied the Valentins' application solely because of the Second TC Opinion. *Id.* ¶ 124. Evans promised to release the opinion as was custom, but Defendants withheld the opinion for close to two years until near the close of discovery. *Id.* ¶¶ 128–130.

*4. Administrative history and Defendants' statements*

The final *Arlington Heights* factor looks at "the legislative or administrative history, including contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Centro Presente*, 332 F. Supp. 3d at 410 (quoting *Arlington Heights*, 429

U.S. at 268). Glater first suggested that the neighbors seek to repeal the New Bylaw. Pl. SOMF ¶ 79. After the Valentins expressed their concern about how a repeal may affect the Project, Freas assured them multiple times that both he and Town Counsel believed the Project would be unaffected. *Id.* ¶¶ 85–89. Finally, Evans unequivocally stated in two NPB meetings in Fall 2020 that any repeal would not affect the Project. *Id.* ¶ 101. The Valentins relied on these assurances and dedicated their efforts to obtaining a special permit rather than opposing the repeal. After the repeal, the assurances Defendants offered to the Valentins were ripped away and the Project was denied exclusively because of repeal of the New Bylaw. *Id.* ¶¶ 124, 127, 131.

Moreover, Defendants did not distance themselves from any of the racially coded opposition. Evans did not disapprove of Yannes's remark that the Project was evidence that "the suburbs are under attack and this is an attack on South Natick." *Id.* ¶ 60. She instead thanked him for his testimony and moved on to the next speaker. It was ten minutes later, after a civil rights lawyer, the President of Natick BLM, and Linda Valentin all objected to the "racial undertones" of Yannes's statement that Evans finally noted that "'The suburbs are under attack' . . . has become something of a dog whistle in this very fr[aught] time" and cautioned the crowd to "be careful in the language [they] use." *Id*. Evans did not "admonish[]" Yannes, as Defendants claim. Mot. at 21. A jury could reasonably infer Evans merely cautioned the neighbors against using racially charged language to object to the Project.

Viewed as a whole, there is a surfeit of evidence that would allow a reasonable jury to conclude that Defendants are liable under § 3604 for acquiescing to racially charged neighborhood opposition and subverting their normal process to deny Plaintiffs' application. Defendants point to a lack of "survey data" showing that the greater Natick citizenry harbors discriminatory animus, rely on an email *from the neighbor who declared that she would call the*

*police if the Valentins visited her* to support Defendants' purported legitimate reason for denying Plaintiffs' application, and point to the NPB's recent approval of a new application filed by Plaintiffs during discovery.[15] *See* Mot. at 14–16. To the extent that any of these arguments is relevant, they at best create a dispute of material fact as to whether Defendants acquiesced to neighborhood opposition that was motivated in part by a discriminatory purpose.

### B. A reasonable jury may find Defendants liable under 42 U.S.C. § 3617

Section 3617 of the FHA makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section . . . 3604." 42 U.S.C. § 3617. A § 3617 claim requires that Plaintiffs show (1) they are "member[s] of an FHA-protected class;" (2) they "exercised a right protected by §§ 3603–06 of the FHA;" (3) Defendants' "conduct was at least partially motivated by intentional discrimination;" and (4) Defendants' "conduct constituted coercion, intimidation, threat, or interference on account of [Plaintiffs] having exercised, aided, or encouraged others in exercising a right protected by the FHA." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham (SMOC)*, 752 F. Supp. 2d 85, 95 (D. Mass. 2010).

Plaintiffs have developed sufficient evidence for a reasonable jury to find Defendants liable under § 3617. The first and second elements are undisputed, *see* Pl. SOMF ¶ 1; Mot. at 13 (acknowledging that § 3604 extends to the discriminatory application of zoning laws), and the third element is coextensive with the intent analysis for Plaintiffs' § 3604 claim, described above, *see SMOC*, 752 F. Supp. 2d at 95–96.

---

[15] It is questionable whether evidence of the NPB's actions regarding Plaintiffs' current attempt to develop 50 Pleasant St. is admissible and it is unclear if approval of Plaintiffs' latest application is a "subsequent remedial measure" to remedy Defendants' prior discriminatory conduct. Nonetheless, the evidentiary weight of the NPB's actions with respect to Plaintiffs while engaged in active litigation is, at best, suspect.

The fourth factor remains. As this Court recognized, "[i]nterference encompasses more than physical force or intimidation." *Valentin v. Town of Natick*, 2022 WL 4481412, at *5; *see also Revok v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113 (3d Cir. 2017) (interference includes "the act of meddling in or hampering an activity or process"). The record includes ample evidence that Defendants meddled with and hampered the Valentins' efforts to develop the Property after Defendants had identified the discrimination embedded in the efforts to delay or defeat the Project. Evers actively supported and collaborated with the neighbors to facilitate the repeal of the New Bylaw, dooming Plaintiffs' application. *Id.* ¶ 82. Acting in his official position as chair of the NHC, Evers provided detailed feedback on the warrant article to repeal the New Bylaw. *Id.* ¶¶ 82–84. He also wrote a letter to Town Meeting, on behalf of the NHC and informed by his personal distaste for the Plaintiffs' application, advocating repeal of the New Bylaw—the only time the NHC has taken a position on a proposed bylaw change in at least thirty years. *Id.* ¶ 90. Finally, Evers advocated at Town Meeting for the repeal. *Id*. ¶ 110. He separately interfered with Plaintiffs' application by affording, through the NHC's advisory review role, ever-expanding importance to the neighbors' opinions and feelings. *Id.* ¶¶ 106, 117. Indeed, by November 2020, Evers gave the neighbors near-veto power over the NHC's approval of Plaintiffs' application, declaring in an email to the NHC, "My first question . . . to the applicant will be: 'Have you presented this to your neighbors?'" *Id.* ¶ 106.

The NPB also interfered with Plaintiffs' efforts to develop the Property. The notion of repeal was introduced by Glater. *Id.* ¶ 79. The NPB's refusal to give constructive guidance to Plaintiffs about the size and kind of project that would be acceptable also hampered Plaintiffs' attempts to exercise their rights under § 3604. *See id.* ¶¶ 61–67, 70–73, 91–100. Finally, the constant, repeated reassurances that any repeal of the bylaw would not affect the Project

interfered with Plaintiffs' exercise of their rights. *Id.* ¶¶ 86–89, 101. Had Plaintiffs known that their application would die with repeal of the New Bylaw, they could have taken any number of affirmative steps to advocate against the repeal, like, for example, lobbying the NPB and Town Meeting candidates as the neighbors did. *Id*. ¶¶ 81, 95.

## II. FACTUAL ISSUES PRECLUDE GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFFS' EQUAL PROTECTION CLAIM

### A. A reasonable jury could find that Defendants subjected the Valentins to selective treatment on account of their race

The Equal Protection guarantee in the Fourteenth Amendment requires that similarly situated people receive substantially similar treatment by the government. *See Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004). Because Plaintiffs belong to a protected class, they may prove an Equal Protection claim by demonstrating that, "compared with others similarly situated, [Plaintiffs were] selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* (quotation omitted). Officials' actions that endorse the discriminatory intent of other parties violate the Fourteenth Amendment, becoming "tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." *A.F.A.P.S.*, 740 F. Supp. at 103; *see also Valentin*, 2022 WL 4481412, at *5 (finding that Plaintiffs stated Equal Protection claim based on allegations that the Board reversed course after the racist opposition movement arose).

#### *1. A reasonable jury could find that the Church Project is similarly situated to the Valentins' Project in all relevant and material aspects*

Plaintiffs' selective treatment claim survives if they "identify and relate specific instances" where they and the comparator received differential treatment. *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis omitted). "To determine whether two or more

entities are 'similarly situated,'" courts ask "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008) (quotations and citations omitted). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Id.* (quotation omitted).

This Court has already recognized that "whether parties are similarly situated is a fact-intensive inquiry," and that the Church Project is a legally appropriate comparator.[16] *Valentin*, 2022 WL 4481412, at *4, *6 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2016)). A reasonable jury could conclude that the Valentins and the Church Project developer were similarly situated in all relevant aspects:

1. Each project was considered by the same five members of the Natick NPB, pursuant to the Town's historic preservation bylaws and within a relatively short period of time of one another. Pl. SOMF ¶ 133.
2. In each instance, the developer worked closely with the NPB to draft a bylaw that balanced historic preservation with expansion and diversification of the Town's housing stock. Each involved the very first application under the respective sections of the Historic Preservation Zoning Bylaw. *Id.* ¶¶ 9, 140.
3. Each project proposed to add square footage to two existing structures to convert them to condominiums: the main house and the barn for the Valentins' Project, and the church and the rectory for the Church Project. *Id.* ¶¶ 91, 136.
4. Each project is located in residentially zoned areas in South Natick, which several Defendants acknowledged is neither "downtown" nor "Natick central." *Id.* ¶¶ 7, 137.
5. The two development proposals also elicited similar community concerns including traffic and density in the residential neighborhoods. *Id.* ¶ 139.

Nonetheless, the NPB approved the Church Project in less than six months, after holding just ten meetings. *Id.* ¶ 134. The Valentins had to endure a total of forty-three meetings over the course of sixteen months. *Id.* ¶ 61. Additionally, the record demonstrates that the NPB subjected

[16] Defendants do not argue that the Church Project is an inappropriate comparator as a matter of law; instead, they rely on a series of factual assertions to argue that the Church Project is factually different from the Valentins' project. *See* Mot. at 22–23. This question should be resolved by a jury at trial, not by this Court at summary judgment.

the Valentins to unusual and burdensome procedural requirements not applied to the Church Project—requiring three-dimensional renderings of the Valentins while approving the Church Project permit based on hand-drawn plans. Pl. SOMF ¶¶ 97, 134. A further contrast is the way the NPB applied the historic preservation bylaw. The NPB had no confusion in the application of the bylaw and granted a permit with conditions subsequent for the Church Project, providing the white developer with time and clear directions to sort out issues raised by community opposition. *Id.* ¶¶ 138–142. After the neighbors began their racially charged opposition campaign, the NPB members inexplicably expressed confusion (perhaps feigned) with the New Bylaw and entertained the neighbors' specious concerns. *Id.* ¶¶ 64, 67–68, 93. This strains credulity; the NPB helped craft the New Bylaw and praised its clarity at Town Meeting. *Id.* at ¶¶ 9, 13–14.

2. *A reasonable jury may find that NPB acted with discriminatory intent in their selective treatment of Plaintiffs' application*

The *Arlington Heights* factors are used to conduct a "sensitive inquiry" into whether Defendants acted with a discriminatory purpose. *See KG Urb. Enterprises, LLC v. Patrick*, No. CIV.A. 11-12070-NMG, 2014 WL 108307, at *8 (D. Mass. Jan. 9, 2014). Plaintiffs have presented ample evidence that would allow a jury to find that Defendants engaged in invidious discrimination. *See supra* Section I.A. The First Circuit has declined to grant summary judgment to municipal defendants on an Equal Protection claim where a jury could find that personal hostility toward an applicant influenced the city's zoning decision, *see Rubinovitz v. Rogato*, 60 F.3d 906, 911–12 (1st Cir. 1995), and hostility grounded in discriminatory animus receives even greater scrutiny, *see Mhany*, 819 F.3d at 605–06.

Defendants' myopic view of discriminatory intent misses the mark. They recognize that circumstantial evidence supports a finding of discriminatory intent but engage only in a narrow analysis of the final *Arlington Heights* factor. Mot. at 20–21. Defendants cling to the contention

that only overtly racist statements made by NPB members can rise to the level of an Equal Protection violation. *Id.* This ignores not only well-settled law around racially coded statements, but also the fact that the NPB acquiesced to the neighbors' racially charged opposition by imposing significant procedural barriers and amplified application requirements on, and providing false assurances to, the Valentins. *See supra* Section I.A.

### B. A reasonable jury could find Defendants liable under a class-of-one Equal Protection theory

In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court recognized Equal Protection class-of-one claims for individuals subjected to arbitrary negative treatment by the government. Under a class-of-one analysis, Defendants' conduct is assessed under rational basis review. *See Norton v. Autoridad de Acueductos y Alcantarillados*, 898 F. Supp. 2d 396, 405 (D.P.R. 2012). A class-of-one claim requires that "a decision [was] based on several discrete concerns" and that "comparators were treated differently with regard to those specific concerns without any plausible explanation for the disparity." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 224 (2d Cir. 2012). Class-of-one claims are "bolstered where, as here, the evidence demonstrates that the government's stated concerns were pretextual." *Id.*

A reasonable jury may find Defendants liable under a class-of-one theory. The "similarly situated" analysis remains the same as with the selective treatment theory and a reasonable jury could find that the Town's sharply contrasting treatment of the Valentins' application and the Church Project constitutes irrational conduct depriving the Valentins of their Equal Protection rights. *See* Pl. SOMF ¶¶ 143, 138, 141. Even if a jury were to determine that the evidence did not support a finding of discriminatory intent, Plaintiffs would prevail on their class-of-one theory if

a jury determined that Defendants' reasons for denying the Valentins' Project were pretextual and based on personal animosity.[17]

## III. FACTUAL ISSUES PRECLUDE SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM

To survive summary judgment on their Substantive Due Process claim, Plaintiffs must adduce evidence showing (1) that the NPB's "actions shock the conscience," and (2) that the NPB "violated a right otherwise protected by the substantive Due Process Clause." *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010). Here, material disputes of fact as to each element preclude summary judgment. Instead of acting as a neutral decisionmaker dispassionately applying the law, the NPB engaged in outrageous conduct that violated the Valentins' due process rights. This conduct involved collaborating with racially motivated neighbors and subjecting the Valentins to a startlingly large number of hearings and unusual application requirements. *See, e.g.*, Pl. SOMF ¶¶ 61–67, 70–73, 91–100, 103, 105. Equally shocking is Defendants' conduct in repeatedly reassuring the Valentins that repeal of the New Bylaw would not affect their application, only to pull the rug out from under them. *Id.* ¶¶ 85–89, 101.

### A. The NPB's treatment of the Valentins shocks the conscience

Plaintiffs have presented evidence of "fundamental procedural irregularity, racial animus, or the like" throughout the NPB deliberation of the Project. *Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 69 (D. Mass. 2013) (quoting *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (quotation omitted)). "In the land-use context," *Brockton Power* recognized, this

[17] *Cordi-Allen* is not to the contrary. *Cordi-Allen v. Conlon*, 494 F.3d 245 (1st Cir. 2007); *contra* Mot. at 23. The project in *Cordi-Allen* did not comply with zoning bylaws and proposed replacing a 400 square foot cottage with a new, 3,262 square foot structure, while the supposed comparator project sought to add only 90 square feet. *Id.* at 248–49, 252–53. In contrast, Valentins' Project complied with the requirements of the New Bylaw. Pl. SOMF ¶¶ 27, 91, 98, 100, 105.

sort of evidence is sufficient for a jury to find an "abuse of government power that shocks the conscience." *Id.* Town officials may exhibit "shocking" conduct beyond openly racist statements. A jury could find it egregious that racial bias infected the NPB's decision-making process. The NPB refused to appropriately address the discriminatory tenor of the opposition to the Valentins' Project, instead acquiescing to it by allowing the racially coded comments to continue and unduly prolonging and intensifying the application process. Pl. SOMF ¶¶ 53, 58, 60, 61, 63. This simultaneous action and inaction caused the Valentins to feel unsafe to the point that they filed a complaint with the Natick Police Department. *Id.* ¶ 54.

This represents far more than "a run-of-the-mill dispute between a developer and a town official." *Mongeau v. City of Marlborough*, 492 F.3d 14, 19 (1st Cir. 2007). Indeed, *Brockton Power* recognized that racial animus infecting a zoning decision would constitute a Substantive Due Process violation, evidenced in part by a municipality acting against advice of legal counsel—just like the NPB ignored the First TC Opinion favorable to the Valentins. *Brockton Power*, 948 F. Supp. 2d at 69–70; *see* Pl. SOMF ¶¶ 73–76.

A jury could also conclude that the NPB's denial of the Valentins' application—after reassuring several times, in no uncertain terms, that their application would survive repeal of the New Bylaw—amounted to "egregious official behavior" that "shocks the conscience." *Brockton Power*, 948 F. Supp. 2d at 69 (cleaned up); *see* Pl. SOMF ¶¶ 85–89, 101. This conduct is even more outrageous given that the TC Second Opinion offered the Board an equitable option to approve the Valentins' permit consistent with its assurances. *See id.* ¶¶ 114, 119, 121. Ignoring this option, Defendants disingenuously acted as though the repeal had forced them into reneging on their assurances and denying the Valentins' permit. *See id.* ¶¶ 124, 126. Similar to *Collier v. Town of Harvard*, No. CIV.A.95-11652-DPW, 1997 WL 33781338, at *6 (D. Mass. Mar. 28,

1997), a reasonable jury could draw a line from the NPB's acquiescence to racially motivated community opposition to its treatment of the Valentins.

### B. A jury could find the Valentins were entitled to a permit

Defendants contend that "[t]he Valentins have failed to establish that they have a 'legitimate claim of entitlement' to the special permit" for 50 Pleasant. *See* Mot. at 23–24. This misstates the parties' respective summary judgment burdens. The Valentins must show material disputes of fact as to whether they were entitled to a permit.

There is a material dispute of fact as to whether there was a "certainty or a very strong likelihood" that the Valentins would have received a permit if not for the NPB's actions denying the Valentins due process of the law. *See Brady v. Town of Colchester*, 863 F.2d 205, 213 (2d Cir. 1988). Each of the Valentins' applications complied with the requirements of the New Bylaw. Pl. SOMF ¶¶ 27, 91, 100, 105. Furthermore, the NPB had helped the Valentins spearhead and pass the New Bylaw to make their project possible, exhibiting significant enthusiasm before the racially charged opposition began. Pl. SOMF ¶¶ 9, 11–13, 30. A reasonable jury could conclude that there was a certainty or strong likelihood that the Valentins would have been granted a permit if not for the NPB's acquiescence to racially motivated neighbor opposition.

## IV. NO INDIVIDUAL DEFENDANT IS ENTITLED TO IMMUNITY FROM SUIT

### A. The Individual Defendants are not entitled to qualified immunity

The First Circuit follows a three-pronged inquiry to decide if a plaintiff has overcome a qualified immunity defense asserted by individual governmental officials: "[(1)] he must show that his allegations, if true, establish a constitutional violation; [(2)] that the right was clearly established; and [(3)] that a reasonable official would have known that his actions violated the constitutional right at issue." *Mihos v. Swift*, 358 F.3d 91, 98 (1st Cir. 2004) (citation omitted). The third prong is "highly fact specific, and may not be resolved on a motion for summary

judgment when material facts are substantially in dispute." *Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir. 1997).

First, the Valentins have adduced substantial evidence that Defendants violated their rights under the Fourteenth Amendment. *See supra* Parts II–III. Second, this Court has already held that it was clearly established law that denying an applicant's permit due to racial or national origin-based animus violated the Fourteenth Amendment at the time the NPB engaged in this conduct.[18] *See Valentin*, 2022 WL 4481412, at *7 (citing *Shelley v. Kraemer*, 334 U.S. 1, 21 (1948)). Third, Defendants acknowledge that they "were and are aware that any less favorable treatment of the Valentins on account of their race is impermissible." Mot. at 27.

Because there is a material dispute of fact as to whether Defendants violated the Valentins' constitutional rights and the second and third factors of the qualified immunity test favor the Valentins, the Individual Defendants are not entitled to qualified immunity.

### B. The Individual Defendants are not entitled to quasi-judicial immunity

The Individual Defendants are also not entitled to quasi-judicial immunity, because they waived this defense by failing to plead it with specificity in their answers.[19] *See* Fed. R. Civ. P. 12(h)(1)(ii). Even if Defendants adequately pleaded quasi-judicial immunity, they are not entitled to it here. A member of a public board is entitled to quasi-judicial immunity only if all of the following factors are met: (1) She is performing a "traditional adjudicatory function," (2) she

[18] Defendants misstate this Court's decision on Defendants' Motion to Dismiss, in which the Court held that plaintiffs had plausibly alleged FHA and Fourteenth Amendment violations because "the Complaint alleges that all the members of the planning board took procedural steps to thwart the project in light of private community opposition based on race." *Valentin*, 2022 WL 4481412, at *7; *contra* Mot. at 26–27 (incorrectly stating that this Court had observed that individual NPB members did *not* take procedural steps to thwart the project).

[19] The answers for the Individual Defendants only made vague reference to "common law immunity" without specifying the source of the asserted immunity. *See* Dkt. 56 at 12; Dkt. 57 at 12; Dkt. 58 at 12; Dkt. 59 at 12; Dkt. 60 at 11; Dkt. 61 at 12.

decides cases that are "sufficiently controversial" such that she would be subject to "numerous damages actions," and (3) she "adjudicate[s] disputes against a backdrop of multiple safeguards designed to protect the complaining party's rights." *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 41 (1st Cir. 2005) (cleaned up).

Defendants meet neither the second nor the third factor. First, that Plaintiffs filed suit to vindicate their right to develop the Property without being stymied by racial and national origin-based discrimination does not equate to a showing that the NPB members would be subject to "*numerous* damages actions" as required by *Diva's*. Second, as this lawsuit makes clear, the NPB process did not provide an adequate safeguard to protect the Valentins from racial discrimination. Pursuing an appeal in land court pursuant to Mass. Gen. Laws Ann. ch. 40A, § 17, as Defendants suggest, Mot. at 29, would not have allowed Plaintiffs to vindicate their rights under either the FHA or the Fourteenth Amendment.

## CONCLUSION

For the above-stated reasons, Defendants' Motion for Summary Judgment should be denied in its entirety.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request that oral argument be had on Defendants' Motion for Summary Judgment.

DATED: May 18, 2023

Respectfully submitted,

/s/ Michael Allen
Michael Allen*
Edward K. Olds*
Emily Curran*
RELMAN COLFAX PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036
mallen@relmanlaw.com
tolds@relmanlaw.com
ecurran@relmanlaw.com
Tel: 202-728-1888
Fax: 202-728-0848

Benjamin J. Wish (BBO # 672743)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
bwish@toddweld.com

*Counsel for Plaintiffs*

* admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2023, a copy of the foregoing Plaintiffs' Opposition to Defendants' Motion for Summary Judgment was filed and served electronically on all counsel of record using the Court's CM/ECF system.

/s/ Michael Allen
Michael Allen

*Counsel for Plaintiff*