**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LINDA VALENTIN, JOEL VALENTIN, and GRACE GABLE MANOIRS, LLC, Plaintiffs, | |
| v. | Civil Action 21-cv-10830-PBS |
| TOWN OF NATICK, et al., Defendants. | |

**MEMORANDUM AND ORDER**

December 20, 2023

Saris, D.J.

**INTRODUCTION**

Linda and Joel Valentin have lived in Natick, Massachusetts for almost 30 years. They are a Black couple and immigrants of Haitian descent. In 2018, the Valentins sought to develop condominium units on their property in South Natick. To achieve this goal, the Valentins worked with the Natick Planning Board to draft a new historic preservation bylaw. Once the new bylaw was approved, the Valentins applied for a special permit for their property pursuant to that bylaw. Over the course of the next sixteen months, the Town held a total of forty-three meetings to discuss the Valentins' proposed project. Ultimately, Natick town officials voted to repeal the new bylaw and deny the Valentins'

application. The Valentins allege that their project was thwarted by racially-motivated neighborhood opposition and an acquiescent Planning Board.

The Valentins bring this action against the Town of Natick, the Natick Planning Board, the Natick Historical Commission, and six town officials acting in their official capacity, alleging violations of the Federal Fair Housing Act, 42 U.S.C. §§ 3604 and 3617, and the Equal Protection and Due Process clauses of the United States Constitution. Defendants move for summary judgment on all claims. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Dkt. 108).

## BACKGROUND

This Court previously summarized the key allegations of this case in its Memorandum and Order on Defendants' Motion to Dismiss. See Valentin v. Town of Natick, 633 F. Supp. 3d 366 (D. Mass. 2022). With the benefit of a more developed record, the Court will summarize the facts as set forth in Defendants' Statement of Material Facts (Dkt. 110) and Plaintiffs' Statement of Material Facts (Dkt. 114-1).[1] The Court views disputed issues of fact in the light most favorable to the Valentins, drawing all reasonable

[1] Plaintiffs submitted responses to Defendants' Statement of Material Facts, identifying disputed and undisputed facts. See Dkt. 114-2. Defendants did not submit responses to Plaintiffs' Statement of Material Facts.

inferences in their favor. See Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 502 (1st Cir. 2022).

## I. The Parties

Plaintiffs Linda and Joel Valentin are Black individuals and immigrants of Haitian descent who live in Natick, Massachusetts. In 2005, the Valentins purchased the property at 50 Pleasant Street in Natick (the "Property"), which is located in a residential single family zoning district. The Property sits on a 63,256 square foot lot, containing a larger main house built in 1917 and a smaller carriage house. The main house is one of the oldest buildings in Natick and is considered a historic structure. A historic barn also previously sat on the back of the Property but is believed to have been lost in a fire.

The Valentins sought to restore the existing structures and build residential condominium units (the "Project"). They intended to transfer all rights in the Property to their limited liability company, Grace Gable Manoirs, LLC, once they had obtained approval to develop the condominiums.

The Natick Planning Board ("Board") is an elected board that oversees the approval of special permits, consistent with the Natick Zoning Bylaws. Defendants Theresa "Terri" Evans, Andrew Meyer, Julian Munnich, Glen Glater, and Peter Nottonson are members of the Board. Evans also serves as Chair of the Board.

The Natick Historical Commission ("Commission") is a ten-person body dedicated to the preservation and protection of places of historical and archaeological significance in Natick. Defendant Steve Evers has been the Chair of the Commission for approximately thirty years.

## II. The Historic Preservation Bylaw

Section III-J of the Natick Zoning Bylaws, titled "Historic Preservation," was adopted in 2014. See Dkt. 111-7 ("2014 Bylaw"). The 2014 Bylaw was meant to "encourage the preservation and continued use of buildings of historic or architectural significance" through adaptive re-use. Id. at 2. Approval for a historic preservation special permit is granted by the Board, which must determine whether the proposed project is "superior to a conventional site development" using the following criteria:

> 1. The proposed project substantially preserves the building or structure.
> 2. Determination that the development is not substantially more detrimental to abutting properties and neighborhood.
> 3. Appropriate use of materials and manner of construction.
> 4. Preservation of landscape features and scenic views.

Id. at 4. The 2014 Bylaw limited new construction to "10 percent of the interior habitable floor area or above grade gross volume of the historic building." Id.

In the fall of 2018, the Valentins began working closely with the Board to draft and sponsor an additional section to the 2014

Bylaw that would allow the Board to "consider an alternative preservation option for certain parcels." See Dkt. 115-22 at 5. ("New Bylaw"). The New Bylaw permitted redevelopment in the form of condominiums or other multifamily units, specifically allowing new construction up to "100 percent of the interior habitable floor area or above grade gross volume of the historic building" for existing structures, and 200 percent of the same for the replication of documented previous structures. Id. at 5-6.

On January 23, 2019, the Board sponsored the warrant article to adopt the New Bylaw by a 5-0 vote. On April 25, 2019, Natick's legislative body, called the "Town Meeting," overwhelmingly passed the New Bylaw. Before the vote, Chair Evans praised the bylaw for creating "additional incentives to preserve Natick's historic and architecturally significant resources, specifically through encouraging the preservation of 'estate properties'" and stated that the Board "now feel[s] comfortable with its application" to projects. Dkt. 115-21 at 4. The New Bylaw was codified as Section III-J.10 in the Natick Zoning Bylaws. See Dkt. 115-22 at 5-6.

## III. Opposition to the Valentins' Application

With the New Bylaw enacted, on August 28, 2019, the Valentins submitted their first application for a special permit ("First Application"). The Valentins proposed renovating the existing houses and building a new reproduction barn. They wanted to

construct a total of eleven condominium units, with underground parking and a swimming pool.

Town officials initially received the Project favorably. Back in 2018, the Commission had determined by unanimous vote that the Valentins' Property was of "architectural significance" to Natick and therefore "subject to the opportunities and obligations of the Historic Preservation by-law." Dkt. 115-26 at 3. In September 2019, after a detailed review of the Valentins' proposal, the Commission issued a letter stating their belief that "the proposed project will have great benefit to our local historic character and architecture by the preservation of the house and development of the reproduced buildings on the site." Dkt. 115-10 at 3-4.

However, residents in South Natick began to express their opposition to the Project. Upon learning about the Valentins' First Application, several South Natick neighbors created a website called www.stop50pleasant.org and an online petition collecting signatures and comments from residents who opposed the Project. See Dkt. 115-32. One resident commented on the petition: "The consequences to the surrounding single-family owned properties would be highly detrimental and completely out of character for our neighborhood." Id. at 8. Another wrote: "This proposal does not fit the character of the surrounding neighborhood and is [a] misuse of historic preservation zoning." Id. at 10. Yet another wrote: "[T]his would destroy the culture of the neighborhood!" Id.

Through letters and emails, Natick residents expressed their concerns about the Project, which included the size of the Project and the impact the Project would have on traffic, drainage, and the community. In an email to the Select Board, one resident wrote: "South Natick is not the place for urban sprawl." Dkt. 115-34 at 2. In a letter addressed to Chair Evans, another resident stated that the Project "should be more correctly called 'Block Buster'" and that it was "designed by the owner of [the Property] to profit from an otherwise bad business decision and in the process destroy a stable community." Dkt. 115-43 at 3; see also Dkt. 115-44 at 4 ("In my day this would be termed a BLOCKBUSTER project. Today it is a NEIGHBORHOOD BUSTER."). Another resident authored a similar email predicting that the Project would result in "a big drop in the sale price of any house . . . due to the completely uncharacteristic appearance of this project." Dkt. 115-45 at 2.

## IV. Board Meetings and Hearings

Over the course of the next year, the Valentins' Project was discussed and debated at several public Board meetings and hearings. The Valentins continually revised and updated their application based on feedback from town officials.

At a Board meeting in November 2019, the Valentins presented a revised proposal that eliminated the carriage house and swimming pool from the design. At the meeting, several residents spoke in opposition to the Project. See Dkt. 115-56. Board member Glater

noted to the residents: "[I]f you don't like the bylaw, [] any of you as residents of the town can submit a warrant article to Town Meeting, go through that process and attempt to get the bylaw changed." Id. at 26.

At a Board meeting in January 2020, Glater stated: "[I]f I lived in any of those houses around there, and I know the room is full of people that do . . . but if I lived in a house next door, and that barn was going up . . . I would be crying every night." Dkt. 115-62 at 25. The Valentins withdrew their First Application and submitted a new application on February 20, 2020 ("Second Application"). See Dkt. 115-73 at 4. The Second Application proposed eleven condominium units: eight in the main house and three in the reproduction barn.

The Valentins testified that around this time, as they were leaving a Board meeting, one of their neighbors accused them of "monkeying" with the New Bylaw. See Dkt. 115-3 at 13.

The Valentins wrote a letter to the Board expressing their disappointment at how the Project was being met with "unprecedented opposition," and how their proposal was receiving more scrutiny than another recent historic preservation project. See Dkt. 115-50 at 3-5. In reaction to this letter, Board member Meyer e-mailed a member of the Select Board, writing: "Lord help us -- we are going to end up with a [Black Lives Matter] issue at the Natick planning board. And the fact is -- we just don't want to approve

a building that overwhelms the little houses in the immediate area. Yeesh." Id. at 2.

At a hearing in June 2020, the Valentins presented a revised proposal featuring nine condominiums and an underground garage. The Board, the Commission, and the Design Review Board continued to express reservations about the Project. The Board requested three-dimensional representations of the Project to help its "members understand whether the building would have adverse impacts on the character of the neighborhood." Dkt. 115-79 at 6. At a subsequent hearing in July, one resident commented that the project would impact neighbors "who are very hard-working people who have been taxpayers for many years." Dkt. 111-21 at 1:06-1:08; see also Dkt. 115-46 at 8.

At a Board meeting in September 2020, one of the town residents said: "The reason I have a problem with the [New Bylaw] is that . . . as you know, the suburbs are under attack and this is [] an attack on South Natick." Dkt. 115-49 at 14. Chair Evans thanked the resident for his comment. After the Valentins' civil rights lawyer, the President of Natick Black Lives Matter, and Linda Valentin all criticized the use of such language, Chair Evans remarked: "I will say just briefly, to a comment made earlier, I actually had the same, the sort of reaction to the phrase that, 'The suburbs are under attack,' [] because I think that has become something of a dog whistle in this very fr[aught] time [] and I

would ask anyone speaking going forward [] to be careful in the language you use." Id. at 17.

On August 12, 2020, the Board voted to deny the Valentins' Second Application without prejudice. See Dkt. 115-83 at 11. In October, the Valentins again submitted revised plans to the Board, reducing the total number of condominium units to seven and replacing the underground parking with individual garages for each unit. See Dkt. 115-81. At last, on November 4, 2020, the Board voted 4-1 to approve the massing, scale, and layout of the Project. However, the Board declined to grant the Valentins a special permit with conditions subsequent.

In addition to the public Board meetings, the Board appointed two of its members to a working group to assist the Valentins in their application process.

## V. Repeal of the New Bylaw

Amid all these meetings and working group sessions, the Board began raising questions about the New Bylaw and its application to the Valentins' Project. The Board sought the opinion of Town Counsel in interpreting the New Bylaw as it related to the Valentins' Project. In December 2019, the Town Counsel issued an opinion addressing various questions the Board had, ultimately concluding that the Valentins' Project proposal conformed with the size requirements outlined in the New Bylaw. See Dkt. 115-59 ("First Town Counsel Opinion"). Board members Meyer and Munnich

rejected the Town Counsel's opinion, even though the Board "followed town counsel's opinion regularly." Dkt. 115-23 at 10.

In early 2020, a group of neighbors introduced a citizen's petition to repeal the New Bylaw. Commission Chair Evers told one of the neighbors that he "would gladly participate in a proposed re-do" of the New Bylaw, since the "experience of [the Valentins'] application would seem to warrant a significant revision." Dkt. 115-67 at 2. Evers also sent a letter on behalf of the Commission supporting "all warrant articles presented by neighbors of [the Property] to reform the existing 'Historic Preservation' by-law." Dkt. 115-72 at 3.

The Valentins became worried that their application would be affected by a repeal of the New Bylaw. However, James Freas, Director of Community and Economic Development, emailed Linda Valentin and others in February 2020, writing: "Spoke with Town Counsel this morning and confirmed that an application received before the date of first notice of a pending zoning change is considered under the existing zoning." Dkt. 115-70 at 2. In addition, Chair Evans informed the Valentins at Board meetings that the repeal of the New Bylaw would not adversely affect their active application before the Board. See Dkt. 115-85 at 5.

On September 9, 2020, the Board held a hearing to discuss the potential repeal of the New Bylaw. The Board voted not to support the repeal. Nonetheless, on November 10, 2020, Town Meeting

repealed the New Bylaw. During the Town Meeting vote, only one of the five Board members voted against the repeal.

Following the repeal of the New Bylaw, the Valentins' attorney sought the opinion of Town Counsel with respect to what impact the repeal would have on the Valentins' application. On November 29, 2020, the Town Counsel issued an opinion ("Second Town Counsel Opinion") recommending that the Board deny the Valentins' application in light of the repeal. See Dkt. 115-98 at 4 ("While there is an equity argument that an application far into the process should be protected from subsequent zoning bylaw changes . . . the more favored argument appears to be that without a permit in hand prior to the notice of the Planning Board hearing on proposed Bylaw changes, an applicant has no vested rights, and no protection from those changes."). Consistent with the Town Counsel's recommendation, on December 2, 2020, the Board denied the Valentins' Second Application on the grounds that the New Bylaw had been repealed.

**VI. The Church Project**

The application for the Sacred Heart Church project (the "Church Project") was submitted pursuant to the 2014 Bylaw, which existed before the New Bylaw. The two White developers of the Church Project submitted a plan that would renovate and preserve two buildings: a church and a rectory. Before submitting their application, one of the developers, Randy Johnson, first worked

with the Board to secure approval of the 2014 Bylaw. The 2014 Bylaw permitted new construction up to "10 percent of the interior habitable floor area or above grade gross volume of the historic building" for existing structures. Dkt. 111-7 at 4. With the 2014 Bylaw enacted, the developers submitted their application for the Church Project, which they supported with hand-drawn plans. After ten hearings held over six months, the Church Project application was approved and granted a special permit subject to conditions subsequent. See Dkt. 115-100.

## VII. Procedural History

The Valentins filed this action in May 2021 alleging five counts against Defendants. See Dkt. 1. Following the Court's ruling on Defendants' motion to dismiss, three counts remain: the Fair Housing Act claims (Count I), the Equal Protection claim (Count II), and the Substantive Due Process claim (Count III). See Valentin, 633 F. Supp. 3d at 376-77 (dismissing procedural due process and Massachusetts Civil Rights Act claims).

In the midst of this litigation, on February 15, 2023, the Board voted 4-1 to grant the Valentins a special permit for their Project, now scaled down to a total of five condominiums (three in the main house and two in the carriage house) with no underground parking. See Dkt. 111-31.

Defendants now seek summary judgment on the remaining claims. See Dkt. 108. Following summary judgment briefing, and after the

Court held a hearing, the parties stipulated to the dismissal of claims against Defendants Evans, Meyer, Munnich, Glater, Nottonson, and Evers in their individual capacities. See Dkt. 137. Thus, the Court need not address the parties' arguments related to quasi-judicial, legislative, or qualified immunity, since those defenses are now moot.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists where the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court must view the record in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

## DISCUSSION

### I. Fair Housing Act Claims

The Valentins bring claims under 42 U.S.C. §§ 3604 and 3617 of the Fair Housing Act ("FHA").

**A. Section 3604**

Section 3604 of the FHA prohibits discrimination in housing based on race, color, and national origin. See 42 U.S.C. § 3604. The FHA "specifically targets the discriminatory use of zoning laws." Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo, 988 F.2d 252, 257 n.6 (1st Cir. 1993). To prove a violation of the FHA, a plaintiff must show either discriminatory intent or a disparate impact. See Macone v. Town of Wakefield, 277 F.3d 1, 5 (1st Cir. 2002).

The Valentins' FHA claim is evaluated under Title VII's three-stage McDonnell Douglas test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). The burden-shifting framework involves three steps: (1) "the plaintiff must first establish a prima facie case of discrimination" and "[i]f he succeeds, an inference of discrimination arises"; (2) the defendant then must "produce evidence that the challenged . . . action was taken for a legitimate, non-discriminatory reason"; and (3) the burden returns to the plaintiff to prove by a preponderance of the evidence that the "proffered reason is pretextual and that the actual reason for the adverse . . . action is discriminatory." Ahmed v. Johnson, 752 F.3d 490, 495-96 (1st Cir. 2014).

For the first step, the parties do not dispute that the Valentins have established a prima facie case of discrimination. For the second step, Defendants have produced evidence showing

that the size of the Project was a "legitimate, nondiscriminatory reason" for the repeal of the New Bylaw and subsequent denial of the Valentins' application. Id. at 496. The record is replete with statements from neighbors and town officials expressing concerns about the size of the Project. See, e.g., Dkt. 111-20 at 8 (Board member remarking during public meeting that "the neighbors are unanimously opposed to the scope, size, and scale of the project"); Dkt. 115-50 at 2 (Board member e-mail stating: "[W]e are going to end up with a BLM issue at the Natick planning board. And the fact is -- we just don't want to approve a building that overwhelms the little houses in the immediate area."). The Valentins responded to these size concerns by reducing the scale of their Project several times throughout the review process. See, e.g., Dkt. 114-2 at 22 ("[T]he Valentins submitted revised plans to the Planning Board reducing the total number of condominium units to seven and eliminating the underground parking and instead proposed individual garages for each unit.").

The analysis thus reaches the third step of the McDonnell Douglas test. The question at the third step is whether Plaintiffs have adduced sufficient evidence to permit a reasonable jury to find that the Valentins' "race, color and national origin (and those of the prospective residents of the condominium units)" played a motivating factor in Defendants' delay and denial of the Valentins' permit application. Dkt. 1 at 3. "[F]or discrimination

against a protected group to qualify as a motivating factor, the decision-maker need not personally feel animus toward the group." S. Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 102 (D. Mass. 2010) ("SMOC"). Instead, it is sufficient if a town official's purpose was to "effectuate the desires of its private citizens, and that improper considerations were a motivating factor behind those desires." Id. (cleaned up). Thus, the third step here is further broken down into two crucial inquiries: (1) whether the public opposition to the Project was animated by racial bias and (2) whether Defendants improperly acquiesced to that racial bias.

With respect to the first inquiry, Plaintiffs have proffered sufficient evidence for a reasonable jury to find that residents of Natick were opposed to the Project, in part, by racial bias. Defendants argue that the Valentins' proof rests on "a handful of allegedly racist emails from neighbors" that are not "representative of the entire citizenry of the Town of Natick." Dkt. 109 at 16. But examination of the record reveals more than merely a "handful" of emails. For example, residents commenting on the online petition stated that the Project was "completely out of character" and "would destroy the culture of the neighborhood." Dkt. 115-32 at 8, 10. Another resident expressed concerns that the Project would cause "urban sprawl." Dkt. 115-34 at 2. The Project was called both a "Block Buster" and "an attack" on the suburbs of

South Natick. Dkt. 115-43 at 3; Dkt. 115-49 at 14. The Project was criticized by a resident as negatively impacting neighbors "who are very hard-working people who have been taxpayers for many years." Dkt. 111-21 at 1:06-1:08. Yet another resident accused the Valentins of "monkeying" with the New Bylaw. See Dkt. 115-3 at 13.

Although some of these statements could be interpreted as opposition based on the size of the Project, when viewed in the light most favorable to the Valentins, these statements could also be perceived as expressions of racial bias against Black individuals. See Mhany Mgmt., Inc. v. Cnty. of Nassau, 819 F.3d 581, 609 (2d Cir. 2016) ("Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. Racially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.") (cleaned up) (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081-82 (3d Cir. 1996); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1085 (8th Cir. 2010)).

With respect to the second inquiry, Plaintiffs have also proffered sufficient evidence for a reasonable jury to find that Defendants gave effect to the racial bias of its residents. Analyzing the factors set forth in Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977), Plaintiffs describe the historical background behind the Defendants' decision, the

specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, and the administrative history -- all of which, they argue, demonstrate Defendants' acquiescence and discriminatory intent. See Dkt. 114 at 19-25. Notable is the evidence of Defendants' departures from procedural norms. The Board conducted twenty-nine meetings and fourteen working group sessions over the course of sixteen months to evaluate the Valentins' application. In contrast, the Board only conducted between six to ten meetings for the other multifamily permit applications approved by the Board between 2013 and 2020. Another departure was the rejection of the First Town Counsel Opinion by at least two of the Board members, despite the fact that the opinion was favorable to the Project and the Board "[f]ollowed Town Counsel's opinion regularly." Dkt. 115-23 at 10. As for the Commission, the record shows that Chair Evers supported the residents in their efforts to repeal the New Bylaw. See, e.g., Dkt. 115-67 at 2; Dkt. 115-72 at 3. Thus, a jury could reasonably infer that both the Board and the Commission departed from normal procedures in acquiescence to the residents' racially-motivated opposition.

The Court concludes that the Valentins' proffered evidence raises material disputes of fact with respect to discriminatory intent that forecloses summary judgment. Accordingly, Defendants'

motion for summary judgment on Plaintiffs' § 3604 claim under the FHA is **DENIED**.

**B. Section 3617**

Section 3617 of the FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights granted under § 3604. 42 U.S.C. § 3617. To prevail, a plaintiff must show:

> (1) the plaintiff is a member of an FHA-protected class;
> (2) the plaintiff exercised a right protected by §§ 3603-06 of the FHA, or aided others in exercising such rights;
> (3) the defendants' conduct was at least partially motivated by intentional discrimination; and
> (4) the defendants' conduct constituted coercion, intimidation, threat, or interference on account of having exercised, aided, or encouraged others in exercising a right protected by the FHA.

SMOC, 752 F. Supp. 2d at 95.

Here, the first and second prongs are undisputed. For the third prong, as already explained above in the context of the § 3604 claim, a genuine dispute exists with respect to whether Defendants' conduct was at least partially motivated by intentional discrimination.

The inquiry under the fourth prong focuses on whether Defendants' conduct constituted "interference" with the Valentins' ability to exercise their rights under the FHA. One court has held that interference under § 3617 can encompass a "pattern of harassment, invidiously motivated." SMOC, 752 F. Supp. 2d at 104;

see also Revok v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 113 (3d Cir. 2017) ("Interference under Section 3617 may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment."). In general, the definition of interference "cannot be so broad as to prohibit any action whatsoever that in any way hinders a member of a protected class." Revok, 853 F.3d at 113 (cleaned up); Halprin v. Prairie Single Family Homes, 388 F.3d 327, 330 (7th Cir. 2004) ("[W]e do not think Congress wanted to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case.").

Here, Plaintiffs argue that Defendants engaged in harassment that interfered with the Valentins' rights protected under § 3604 of the FHA. As evidence of interference, Plaintiffs primarily point to Glater's and Ever's support and facilitation of the repeal of the New Bylaw, and Evan's reassurances that any repeal would not impact the Valentins' Project. However, no reasonable factfinder could conclude that these actions by town officials rise to the level of a "pattern of harassment, invidiously motivated" that would otherwise impose liability under § 3617. See Watters v. Homeowners' Assoc. at Preserve at Bridgewater, 48 F.4th 779, 787 (7th Cir. 2022) (finding interference under § 3617 because defendants' "repeated use of racist language is the quintessential example of interference that establishes a pattern of harassment, invidiously motivated" (cleaned up)).

Accordingly, Defendants' motion for summary judgment on the § 3617 claim under the FHA is **ALLOWED**.

## II. Equal Protection Claim

Plaintiffs allege that Defendants treated the Valentins, members of a suspect class, "in a manner which they have never treated other developers who have applied for special permits in Natick," in violation of their equal protection rights. Dkt. 1 at 31. To establish an equal protection claim, Plaintiffs "must allege facts indicating that, compared with others similarly situated, [they were] selectively treated based on an impermissible consideration (in this case, race)." Alston v. Spiegel, 988 F.3d 564, 574-75 (1st Cir. 2021). For the reasons stated above, the Valentins have presented sufficient evidence to support its claim of equal protection under a selective treatment theory. Defendants subjected the Valentins' application to forty-three meetings over sixteen months -- a much longer and more burdensome review process than that conducted for other applications. See Dkt. 114-1 at 30 ("The three other multifamily permit applications approved by the [Board] between 2013 and 2020 received, respectively, 6, 6, and 10 hearings prior to approval."). And whether Defendants' actions were a knowing response to racially-motivated neighborhood opposition is a factual issue that precludes summary judgment. See United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1224 (2d Cir. 1987) ("The Supreme Court has long held, in a variety of

circumstances, that a governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens.”).

Plaintiffs also allege an equal protection claim under a “class of one” theory, arguing that the Valentins have been impermissibly singled out for unfavorable treatment by Defendants. See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). A “class of one” claim is cognizable when a “plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.” Id. To determine if there is an adequate comparator, “plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.” Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)). “[T]he proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile.” Id. (citing Perkins v. Brigham & Women’s Hosp., 78 F.3d 747, 751 (1st Cir. 1996)).

Here, Plaintiffs have presented similarities between the Valentins’ Project and the Church Project. For example, both

properties are located in residentially zoned areas in South Natick: the Church Project is located within a "RSC" (residential single C) zoning district, while the Valentins' Property is located in a residential single family zoning district. Developers of both projects worked with the Board to draft sections for Natick's Historic Preservation Bylaw; each project involved the first application under the respective sections of that bylaw.

Nevertheless, Defendants are correct in pointing out that the size of the Valentins' Project is much larger than the Church Project, and that the Church Project proposed only minor changes to the church's exterior structure. The Church Project was approved pursuant to the 2014 Bylaw, which allowed new construction up to "10 percent of the interior habitable floor area or above grade gross volume of the historic building" for existing structures. In contrast, the Valentins' Project was approved under the New Bylaw, which permitted new construction up to "100 percent" for existing structures, and up to "200 percent" for replication of documented previous structures. Although "the applicable standard does not require that there be an exact correlation" between two comparators, due to the differences in size and bylaw provisions, no reasonable jury could find that the Church Project was an adequate comparator to support a "class of one" claim. Cordi-Allen, 494 F.3d at 251.

Accordingly, Defendants' motion for summary judgment on the "class of one" Equal Protection claim is **ALLOWED**. Defendants' motion for summary judgment on the "selective treatment" Equal Protection claim is **DENIED**.

## III. Substantive Due Process Claim

The Valentins contend that Defendants have violated their substantive due process rights by acquiescing to the racially-motivated campaign of the Natick residents and preventing the Valentins from developing their Property. Defendants argue that they are entitled to summary judgment on this claim on two grounds. First, Defendants assert that Plaintiffs have failed to establish that they had a sufficient property interest. Second, Defendants contend that Plaintiffs have failed to establish that the delay in the permitting process was due to racial animus, and therefore Defendants' actions do not satisfy the shock-the-conscience test.

First, Defendants argue that the substantive due process claim fails because the Valentins had no property interest or "legitimate claim of entitlement" to a special permit. See Dkt. 109 at 23-24 (citing Macone, 277 F.3d at 9). Under the Natick Zoning Bylaws, the Board has considerable discretion over whether to grant a Historic Preservation special permit or not. The Valentins cannot demonstrate a property interest solely based on the Board's prior enthusiasm or approval for their Project. See Macone, 277 F.3d at 9 (finding that plaintiffs could not "demonstrate a property

interest in the Board's prior approval" of a project since the "record contain[ed] nothing but evidence that local approval of [the] projects is entirely discretionary").

The First Circuit has held that where plaintiffs "fall far short of showing any cognizable property interest" to support a substantive due process claim, courts have still "left the door open in truly horrendous situations." Macone, 277 F.3d at 9; see also Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991) ("[I]t is not required that the plaintiffs prove a violation of a specific liberty or property interest; however, the state's conduct must be such that it 'shocks the conscience.'"). Thus, the Valentins' lack of property interest is not fatal to their substantive due process claim if Defendants' conduct was sufficiently conscience-shocking.

"[I]n order to shock the conscience, conduct must at the very least be extreme and outrageous, or, put another way, truly outrageous, uncivilized, and intolerable." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (cleaned up). "There is no scientifically precise formula for determining whether executive action is -- or is not -- sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment." Id. As a general matter, "[t]he due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes" because in "the vast majority of instances, local and state agencies and courts are closer to

the situation and better equipped to provide relief." Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992). The First Circuit has only "left the door slightly ajar for federal relief in truly horrendous situations." Id.

Despite this demanding standard, the First Circuit has suggested that a planning dispute "tainted with fundamental procedural irregularity, racial animus, or the like" may shock the conscience. Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982); see also Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48, 69 (D. Mass. 2013). As discussed above in the context of the FHA claims, Plaintiffs have presented evidence raising genuine issues of material fact as to whether Defendants' review process for the Valentins' application was tainted by racial animus sufficient to shock the conscience. See Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007) (denying summary judgment based on sufficient evidence that town board's decision was tainted by racial animus). A reasonable jury could find that racial bias infected the Board's decision-making based on the abrupt change in the Board's and the Commission's treatment of the Valentins' application after town opposition became public and widespread.

Defendants contend that many of the Board members believed the Project was too large, and that it was not improper for the

Board to consider the same concerns expressed by the neighbors. However, as explained by the Second Circuit:

> [A] plaintiff seeking to hold a municipality or public officials liable based on the actions of a public body may prevail -- and, at the very least, should survive summary judgment -- even when the plaintiff has not presented evidence that a majority of the individual members of that body acted with unconstitutional motives. In our view, even if a plaintiff does not demonstrate directly that a majority of a public body acted with unconstitutional motives, he should be permitted to take his case to trial if he proffers evidence that strongly indicates that discrimination was a significant reason for a public body's actions and the defendant body, or its members, fails to counter that evidence with its own clear evidence that a majority acted with permissible motives.

Cine SK8, 507 F.3d at 786. The Valentins have sufficiently distinguished their case from the "run of the mill dispute between a developer and a town planning agency." Creative Env'ts, 680 F.2d at 833. Accordingly, Defendants' motion for summary judgment on the Substantive Due Process claim is **DENIED**.

**ORDER**

For the foregoing reasons, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 108) with respect to Plaintiffs' claim under Section 3617 of the FHA and their "class of one" Equal Protection claim. The Court **DENIES** Defendants' motion as to all other claims.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge